BIEC INTERNATIONAL, INC., Plaintiff,

v.

GLOBAL STEEL SERVICES, LTD., James L. Forand, Jr., Angelo R. Borzillo, James J. Connolly, and Paik W. Shin, Defendants.

No. 92–0108.

United States District Court,
E.D. Pennsylvania.

May 5, 1992.

Gregory B. Jordan, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for plaintiff.

Joseph Wolfson, Stevens & Lee, Reading, Pa., for defendants.

## DECISION AND ORDER

VAN ANTWERPEN, District Judge.

This major non-jury matter is before us on a motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65. At issue in this case is each parties' right to provide world steel-makers with information and services related to 55% aluminum-zinc coated sheet steel. The coating is undertaken to protect the steel. For more than a decade, Plaintiff BIEC International, Inc. has successfully licensed technology related to 55% aluminum-zinc coatings to sophisticated steel companies throughout the world. BIEC International, Inc. and its licensees have invested millions of dollars in the technology and the licensing program, and BIEC licensees to date are the only producers of 55% aluminum-zinc coated sheet steel in the world.

The individual Defendants—Forand, Borzillo, Shin, and Connolly—were longtime executives at BIEC International, Inc. until July 28, 1991 when they were terminated without cause. Forand, Borzillo, and Shin, together with Connolly on a part-time consulting basis, have started their own company, Defendant Global Steel Services, Ltd., to provide technical services in the area of 55% aluminum-zinc coatings. BIEC International, Inc. seeks to enjoin the Defendants from competing against it in this area. More specifically, BIEC International, Inc. seeks to enjoin the Defendants from using BIEC International's trade secrets, trademark, and logo and from conspiring to interfere with Plaintiff's contractual relations and corporate opportunities.

In response to this motion, Defendants have filed a Motion to Dismiss Plaintiff's trademark claim for failure to state a claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). While we agree that the gravamen of the present action lies in Plaintiff's state law claims for trade secret

protection, we find, none-the-less, that Plaintiff has plead sufficient facts to withstand a motion to dismiss, and we proceed with Plaintiff's Motion for a Preliminary Injunction.

This Court has original jurisdiction over the federal trademark claims pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and supplemental jurisdiction over the state law claims for trade secret protection, tortious interference with contractual relations, diversion of corporate opportunity, and civil conspiracy pursuant to 28 U.S.C. §§ 1338 and 1367.

In light of the highly sensitive nature of much of the evidence in this case, this Court entered a Protective Order on January 15, 1992 requiring that all sensitive testimony be presented in camera and that all sensitive filings be made under seal. Never-the-less, because of the numerous and novel issues presented in this case, this Court feels compelled to publish its Decision and Order. Accordingly, all information which this Court finds to be particularly sensitive to the parties involved has been included in an unpublished Confidential Appendix and filed under seal.[1]

Extensive hearings on Plaintiff's Motion for a Preliminary Injunction were held in Easton, Pennsylvania from February 12, 1992 through February 27, 1992. In light of the highly technical and voluminous nature of these proceedings (the record in this case is comprised of three-weeks of highly technical testimony and approximately 500, equally voluminous, exhibits for a total of approximately 30,000 pages), this Court ordered, on February 27, 1992, that the parties submit exhaustive post-trial submissions to be fully annotated to the record in lieu of closing arguments. The Court further ordered that the parties would be limited at this stage to the issues and facts put forth in these submissions. Over the course of one month, each party was given an opportunity to submit proposed findings of fact, answers to his opponent's proposed findings of fact, and rebuttal to his opponent's answers, as well as one brief in support of its position and one rebuttal brief.[2] Having fully considered the voluminous testimony and exhibits presented at this three-week hearing, the post-trial submissions, and the arguments of counsel, we make the following findings of fact and state the following conclusions of law, pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

### I. THE PARTIES AND KEY WITNESSES.

1. Plaintiff BIEC International, Inc. ("BIEC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 3400 Bath Pike, Bethlehem, Pennsylvania 10817. (Joint Stipulation—Pl.'s Proposed Finding number 1.[3]) BIEC licenses information and services related to a corrosion resistant aluminum-zinc coating for sheet steel that is applied by a hot-dip process ("55% aluminum-zinc coating"). GALVALUME is the trademark used by BIEC and its licensees for sheet steel coated with 55% aluminum-zinc. (2/12/92 Tr. at 39–40, 45, Wechsler Direct; 2/20/92 Tr. at 77, Borzillo Direct; Pl.'s Ex. 91 at 1; Defs.' Exs. 147, 151.)

2. BIEC is owned by Australian steel conglomerate Broken Hill Proprietary Company, Limited ("Broken Hill Proprietary").

---

1. Since we have only cited to exhibits containing proprietary information, rather than setting forth the specific formulas and parameters contained within those exhibits, we believe our technical findings are broad enough not to disclose any proprietary information, and as such, none of our technical findings have been filed under seal.

2. In light of the voluminous and highly technical nature of this case, the Court granted Global Steel Services and the individual Defendants' permission to file the final two submissions required by this Court's Order of February 27, 1992—Defendants' Rebuttal to Plaintiff's Response to Proposed Findings of Fact and Defendants' Post–Trial Rebuttal Memorandum of Law in Opposition to Motion for Preliminary Injunction—by April 20, 1992.

3. This finding of fact was proposed by Plaintiff and admitted by Defendants. All subsequent proposed findings of fact to which the opposing party has agreed will be designated—"Joint Stipulation."

(2/12/92 Tr. at 88–89, Wechsler, Direct.) Broken Hill Proprietary acquired the business of licensing technical information and services relating to 55% aluminum-zinc coating in 1986 when it purchased Bethlehem International Engineering Corporation ("Bethlehem International"), a wholly-owned subsidiary of Bethlehem Steel Corporation ("Bethlehem Steel"). (2/12/92 Tr. at 88–89, Wechsler Direct.) Bethlehem International's name was then changed to BIEC International, Inc. (Joint Stipulation—Pl.'s Proposed Finding number 29.) As part of the purchase, Broken Hill Proprietary and its subsidiary also acquired certain assets from Bethlehem Steel. (Pl.'s Ex. 89.) Bethlehem Steel began licensing technical information and services relating to 55% aluminum-zinc coating in 1974. (2/26/92 Tr. at 40, Forand Direct.)

3. Defendant Global Steel Services, Ltd. ("Global Steel Services") was incorporated in July, 1991 by three former BIEC senior employees, James L. Forand, Jr., Angelo R. Borzillo, and Paik W. Shin who received letters of termination from BIEC on June 28, 1991. (Pl.'s Ex. 2; Defs.' Exs. 83, 84, 85, 86.) Global Steel Services was formed primarily to provide technical information and services relating to 55% aluminum-zinc coating. (2/25/92 Tr. at 122, Shin Direct; 2/26/92 Tr. at 67, Forand Direct.)

4. Defendant James L. Forand, Jr. ("Forand") is a Pennsylvania citizen residing at 4450 Phillip Street, Whitehall, Pennsylvania 18052. Forand was a Director of BIEC and was its President from August 1986 through July 28, 1991 when he was terminated without cause. (2/26/92 Tr. at 111, 124–125, Forand Cross; Pl.'s Ex. 164 at 327–28.) Forand is currently a shareholder, director, employee and the President of Global Steel Services. (2/27/92 Tr. at 10, Forand Cross; Pl.'s Ex. 164 at 78.) Forand became involved with 55% aluminum-zinc coatings in the late 1960's as a research engineer with Bethlehem Steel. (2/26/92 Tr. at 35, Forand Direct.) In the early 1970's, Forand was responsible for the technical development of a 55% aluminum-zinc product called DURASKIN which was a derivative of GALVALUME. (2/26/92 Tr. at 36, Forand Direct.) Forand headed the GALVALUME project team from 1975–77 which was responsible for marketing 55% aluminum-zinc coated sheet steel in the United States. (2/26/92 Tr. at 38, Forand Direct.) While at Bethlehem Steel, Bethlehem International and later BIEC, Forand was primarily responsible for managing the worldwide 55% aluminum-zinc coating licensing program. (2/25/92 Tr. at 124, Shin Direct; 2/26/92 Tr. at 38–45, Forand Direct.)

5. Defendant Angelo R. Borzillo ("Borzillo") is a Pennsylvania citizen residing at 3014 Taft Road, Norristown, Pennsylvania 19403. Borzillo was the Vice President in charge of technology of BIEC from August 1986 through July 28, 1991 when he was terminated without cause. (2/14/92 Tr. at 80, Borzillo Direct; Pl.'s Ex. 175 at 349–50.) Borzillo is currently a shareholder, director, employee and the Chairman of Global Steel Services. (2/14/92 Tr. at 80, Borzillo Direct; Pl.'s Ex. 175 at 11.) In the early 1960's at Bethlehem Steel, Borzillo directed the research effort of applying an alloy-coating combination of aluminum and zinc on sheet steel. (2/19/92 Tr. at 11, Borzillo Direct.) Borzillo co-invented and co-patented the process for aluminum-zinc coating of sheet steel and the product that results from that process. (Defs.' Exs. 147, 151.) Borzillo has been intimately involved in the development, marketing and production of 55% aluminum-zinc coated sheet steel and consequent worldwide licensing effort for the past thirty years. (2/19/92 Tr. at 39, Borzillo Direct.) Borzillo is commonly referred to as the "Godfather of GALVALUME." (2/25/92 Tr. at 124, Shin Direct.) From 1962 to the present, other than a two-year period of 1967 and 1968, Borzillo has worked exclusively with aluminum-zinc coatings. (2/19/92 Tr. at 39, Borzillo Direct.)

6. Defendant Paik W. Shin ("Shin") is a Pennsylvania citizen residing at 2626 Heckmans Lane, Coopersburg, Pennsylvania 18036. Shin was in charge of sales and servicing of the Far East and Asia for BIEC from August 1986 through July 28, 1991 when he was terminated without cause. (2/25/92 Tr. at 69–70, Shin Direct;

Pl.'s Ex. 165 at 283–87.) Shin is currently a shareholder, director, employee and the Treasurer of Global Steel Services. (2/25/92 Tr. at 182, Shin Direct; Pl.'s Ex. 165 at 46.) Shin began working with 55% aluminum-zinc coating in the early 1970's. He helped develop appropriate post annealing cycles for DURASKIN. (2/25/92 Tr. at 60–62, 69–70, Shin Direct.) In the late 1970's, he co-patented annealing practices to improve the formability of 55% aluminum-zinc coated sheet steel. (2/25/92 Tr. at 63, Shin Direct; Defs.' Ex. 248.) After promoting the use of 55% aluminum-zinc coated sheet steel to the automotive industry in the United States and to steelmakers in Korea from 1977–1980, Shin began working at Bethlehem International in 1982. (2/25/92 Tr. at 63, Shin Direct.) From 1982 to June 28, 1991, Shin directed the marketing of 55% aluminum-zinc technology in the Far East for Bethlehem International and its successor, BIEC. (2/25/92 Tr. at 65–70, Shin Direct.)

7. Defendant James J. Connolly ("Connolly") is a Maryland citizen residing at 1111 Green Acre Road, Towson, Maryland 21204. Connolly was in charge of operations for BIEC from August 1986 through July 28, 1991 when he was terminated without cause. (Pl.'s Exs. 59, 163 at 36–38.) Connolly is retired and has never performed any services for Global Steel Services. Connolly has, however, been identified as a possible consultant for Global Steel Services. (Pl.'s Ex. 2.)

8. Larry Caldwell ("Caldwell") was associated with BIEC as a contract consultant from late 1984, when he retired from Bethlehem Steel, through July 30, 1991, when he ceased his affiliation with BIEC and began to consult with Global Steel Services. During his service as a contract consultant with BIEC, Caldwell collected more than $325,000 in salary and bonuses and was involved in BIEC's technology transfers to licensees, line start-ups by licensees and technical problem-solving for licensees. (Joint Stipulation—Pl.'s Proposed Finding number 38.) As an employee of Bethlehem Steel and a technical consultant of BIEC, Caldwell was involved in nineteen out of twenty-one technology transfers to licensees between January 1979 and June 1991. (2/24/92 Tr. at 20, Caldwell Direct.)

9. Richard L. Wechsler ("Wechsler") is the current President of BIEC. He began working for Bethlehem International in 1980 as a sales manager, and he was named general manager of sales in 1984–85 where he was primarily responsible for licensing the aluminum-zinc technology. Prior to 1980, Wechsler had no experience with 55% aluminum-zinc or 55% aluminum-zinc services. (2/12/92 Tr. at 36, 40–41, Wechsler Direct.)

10. Noel Doyle ("Doyle") is an employee of Broken Hill Proprietary and the person to whom BIEC's president reports. (2/14/92 Tr. at 59, Wechsler Cross; 2/26/92 Tr. at 49, Forand Direct.) Doyle was Forand's immediate superior prior to termination. (2/26/92 Tr. at 49, Forand Direct.) Doyle and Wechsler have regular contact that varies from once a day to once a month. (2/14/92 Tr. at 59, Wechsler Cross.) In 1986, Doyle was the General Manager of International Business in the Coated Products Division of Broken Hill Proprietary. (2/26/92 Tr. at 49, Forand Direct.) He has been a director of BIEC since its inception in 1986. (2/26/92 Tr. at 49, Forand Direct.)

11. The individual Defendants in this cause of action are the same four individuals (Forand, Borzillo, Shin, and Connolly) who are the plaintiffs in an action pending in the Northampton County Court of Common Pleas filed against BIEC and Broken Hill Proprietary in late November 1991 for damages arising from an alleged breach of their employment agreements. (2/25/92 Tr. at 120, Shin Direct.) BIEC filed this action on January 8, 1992.

II. THE ORIGINAL DEVELOPMENT OF 55% ALUMINUM–ZINC COATING.

12. The genesis of some of the 55% aluminum-zinc technology at issue was Bethlehem Steel, which developed, tested, refined and produced a 55% aluminum-zinc alloy coating for sheet steel in the 1960's

and 1970's. (Joint Stipulation—Pl.'s Proposed Finding number 9.)

13. 55% aluminum-zinc coated sheet steel began as a research project to improve the long term corrosion resistance of steel. (2/19/92 Tr. at 8, Borzillo Direct.)

14. Coating sheet steel with zinc (called "galvanizing") provides galvanic or sacrificial protection (electrochemical protection to the steel—the zinc sacrifices itself to protect the steel) but over time the coating sacrifices and consumes itself and the protection ceases. (Joint Stipulation—Defs.' Proposed Finding number 12.)

15. Coating steel with an aluminum coating ("aluminizing") was found to provide the steel with a remarkable long-term (twenty year) protection against corrosion, while lacking the galvanic or sacrificial protection of zinc coatings. (2/19/92 Tr. at 8, Borzillo Direct.)

16. When Bethlehem Steel's experimentation with aluminum-zinc coatings for sheet steel began, galvanizing was a very old and standard practice. The first hot-dip galvanized sheets were made somewhere around 1830 to 1840 and the continuous process of coating sheet steel with zinc began in the late 1930's and early 1940's. (Joint Stipulation—Defs.' Proposed Finding number 14.)

17. The Bethlehem Steel hot-dip coating project to develop a protective coating that combined the benefits of aluminized and galvanized coatings was directed by Borzillo in the early 1960's. (2/19/92 Tr. at 10–11, Borzillo Direct.)

18. The early testing of aluminum-zinc coatings resulted in a coated sheet steel product that was useless. However, with the addition of silicon to the coating bath, a workable product resulted and experimentation began with percentages of aluminum ranging from 20% to 75%. The aluminum-zinc alloy coated sheet steel demonstrated remarkable resistance to corrosion in early laboratory tests. (2/19/92 Tr. at 14–17, Borzillo Direct.)

19. With the results of early tests, a full range of aluminum-zinc coatings were applied on small coils of sheet on a continuous pilot line. The operator of the pilot line during this program was Larry Caldwell. Coatings ranging between 1% and 70% aluminum were applied on the pilot line. (Joint Stipulation—Defs.' Proposed Finding number 17.)

20. Samples from the aluminum-zinc pilot line program were evaluated and compared to conventional galvanized and aluminum coatings. (2/19/92 Tr. at 22, Borzillo Direct.)

21. Samples which were produced on the pilot line were tested by Bethlehem Steel to judge, among other things, the corrosion resistance, paintability, weldability and solderability of the coatings. (Joint Stipulation—Defs.' Proposed Finding number 19.)

22. The pilot line samples were also subjected to extensive corrosion testing at various Bethlehem Steel sites over a twenty (20) year period. (Joint Stipulation—Defs.' Proposed Finding number 20.)

23. The results of the corrosion testing described in Finding 22 have been published through the years and the most recent test results publication is a joint paper by Dr. Herb Townsend (Bethlehem Steel research), Borzillo and David Barker. The paper was presented at the Rome Intergalva Conference in 1988. (2/19/92 Tr. at 21–15, Borzillo Direct; Defs.' Ex. 234 at SA 1/1—SA 1/11.)

24. Bethlehem Steel conducted a production trial of aluminum-zinc coating in 1965 at Bethlehem Steel's Sparrows Point plant in Maryland. (2/19/92 Tr. at 26, Borzillo Direct.)

25. After success on the pilot and production lines, patent applications were filed by Bethlehem Steel in the United States and worldwide. Patents were initially granted by the U.S. Patent Office relating to aluminum-zinc compositions ranging from 25% to 70% aluminum in the coating bath. (2/19/92 Tr. at 35, Borzillo Direct; Defs.' Exs. 151, 147.)

26. The 55% aluminum-zinc composition was selected as the optimum composition in 1969. (2/19/92 Tr. at 41, Borzillo Direct.)

27. From 1969 to the present, the composition of the aluminum-zinc coating bath has not changed. The composition is approximately 55% aluminum, 43½% zinc and 1½% silicon. This composition was printed in Bethlehem Steel's promotional brochures and advertisements and communicated to those who were interested in buying the new 55% aluminum-zinc coated product. (2/19/92 Tr. at 41–42, Borzillo Direct.) Similarly, standard trade reference handbooks detail the bath composition. (Defs.' Ex. 230 at 348 [4].)

28. Bethlehem Steel produced good quality aluminum-zinc coated sheet steel in limited trials in 1970. (2/19/92 Tr. at 44–45, Borzillo Direct.)

29. In the early 1970's, Bethlehem Steel used the existing No. 3 galvanizing line at the Sparrows Point plant to produce 55% aluminum-zinc coated sheet steel. (2/19/92 Tr. at 47–48, Borzillo Direct.)

30. Currently, the No. 3 line at Sparrows Point is still used for the production of 55% aluminum-zinc coated sheet steel. (Joint Stipulation—Defs.' Proposed Finding number 39.)

31. Under the trademark GALVALUME, 55% aluminum-zinc coated sheet steel was ultimately brought to market by Bethlehem Steel in the mid–1970's. (2/19/92 Tr. at 46–47, Borzillo Direct; Pl.'s Ex. 175 at 311.)

32. The development and refinement of the 55% aluminum-zinc technology by Bethlehem Steel involved dozens of people within Bethlehem Steel and budgets in the millions of dollars. It was an important project within Bethlehem Steel and it was treated as a sensitive matter involving confidential information within Bethlehem Steel. (Joint Stipulation—Pl.'s Proposed Finding number 11.)

### III. THE LICENSING PROGRAM.

33. BIEC owns the trademark GALVALUME for sheet steel coated 55% aluminum-zinc. (2/27/92 Tr. at 24, Forand Cross; Pl.'s Ex. 211.) The trademark was first introduced to the market during the mid–1970's and first registered in 1991. The GALVALUME trademark is registered by BIEC and its licensees in twenty-one countries, including the United States.[5] (2/12/92 Tr. at 76, Wechsler Direct; Pl.'s Ex. 63.)

34. Beginning in the mid 1970's, Bethlehem Steel began a worldwide licensing program with respect to its GALVALUME trademark and the 55% aluminum-zinc technology. John Lysaght, Australia, now part of Broken Hill Proprietary, was the first licensee pursuant to an agreement entered into in 1974. Caldwell and Connolly started up the John Lysaght 55% aluminum-zinc line. (2/26/92 Tr. at 39–40, Forand Direct; 2/19/92 Tr. at 54–56, Borzillo Direct; Pl.'s Ex. 87 at 99–100.)

35. After the John Lysaght licensing, Bethlehem Steel decided, in 1975, to attempt a full scale licensing effort to worldwide steel-makers. (2/19/92 Tr. at 54–55, Borzillo Direct.) Major steel companies with existing galvanizing lines were targeted for licensing because the 55% aluminum-zinc process was readily adaptable to existing galvanizing lines. (2/19/92 Tr. at 55, Borzillo Direct.)

36. The committee formed to begin marketing 55% aluminum-zinc services was headed by Mr. Joseph O'Keefe, manager of patents at Bethlehem Steel, and included Forand and Borzillo. (2/19/92 Tr. at 56, Borzillo Direct.) The Bethlehem Steel licensing committee existed from 1975 to about mid–1979. (2/19/92 Tr. at 56, Borzillo Direct.)

---

**4.** Although not included on the transcribed list of exhibits received into evidence, Defs.' Ex. 230 was received by the Court without objection from BIEC. (2/26/92 Tr. at 30.)

**5.** For the sake of brevity, BIEC did not introduce at trial all of its worldwide registrations of the GALVALUME trademark. Rather, BIEC relied on Pl.'s Ex. 63 as a summary of those countries in which BIEC has registered the GALVALUME trademark for its licensees. Having been given an opportunity to object at trial and having failed to object to the accuracy of this summary at that time, Global Steel Services has waived its present objection that BIEC is not a worldwide holder of the GALVALUME trademark. (2/12/92 Tr. at 76, Wechsler Direct.)

37. Bethlehem Steel formed their wholly-owned subsidiary, Bethlehem International, in 1979, to manage and operate the licensing of Bethlehem Steel's GALVALUME trademark and 55% aluminum-zinc technology. (2/26/92 Tr. at 41–43, Forand Direct; Pl.'s Ex. 87 at 99–100.)

38. From 1979 through August 1986, Bethlehem International successfully operated the GALVALUME licensing program, and entered into nineteen (19) license agreements. (Confidential Appendix ¶ 1.) All but two or three of these licensees were experienced galvanizers prior to becoming a licensee of BIEC. (2/20/92 Tr. at 143, Borzillo Cross; 2/21/92 Tr. at 101–02, Borzillo Cross; 2/24/92 Tr. at 146, Caldwell Cross.)

39. Separate licenses were also entered into by BIEC with four (4) equipment suppliers with respect to equipment necessary for the production of 55% aluminum-zinc coated sheet steel products. (Confidential Appendix ¶ 2.)

40. In 1985, Bethlehem Steel decided to sell Bethlehem International and the licensing business, including the 55% aluminum-zinc technology and the GALVALUME trademark. (2/12/92 Tr. at 86, Wechsler Direct; Pl.'s Ex. 175 at 326.)

41. The individual Defendants Forand, Borzillo, Shin, and Connolly, together with Wechsler, proposed an $8 million leveraged buy-out of Bethlehem International. (2/19/92 Tr. at 64–65, Borzillo Direct.) The offer was rejected by Bethlehem Steel and Bethlehem Steel subsequently sold Bethlehem International to Broken Hill Proprietary. (2/19/92 Tr. at 63–65, Borzillo Direct.)

42. According to Forand, each of the Defendants would have earned millions of dollars if the proposed leveraged buy-out had been accepted by Bethlehem Steel. (Joint Stipulation—Pl.'s Proposed Finding number 26.)

43. Broken Hill Proprietary changed the name of Bethlehem International to BIEC International, Inc. ("BIEC"), and BIEC then paid in excess of $7 million to acquire from Bethlehem Steel all of the intellectual property assets pertaining to the 55% aluminum-zinc technology, including patents, trademarks, and all relevant technical information pertaining thereto, along with the outstanding licenses. (Joint Stipulation—Pl.'s Proposed Finding number 29.)

44. After the sale, Bethlehem Steel became a licensee of BIEC and retained the right to produce GALVALUME sheet steel products. It could no longer license or transfer the GALVALUME trademark or the 55% aluminum-zinc technology to others. (Pl.'s Ex. 89, Tab V; Pl.'s Ex. 168 at 31–32.)

45. The individual Defendants continued their employment with BIEC after the acquisition by Broken Hill Proprietary. (2/26/92 Tr. at 83, Forand Direct; 2/19/92 Tr. at 66, Borzillo Direct; 2/25/92 Tr. at 69, Shin Direct; Pl.'s Ex. 163 at 32–34.) BIEC entered into employment contracts with each of the four individual Defendants. Each of the individual Defendants were represented by attorney Ed Fedok throughout these negotiations, and each of the individual Defendants read, understood and signed the contracts. (Joint Stipulation—Pl.'s Proposed Finding number 31.)

46. The employment contracts provided for lucrative salaries and bonus opportunities if profit levels were attained, but specifically provided that the respective employment was "at-will" and was terminable with or without cause on thirty days' notice. (Pl.'s Exs. 50, 58, 61, 62.) Under these contracts, Forand was paid between $159,000 and $191,000 annually (and a total of $929,000); Borzillo was paid between $128,000 and $164,000 annually (and a total of $768,000); Shin was paid between $101,000 and $116,000 annually (and a total of $558,000); and Connolly was paid between $111,000 and $143,000 annually (and a total of $669,000). (2/26k at 86, Forand Cross; 2/25/92 Tr. at 140, Shin Cross; 2/20/92 Tr. at 84–85, Borzillo Cross; Pl.'s Ex. 78.) Forand also received a new Lincoln Town car every three years and a country club membership at Saucon Valley Country Club, Bethlehem, Pennsylvania, and the Defendants were given liberal expense accounts. (2/26/92 Tr. at 88, Forand Cross.)

47. At the time of the 1986 acquisition, Forand and Borzillo qualified to receive (and have received) pensions and health and life insurance from Bethlehem Steel. Forand and Shin received bonuses from Bethlehem Steel by reason of the sale of BIEC to Broken Hill Proprietary equal to 100% and 50% of their Bethlehem Steel salaries, respectively. (Joint Stipulation—Pl.'s Proposed Finding number 33.)

48. To assure their licensees and prospective licensees that Bethlehem Steel's divestiture of Bethlehem International would not in any way alter the business or services of Bethlehem International, BIEC, through the individual Defendants, prepared and circulated an announcement which confirmed that BIEC would continue to have the same expertise, provide the same services and be run by the same people. (Joint Stipulation—Pl.'s Proposed Finding number 36.)

49. Until their termination in July 1991, each of the individual Defendants was involved as an officer or senior manager of BIEC. Forand served as President of BIEC and was on the Board of Directors. Borzillo was Vice President in charge of technology. Connolly was in charge of operations. Shin was in charge of sales and servicing for the Far East and Asia. (Joint Stipulation—Pl.'s Proposed Finding number 37.)

50. From August 1986 through July 1991, two additional producer licenses were signed and three additional equipment supplier licenses were also signed. (Confidential Appendix ¶¶ 3 and 4.) (Joint Stipulation—Pl.'s Proposed Finding numbers 41 and 42.)

51. By 1990, two million tons of 55% aluminum-zinc coated sheet steel were produced annually by BIEC's licensees, compared to 20,000 tons of 55% aluminum-zinc coated sheet steel in 1975. (Joint Stipulation—Pl.'s Proposed Finding number 43.)

52. Between January 1980 and December 1991, BIEC received $61,274,000 in fees and royalties from its producer and equipment licensees. (Confidential Appendix ¶ 5.) (Joint Stipulation—Pl.'s Proposed Finding number 4.)

53. To date, none of BIEC's licensees have refused to pay the fees and royalties associated with the transfer of BIEC's confidential 55% aluminum-zinc technology. (2/27/92 Tr. at 55–56, Wechsler Direct.)

54. Since August 1991 and following over two years of negotiations, BIEC has signed three new producer licensees for fees and royalties in excess of $5 million. (2/12/92 Tr. at 43–44, 55, 59–61, Wechsler Direct; Pl.'s Exs. 67, 68.)

55. BIEC's licensees are the only known producers of 55% aluminum-zinc coated sheet steel in the world. (2/24/92 Tr. at 146–47, Caldwell Cross; Pl.'s Ex. 68.)

56. Since 1986, BIEC has spent more than $1.6 million promoting the GALVALUME trademark. (2/12/92 Tr. at 84–86, Wechsler Direct; Pl.'s Ex. 176.) BIEC spent approximately $300,000 per year promoting GALVALUME prior to 1986. (2/12/92 Tr. at 84–86, Wechsler Direct; Pl.'s Ex. 176.) The GALVALUME trademark is known and accepted throughout the hot-dip coating industry. (2/25/92 Tr. at 199–200, Shin Cross.)

57. The competitive products to BIEC's 55% aluminum-zinc coating for sheet steel are galvanizing (100% zinc), Crack Free (1% aluminum), Galfan (5% aluminum), Superzinc (5% aluminum), and aluminizing (100% aluminum). (2/12/92 Tr. at 48–49, Wechsler Direct; 2/24/92 Tr. at 71, Wechsler Redirect; 2/27/92 Tr. at 8–9, Forand Cross; Pl.'s Ex. 202.) Also available for future development as a competitive product to 55% aluminum-zinc coated sheet steel is the recently patented product in the range of 75% to 90% aluminum. (2/20/92 Tr. at 77, Borzillo Cross; 2/24/92 Tr. at 71, Wechsler Redirect.)

58. Licensing negotiations between BIEC and its prospective licensees often span a period of two to three years before resulting in a license agreement.

59. The costs of constructing a hot-dip coating line can range from $18 million to $75 million. (2/20/92 Tr. at 2, Borzillo Direct.)

## IV. THE 55% ALUMINUM–ZINC TECH-NOLOGY PACKAGE.

60. The collective aluminum-zinc operating, marketing, and research experiences of Bethlehem Steel, Bethlehem International, BIEC, and their licensees has been documented over the years in BIEC's technology manuals. BIEC maintains the following technology manuals: Operating Manuals; Technology and Research Manuals; Marketing Manuals; and Equipment Supplier's Manuals. (2/12/92 Tr. at 63–65, Wechsler Direct; Pl.'s Exs. 91, 92, 93, 94.)

61. In 1985 or 1986, BIEC spent hundreds of hours rewriting and updating its operating, technology and marketing manuals, which were provided by BIEC to each licensee. Prior to 1986, there were two distinct series of manuals. One series described the experiences of Bethlehem Steel at Sparrows Point and the other series described the experiences of the 55% aluminum-zinc line operated by the original licensee, John Lysaght, now part of Broken Hill Proprietary. In 1986, an effort was made to document the experiences of the two aluminum-zinc lines, as well as to include other information that had been acquired by the licensees up to that point in one comprehensive set of manuals. (2/12/92 Tr. at 65, Wechsler Direct; 2/24/92 Tr. at 128–31, Caldwell Cross; 2/20/92 Tr. at 104–05, Borzillo Direct; Pl.'s Exs. 166 at 32, 190.) The 1986 manuals were referred to by BIEC's licensees as "The New Testament of GALVALUME." (2/24/92 Tr. at 152–53, Caldwell Cross; Pl.'s Ex. 166 at 33.)

62. Two additional updates to the Operating Manual were issued—one in 1987 and one in 1988—reflecting new information regarding better and improved ways to make, use, or sell 55% aluminum-zinc coated steel products. (Pl.'s Exs. 34, 35.)

63. The technology manuals play a leading role in the transfer of 55% aluminum-zinc technology by BIEC to its licensees. Typically, after a license is signed, the manuals are sent by BIEC to the new licensee with a request that they read them in detail. (2/12/92 Tr. at 64, Wechsler Direct.)

64. BIEC's transfer of the 55% aluminum-zinc technology to its licensees involves several other aspects. Typically, after reviewing the manuals, the licensee will present a series of questions and ask BIEC for assistance. BIEC then schedules a formal technology transfer session and prepares answers to the licensee's questions. A classroom session lasting several days is held during which BIEC's technical experts teach the technology to the licensee's operators. A tour of one of BIEC's licensees' existing 55% aluminum-zinc facilities and a research facility (such as Bethlehem Steel's Homer Research Center) also occurs. (Joint Stipulation—Pl.'s Proposed Finding number 57.)

65. The next phase of BIEC's technology transfer typically involves a review by BIEC of the licensee's engineering drawings for technical adequacy. The licensees are then sent home to build or equip their facilities under confidentiality agreements with their equipment suppliers and BIEC's equipment suppliers. (Joint Stipulation—Pl.'s Proposed Finding number 58.)

66. Since each licensee builds a different type of continuous processing line, the material provided in the manuals (which represents in large part the specific operating experiences from Bethlehem Steel's Sparrows Point line and Broken Hill Proprietary's John Lysaght's line) does not necessarily set forth operating parameters fully suitable to each licensee's needs. (2/24/92 Tr. at 21, Caldwell Direct.) Determining the correct operating parameters for a new 55% aluminum-zinc line is also very dependent upon an operator's experience and type of equipment. Therefore, after determining the correct operating parameters for the licensee's line, a BIEC technology transfer team travels to the licensee's location and assists in the start-up of production. (2/24/92 Tr. at 20–21, Caldwell Direct.) These production assistance visits typically last a few weeks to a month. (2/12/92 Tr. at 80–81, Wechsler Direct; 2/24/92 Tr. at 117–20, Caldwell Direct.)

67. Finally, the technology transfer involves ongoing trouble-shooting and prob-

lem-solving as the new licensee makes the 55% aluminum-zinc coated product. (2/12/92 Tr. at 82, Wechsler Direct.)

68. The technology manuals are used as a ready reference by BIEC personnel to answer licensee questions and solve licensee problems. Larry Caldwell, a BIEC technical consultant, had a reduced size operating manual made so that he could easily carry it on his international trips to visit licensees. (2/24/92 Tr. at 153–57, Caldwell Cross; Pl.'s Ex. 192.)

69. In a November 1990 paper, Forand summarized the technology package as follows:

### The GALVALUME Package

One might question the contents of the technology package. On the surface the concept of galvaluming might not appear any different from continuous galvanizing. Galvanizing is itself somewhat of a high level "art form." Operator knowhow and tricks of the trade have been discussed at length during many international galvanizing conferences.

### The Keys to Success

The [BIEC] technology package embodies the details of the required operating practices necessary for quality production. An operating manual and a detailed product technology manual are sent to the licensee company after the license agreement is signed. The technology disclosure pays particular attention to the facility equipment mix and design. Several days of consultation are included to review engineering drawings of the facility and to provide assistance in the selection of specific equipment items essential to the production of quality GALVALUME. Key manufacturing parameters are isolated, with specific limits to the range of acceptability. Potential problem areas are clearly defined, with suggested changes in operating practice to minimize or eliminate a given product-quality problem.

The technology package provided by [BIEC ...] contains not only detailed operating practices but also a vast amount of product-testing data. In addition, intrinsic materials engineering properties are disclosed as well as corrosion mechanisms operable under differing atmospheric exposure conditions. The technology package also includes start-up or facility-commissioning assistance. [BIEC] generally provide[s] two skilled operating personnel to the licensee to assist with start-up operations. Such assistance is available for one month, although thus far most existing licensees have produced prime-quality product on a consistent basis well within a month.

For those licensees with limited or no prior experience in hot-dip metallic coating operations, [BIEC] provide[s] an operator training program. This training program, which may last for weeks, is conducted at a facility that most closely matches the layout and design of the licensee's coating line. The training program is given within the six-month period prior to the commissioning of the licensee's GALVALUME line.

Also, BIEC provides ongoing technical support services throughout the life of the license agreement. These services may be in the form of direct troubleshooting visits to licensee facilities or general technical support through BIEC's InterZAC forum, which will be described later. Now let us turn our focus to selling the GALVALUME technology.

(2/26/92 Tr. at 94–96, Forand Cross; Pl.'s Ex. 52 at 3–4.) While we recognize that Forand's summary of the technology package was intended as a marketing and advertising tool, and also contains a certain amount of "puffing," we never-the-less feel that Forand's statement accurately describes BIEC's 55% aluminum-zinc technology. (2/21/92 Tr. at 106–08, Borzillo Cross.)

70. In 1981, BIEC formed the International Zinc–Aluminum Coaters Association ("InterZAC"). Membership in InterZAC was restricted to BIEC's licensees, and conferences were held every eighteen months to two years. InterZAC conferences were held by BIEC in 1981 (Sparrows Point,

Maryland), 1983 (Sydney, Australia), 1984 (Chicago, Illinois), 1986 (Maui, Hawaii), 1987 (London, England) and 1989 (Osaka, Japan). (Joint Stipulation—Pl.'s Proposed Findings numbers 66 and 67.)

71. The objectives of InterZAC were to provide licensees with an opportunity to develop personal relationships, to provide a forum for discussing technical aspects on the performance, production and application of 55% aluminum-zinc, and to pass-through improvements among BIEC and its other licensees under the terms of the individual licensing agreements. (2/14/92 Tr. at 124, Borzillo Direct.)

72. As President of BIEC, Forand publicly described the InterZAC program as follows:

> Our joint technology sales program has been enormously successful, as witnessed by the achievements of our licensees. The program not only insures the availability of the most complete and up-to-date technology, but it also provides for the continuing exchange of technical information and improvements among old and new licensees through InterZAC. This is why we say that it is truly a unique program.
>
> To amplify, much of this technology exchange takes place every 18 months at joint licensee meetings which serve as vehicles for passing production improvements back to licensees. Named Inter-ZAC—the acronym for International Zinc–Aluminum Coaters I mentioned earlier—membership is limited *only* to GAL-VALUME licensees. At the week-long meetings, key personnel present papers and discuss production and technology improvements. Also included are tours of coating facilities and a mini trade show of world-wide suppliers of goods and services to hot-dip coated sheet producers. The major "players" in the metallic coatings business attend.

Again, while we recognize that Forand's statements were designed with advertising and marketing goals in mind, and as such contain a certain amount of "puffing," we find that Forand's statement accurately reflects InterZAC's goals. (2/26/92 Tr. at 99–101, Forand Cross; Pl.'s Ex. 88 at 52–53.)

73. As chairman of InterZAC, Borzillo oversaw the proceedings and kept track of and collected all of the technical papers and research notes that were presented by BIEC's licensees at the InterZAC conferences. (Joint Stipulation—Pl.'s Proposed Finding number 70.) As InterZAC chairman, Borzillo also prepared a section entitled "highlights," which identified the new and useful information exchanged at each InterZAC conference. A "highlights" section was circulated to the licensees as part of each InterZAC manual with the exception of the InterZAC manuals for 1981 and 1983. (2/14/92 Tr. at 128, 130–133, Borzillo Direct; Pl.'s Exs. 18, 21, 24, 27, 29, 31.)

74. BIEC also organized and ran regional organizations for its licensees which met quarterly, semi-annually and annually: NamZAC—(for the North American licensees); PacZAC (for the Pacific Rim licensees); EuroZAC (for the European licensees); and OpZAC (for the operating personnel of the various licensees). (2/12/92 Tr. at 69–75, Wechsler Direct; Pl.'s Exs. 101–104.) As with InterZAC, these regional organizations provided a means for sharing within BIEC's licensee group new and useful information regarding improved ways to make, use and sell GALVALUME sheet steel. This new information was maintained as confidential, provided only to licensees, and formed a part of BIEC's expanding 55% aluminum-zinc package. (2/12/92 Tr. at 69–75, Wechsler Direct; 2/25/92 Tr. at 148–49, Shin Cross; 2/21/92 Tr. at 62–64, Borzillo Direct; Pl.'s Exs. 101–104.)

75. All of the individual Defendants were active in InterZAC and the regional organizations. Borzillo was Chairman of InterZAC, Connolly was Chairman of OpZAC, and Shin was Chairman of Pac-ZAC. Forand, as President of BIEC, attended organizational meetings and delivered welcoming remarks. (Joint Stipulation—Pl.'s Proposed Finding number 78.)

V. PUBLIC NATURE AND SPECIFIC TECHNICAL TRADE SECRETS RELATING TO BIEC'S 55% ALUMINUM–ZINC TECHNOLOGY.

76. The process of manufacturing 55% aluminum-zinc coated sheet steel is dis-

cussed herein in relation to various parts of the processing and the equipment utilized in the processing, namely, the sheet steel or substrate used for coating, the furnace and its protective atmospheres, the snout section of the furnace, the coating bath composition, the pre-melt pot, main pot and launder, bottom dross, the pot machinery, the line speed, the upleg cooling tower, the jet wipers, line stops, post-annealing, passivation and painting practices, and the coating and alloy layer properties of the coated sheet steel in relation to processing parameters. (2/13/92 Tr. at 43–171, Wechsler Direct; 2/18/92 Tr. at 37–89, Marder Direct.)

77. The process of manufacturing a 55% aluminum-zinc coating is very similar to hot-dip galvanizing. The applications and the processing of the sheet steel for 55% aluminum-zinc coated sheet steel from hot rolling through tandem rolling is essentially the same as that used for galvanizing. (Pl.'s Ex. 91 at 61; Defs.' Ex. 278.) In fact, seventeen (17) of the original twenty-one (21) licensee operated 55% aluminum-zinc coating lines were converted galvanizing lines. (2/19/92 Tr. at 175–76, Borzillo Direct; 2/20/92 Tr. at 143, Borzillo Cross; 2/21/92 Tr. at 101–02, Borzillo Cross; 2/24/92 Tr. at 146, Caldwell Cross.)

78. Plaintiff has publicly admitted that "[p]roduction methods for GALVALUME are generally similar to those used for continuous hot-dipped galvanizing. Only minor [conversion] modifications requiring minimal capital investment distinguish the two processes." (Defs' Ex. 121 at 2.)

79. The grades of steel for 55% aluminum-zinc coated sheet steel are, in general, similar to those for competitive galvanized products. (2/19/92 Tr. at 157, Borzillo Direct; 2/24/92 Tr. at 63, Caldwell Direct; Pl.'s Ex. 91 at 61.)

80. While BIEC provides specific information to its licensees on the types of steel that have been successfully used for the substrate on particular aluminum-zinc lines, operated by BIEC or its licensees, the evidence fails to establish that steel type information is not publicly available or that there exists a discrete set of steel grades which must be used for the substrate on a 55% aluminum-zinc line. (2/13/92 Tr. at 91, Wechsler Direct; Pl.'s Ex. 91 at 61, 64; Pl.'s Ex. 92, § IV at 3; Pl.'s Ex. 99, Day 3, PM Round Table at 4; Pl.'s Ex. 95, SSAB notes.)

81. It is well-known that 55% aluminum-zinc coatings are more sensitive than galvanized coatings to certain types of surface characteristics such as the presence of oils and lubricants, microscopic iron fines from the rolling process, and the presence of lightly oxidized areas that must be controlled to avoid bare spots and bridged uncoated defects in the coated product. (2/13/92 Tr. at 51–52, 71, 91–92, Wechsler Direct; 2/18/92 Tr. at 38, Marder Direct; 2/19/92 Tr. at 127, Borzillo Direct; 2/24/92 Tr. at 28, 64–65, Caldwell Direct; Defs.' Ex. 276 at 27.)

82. While BIEC provides specific information to its licensees concerning surface cleanliness—oil levels measured in milligrams per square meter and iron fine levels measured in milligrams per square meter—that have been successfully used on particular aluminum-zinc lines, the evidence fails to establish that this information is not publicly available or that there exists a discrete set of required cleanliness measurements. (Pl.'s Ex. 91 at 65; Pl.'s Ex. 98, SSAB Notes, Session 2, Feed Stock, at 1; Pl.'s Ex. 100, JLA Notes, Feedstock Surface Cleanliness; Pl.'s Ex. 96, Vickers, at 21.)

83. As part of the process in preparing feedstock steel for continuous hot-dip processing, the hot rolled strip is pickled and side trimmed before undergoing reduction by cold rolling. Surface oxides on the steel must be completely removed, pickling acid residues completely rinsed off and the edges of the steel must be trimmed properly to avoid cracking during cold rolling. The pickling and trimming practices used are very similar for both galvanizing and 55% aluminum-zinc processing. (2/19/92 Tr. at 162–65, Borzillo Direct; 2/24/92 Tr. at 65–68, Caldwell Direct.)

84. While BIEC provides its licensees with information on pickling and side trimming practices to avoid surface oxidation

and cracked edges on the steel strip, the evidence fails to establish that this information is not publicly available or that there exists a discrete set of recommendations related to such practices. (2/13/92 Tr. at 92–94, Wechsler Direct; Pl.'s Ex. 91 at 68–79.)

85. The flatness of the steel strip is an equally important and well known consideration in galvanizing and aluminizing as it is in 55% aluminum-zinc coatings. (2/19/92 Tr. at 167, Borzillo Direct; Defs.' Exs. 122; 119 at 43–45, Fig. 7; 130 at 35, Fig. 3.)

86. While BIEC provides its licensees with information on the importance of flatness and ways of flattening the substrate to obtain necessary coating weight uniformity and corrosion resistance in a 55% aluminum-zinc coated product, the evidence fails to establish that this information is not publicly available or that there exists a discrete set of recommendations related to such practices. (2/13/92 Tr. at 95–96.)

87. Maximum and minimum line speeds on 55% aluminum-zinc processing lines are a function of the line design. (2/19/92 Tr. at 172–75, 180, 183, Borzillo Direct; Defs.' Ex. 235.) Proper line speeds are determined by the desired product mix, which includes capacity, steel strip widths and strip thicknesses. (*Id.*) Line speeds are determined by informing the equipment manufacturer of the desired product mix. The manufacturer then designs the line to satisfy the desired product mix. (*Id.*) The line design process and setting of line speeds is really no different for aluminum-zinc than it is for galvanizing. (*Id.*)

88. Surface roughness is related to line speeds in galvanizing, aluminizing or aluminum-zinc processing. A rough surface on the steel substrate is used to ensure coating uniformity at low line speeds. (2/20/92 Tr. at 120–21, Borzillo Redirect; 2/24/92 Tr. at 70–72, Caldwell Direct.) The decision about whether surface roughness is required is made by an operator who observes the appearance of the coating and visually concludes that the coating is not being uniformly applied to the substrate. (2/20/92 Tr. at 120–21, Borzillo Redirect; 2/24/92 Tr. at 72–73, Caldwell Direct.) The process of deciding whether surface roughness is required is very similar in galvanizing and 55% aluminum-zinc processing. (2/20/92 Tr. at 120–21, Borzillo Redirect; 2/24/92 Tr. at 70–72, Caldwell Direct.)

89. While the process of setting line speed and the process of deciding whether surface roughness is required are very similar in galvanizing and 55% aluminum-zinc processing, BIEC provides its licensees with specifications for surface roughness of the substrate related to the particular fluidity of the molten 55% aluminum-zinc, the line speed, and the thickness and steel grade of the substrate. Specifications like these are not intrinsically known to an operator; rather they become apparent only after trial and error. (2/13/92 Tr. at 96–98, Wechsler Direct; 2/18/92 Tr. 39–40, 44, 62, Marder Direct; Pl.'s Ex. 91 at 62–64.)

90. The furnace used in making 55% aluminum-zinc coated sheet steel is similar to the furnaces used in galvanizing and other hot-dip processes. These furnaces are divided generally into four sections, namely, direct fired section, radiant tube or hold section, cooling section and snout section. The furnaces are operated under positive pressure to avoid seepage of oxygen into the furnace. (2/13/92 Tr. at 103, Wechsler Direct.) The direct fired section, which may be horizontal or vertical, and the radiant tube section are generally the same in galvanizing and 55% aluminum-zinc coating. However, the cooling section and the snout sections are different in terms of the temperature cycles, requirements for jet cooling, design of the snout section, and the parameters for processing. (Pl.'s Ex. 91 at 110; Pl.'s Ex. 96, Vickers, Figs. 2 & 3; Pl.'s Ex. 96, West.)

91. Thermal cycles refer to the process of heating the substrate in the furnace to obtain desired mechanical properties in the steel. (2/24/92 Tr. at 33–34, 74–78, Caldwell Direct.) The thermal cycles used in processing aluminum-zinc coatings are very similar to those used in other hot-dip coating processes (2/19/92 Tr. at 157–59, Borzillo Direct; 2/24/92 Tr. at 30–34, 74–78,

Caldwell Direct; 2/20/92 Tr. at 156–60, Borzillo Cross; Defs.' Ex. 120).

92. BIEC provides its licensees with specific temperature profiles for the cooling and snout sections of the furnace for processing of substrates of specific steel grades, i.e., annealed, full hard, commercial quality, drawing quality, titanium stabilized, deep drawing quality and high strength steels. (2/13/92 Tr. at 100–02, Wechsler Direct; 2/18/92 Tr. at 40–41, 59–60, Marder Direct; Pl.'s Ex. 91 at 110, 489, 523; Pl.'s Ex. 96, Vickers, Figs. 2 & 3; Pl.'s Ex. 100, JLA Notes, Table of Thermal Cycle for Zincalume Qualities—0.4 mm Thick.) The evidence fails to establish that this information is not in the public domain. (2/19/92 Tr. at 157–59, Borzillo Direct.)

93. There are many different furnace control practices, well documented in the public literature, that can be utilized in aluminum-zinc processing. The purpose of these practices is to eliminate barespots on the aluminum-zinc coated sheet by ensuring a clean, oxide-free surface on the incoming sheet, avoiding oxidation of the coating bath inside the snout and minimizing the formation of zinc dust condensed from zinc vapor inside the snout and annealing furnace. (2/20/92 Tr. at 218, Borzillo Direct; 2/24/92 Tr. at 93–95, Caldwell Direct; Defs.' Exs. 222, 223, 227, 228, 229, 261; Pl.'s Ex. 195.)

94. Much of the information related to the furnace operation is well documented in the public literature including the general composition of gases making up the atmosphere in the snout and furnace, the possible entry location and distribution of gasses input to the furnace, and possible snout design. There are six patents in this area. (2/20/92 Tr. at 18, Borzillo Direct; Defs.' Exs. 222, 223, 227, 228, 229, 261; Pl.'s Ex. 195.)

95. BIEC provides its licensees with examples of successful furnace operation, including the specific mixture of hydrogen and nitrogen gas, the dewpoint of the gas (or dryness), the flow rates of the incoming gas, and the entry location and distribution of gasses input to the furnace used on specific aluminum-zinc lines operated by BIEC's licensees. (2/13/92 Tr. at 102–06, Wechsler Direct; 2/18/92 Tr. at 60, Marder Direct; Pl.'s Ex. 91 at 80–142; Pl.'s Ex. 100, Bethlehem Notes, Session 1, 2–b In Line Annealing Furnace, Atmosphere Practice; Pl.'s Ex. 100, JLA Notes, Session 1, 2. In–Line Annealing Furnace, Atmosphere Gas Practice No. 5 Line; Pl.'s Ex. 99, J & L Notes, Operating Practices at 1; Pl.'s Ex. 99, JLA Notes, Session 2, Furnace Atmospheres, at 3–9; Pl.'s Ex. 99, USS Line, Leonard, at 7–8, Table IV; Pl.'s Ex. 99, Startup, Santo, at 5; Pl.'s Ex. 98, LTV Notes, Operating Practices, Furnace Atmospheres; Pl.'s Ex. 98, USS Notes, Session 2, Operating Practices, ¶ 1B; Pl.'s Ex. 98, SSAB Notes, Session 2, Round Table Discussion, Operating Practices at 1; Pl.'s Ex. 98, Galvalange Notes, Session 2, 1. Bare Spots, Furnace Atmospheres; Pl.'s Ex. 98, Lysaght Notes, Session 2, Operating Practices, at 1, 3, Furnace Atmospheres; Pl.'s Ex. 98, Bethlehem Notes, Bare Spots, B. Furnace Atmospheres; Pl.'s Ex. 98, Startup, Burlein, at 3; Pl.'s Ex. 104, 1991 Minutes, Survey, Question 5; Pl.'s Ex. 104, 1989 Minutes, Questionnaire Section III, Pot Area A and B; Pl.'s Ex. 104, 1988 Minutes, Questionnaire Section II, Furnace 1 and 2; Pl.'s Ex. 95, Snout Modification As A Means Of Reducing "Bare Spots", Uno et al, at 3–4; Pl.'s Ex. 95, Start-up and Production Experience with IMSA's Zintro–Alum Line, Perez, at 2, Fig. 34.) While these parameters are maintained by automatic controls and readouts on the furnace and snout, which are similar to other hot-dip lines, (2/24/92 Tr. at 37, Caldwell Direct), these parameters are not intrinsically known to an operator; rather they only become apparent after trial and error.

96. While BIEC also provides its licensees with information relating to snout design and control of the zinc vapor in the snout, there is insufficient evidence to find that this information is not publicly known or that there are a discrete set of recommendations relating to this processing or procedures. (2/13/92 Tr. at 50–51, 67, 71–73, 106–13, Wechsler Direct; 2/18/92 Tr. at 47–49, 66–70, 73–74, Marder Direct; Pl.'s Ex. 91 at 398; Pl.'s Ex. 179 at 1–7; Pl.'s

Ex. 95, Session 2, BHP Notes, Lucas and Brandis.)

97. The pre-melt and main pots used on 55% aluminum-zinc lines to coat the substrate with molten metal are similar to those used on galvanizing lines. (2/24/92 Tr. at 99, Caldwell Direct; Defs.' Ex. 130 at 40, Fig. 12.) Moreover, the evidence establishes that maintenance practices for pots used on aluminum-zinc processing lines is largely determined by the pot manufacturer. (2/24/92 Tr. at 103–05, Caldwell Direct; Pl.'s Ex. 91 at 276–88.) Indeed, BIEC itself recognizes that it is ill equipped to fully consult on at least one of the two types of pots used. BIEC advises that the "statements and opinions expressed herein are only general in nature and BIEC International, Inc. assumes no responsibility with respect to such statements and opinions. *Each party having an interest in use of a coreless pot should investigate with manufacturers of such pots all aspects of their design, construction and operation.*" (Pl.'s Ex. 91 at 204.) (emphasis supplied).

98. The only specific difference between the pots used on galvanizing lines and aluminum-zinc lines is the necessity of having a high alumina refractory on aluminum-zinc pots. This requirement, however, was explicitly disclosed in a 1973 paper. (Defs.' Ex. 120 at 12.)

99. Pot operation is also similar on aluminum-zinc and galvanizing lines. The evidence establishes that pot temperature on both lines should be maintained within 5° of the target. (2/24/92 Tr. at 100–03, Caldwell Direct; Defs.' Ex. 130 at 40, Fig. 11.) Moreover, automatic temperature controls are used on the pots to regulate bath temperature in both galvanizing and aluminum-zinc processing. (2/24/92 Tr. at 103, Caldwell Direct; Defs.' Ex. 130 at 40.)

100. On those aluminum-zinc processing lines where a premelt pot is used, launders are used to transfer the molten metal to the main coating pot in a similar manner as that in galvanizing. (2/24/92 Tr. at 105, Caldwell Direct; Defs.' Exs. 130 at 40, Fig. 12; 124 at 5.) Various pot and launder arrangements are described in the public literature. (Defs.' Ex. 130 at 40 and Fig. 12; Defs.' Ex. 122 at 75–77; Defs.' Ex. 119 at 45 and Fig. 8; Defs.' Ex. 234 at SB 5/1—5/8.)

101. While BIEC provides licensees with information on the advantages and disadvantages of each of the particular types of pots and configurations used (2/13/92 Tr. at 117–18, Wechsler Direct; Pl.'s Ex. 91 at 204–64), on the inductor arrangements for the pots (2/13/92 Tr. at 117, 120–21, 123, Wechsler Direct; Pl.'s Ex. 91 at 276–288), on ramming and temperature monitoring practices for the inductors (2/13/92 Tr. at 114, 116, 118, 122, 123, Wechsler Direct; 2/18/92 Tr. at 60–61, Marder Direct; Pl.'s Ex. 91 at 187–88, 267–74, 278; (Pl.'s Ex. 99, Day 1, Round Table, at 43), and on launder design and configuration (2/13/92 Tr. at 110, 124–25, Wechsler Direct; Pl.'s Ex. 91 at 23, 279–88, 493), the evidence failed to establish that this information is not in the public information or that there exists a discrete set of recommendations regarding these practices. Rather, the evidence shows that BIEC's licensees in fact follow various practices and use different configurations. (2/13/92 Tr. at 110, Wechsler Direct; Pl.'s Ex. 91 at 204–64; Pl.'s Ex. 95, Perez at 2; Pl.'s Ex. 99, Leonard at 8; Pl.'s Ex. 99, Santo at 2 and Fig. 1.)

102. Another area of similarity between galvanizing and aluminum-zinc processing is in the make-up of the pot machinery. Pot machinery consists of the sink roller, around which the strip moves through the molten bath during coating, the stabilizer rollers which assist in maintaining flatness through the jet wipers, and the supports for the sink roller and stabilizer rollers. (2/13/92 Tr. at 127, 132–38, Wechsler Direct.)

103. Pot machinery is shown in the public literature and operates submerged in the bath. (2/20/92 Tr. at 28–29, Borzillo Direct; Defs.' Ex. 124.) Further, the evidence shows that the same grades of stainless steel used in aluminum-zinc processing are also recommended and used in galvanizing. (2/24/92 Tr. at 106–08, Caldwell Direct.) Maintenance performed on the pot

machinery is also similar to that done in galvanizing. (2/19/92 Tr. at 137, 140–41, Borzillo Direct.) Primarily, scrapers are used to avoid alloy buildup and irregular spangle formation. (*Id.;* Defs.' Ex. 160.)

104. Although different types of stainless steel can be used in the coating pot, BIEC maintains that the sink roller and stabilizer roller should be fabricated of a certain stainless steel. (2/13/92 Tr. at 60, 83–84, 128–29, 130–31, Wechsler Direct; 2/18/92 Tr. at 45, 61, 75–76, Marder Direct; 2/25/92 Tr. at 47, Caldwell Redirect; Pl.'s Ex. 91 at 290, 295, 297; Pl.'s Ex. 91 at 309–10, 315, 323, 494; Pl.'s Ex. 95, British Steel Notes, page 2, fig. 2, Table 1; Pl.'s Ex. 95, British Notes, Session 6, Figs. 2 & 3; Pl.'s Ex. 99, Day 1 Round Table, at 27–28.) BIEC also provides its licensees with information on the preheating and avoidance of pickling of the pot machinery before entry into the bath as well as information on the maintenance of the sink and stabilizer rollers. (2/13/92 Tr. at 130–131, Wechsler Direct; 2/18/92 Tr. at 45, 75–76, Marder Direct; Pl.'s Ex. 91 at 322–25; Pl.'s Ex. 99, Day 1 Round Table, at 29, 31.) The evidence fails to establish that this information is not in the public information.

105. The use of stabilizer rollers and hot bridles in aluminum-zinc processing is the same as in galvanizing. (2/20/92 Tr. at 27–29, Borzillo Direct; 2/24/92 Tr. at 109–11, Caldwell Direct.) Stabilizer rollers and hot bridles are used to maintain strip flatness throughout processing. (*Id.*) Moreover, these types of practices on aluminum-zinc processing lines are well documented. (Defs.' Ex. 124 at 6 and Fig. 5.)

106. While BIEC provides its licensees with information on the preferred use of hot bridles, minimum coating thickness, and the corrosion resistance properties for 55% aluminum-zinc coating (2/13/92 Tr. at 57–58, 96, Wechsler Direct), the evidence fails to establish that this information is not in the public information or that there exists a discrete set of recommendations relating to these practices.

107. The specific bath composition has been widely disclosed and is set forth in standard trade reference texts. (2/19/92 Tr. at 41–42, Borzillo Direct; Defs.' Ex. 230 at 348.) The early patents issued to Mr. Borzillo, as well as other patents issued for 55% aluminum-zinc coatings, describe the grades and composition of spelter used to prepare the aluminum-zinc coating bath. (Defs.' Exs. 147, 148.) Moreover, the effects of specific bath impurities have been extensively discussed in public literature. (2/20/92 Tr. at 22–26, Borzillo Direct; 2/21/92 Tr. at 66–69, Borzillo Cross; Defs.' Exs. 149, 224, 277.)

108. Although use of the various patents is likely to result in a coating bath containing a minimum level of impurities, (2/20/92 Tr. at 20–26, Borzillo Direct), BIEC further instructs its licensees about the critical impurity levels. (2/13/92 Tr. at 126–27, Wechsler Direct; Pl.'s Ex. 91 at 173, 493; Pl.'s Ex. 97, Lysaght Notes, Session 10, at 2; Pl.'s Ex. 98, LTV Notes, at 2; Pl.'s Ex. 99, Bethlehem Notes at 8; Pl.'s Ex. 197, Letter dated 3/17/89.)

109. Unlike galvanizing, 55% aluminum-zinc processing required accelerated cooling. This is accomplished through what is referred to as the upleg cooling tower. The required rate of cooling through the upleg cooling tower is set forth in a patent issued to Mr. Cleary of Bethlehem Steel. (Defs.' Ex. 169.) Furthermore, the temperature to which the strip must be cooled at the end of the upleg cooling tower is also set forth in public documents. (2/18/92 Tr. at 106, Marder Cross; Defs.' Ex. 230 at 349.)

110. Based upon these publicly available operating parameters, a manufacturer of continuous process line equipment can construct an appropriate upleg cooling unit for an operating aluminum-zinc coating line. (2/24/92 Tr. at 92–93, Caldwell Direct; 2/20/92 Tr. at 32–33, Borzillo Direct.) Indeed, that is precisely how Bethlehem Steel constructed the first upleg cooling tower which is still in use at Sparrows Point. (*Id.*) Moreover, the uncontradicted evidence established that LTV, a BIEC licensee, constructed an appropriate upleg cooling tower without BIEC's assistance, and that cooling tower is still in use. (2/24/92 Tr. at 84–88, 93, Caldwell Direct.)

111. Although the BIEC Operating Manual written in 1986 indicated that a maximum cooling rate was not a factor, (Pl.'s Ex. 91 at 497), subsequent BIEC information discloses that coating hardening and in turn ductility properties are related to cooling rate, and that cooling rates should be maintained as low as possible (but not less than 11° C per second as prescribed in the Cleary patent) for induced crazing and improved ductility properties. (2/18/92 Tr. at 40–41, Marder Direct; Pl.'s Ex. 97, Roudabush, at 3–4.) Information has also related the defect of mottling to interaction between the upleg cooling rate and coating pot bath silicon content. (2/13/92 Tr. at 79, Wechsler Direct; 2/18/92 Tr. at 76, Marder Direct; Pl.'s Ex. 98, Mercer et al; Pl.'s Ex. 99, Cooling Rate by Jolley, Questions, at 7; Pl.'s Ex. 180.) In addition, BIEC gives the design and operating parameters for the upleg cooling tower to provide the desired cooling rate with minimum amounts of cooling air and electric cost, as well as the height of the upleg tower above the bath and the spacing of the tower from the strip which are critical. (2/13/92 Tr. at 146–47, 149, Wechsler Direct; 2/18/92 Tr. at 49–51, Marder Direct; Pl.'s Ex. 91 at 361–78, 390, 497; Pl.'s Ex. 92, § VII, at 1–15.) Further, BIEC provides information on how to measure the temperature at the turnaround roll (at the top of the cooling tower) with a parameter to avoid turnaround-roll pick-off defects in 55% aluminum-zinc coated product. (2/13/92 Tr. at 86–87, Wechsler Direct; 2/18/92 Tr. at 41, Marder Direct.) The BIEC information also instructs that slow cooling of the strip should be done with 55% aluminum-zinc after the turnaround roll and thereafter water with specific purity requirements is quenched at particular entry and exit temperatures. (2/13/92 Tr. at 148, Wechsler Direct; 2/18/92 Tr. at 63, Marder Direct; Pl.'s Ex. 91 at 497–98.) Using the Cleary patent as a starting point, BIEC and its licensees have developed additional upleg cooling parameters for specific aluminum-zinc lines. These parameters are not intrinsically known to an operator; rather they become apparent only after trial and error.

112. Whether planned or unplanned, occasionally operation of a hot-dip coating line stops. When this occurs, certain practices must be followed to avoid having to rethread the strip through the line. These practices are the same in aluminum-zinc processing as they are in galvanizing. (2/24/92 Tr. at 112–16, Caldwell Direct.) These practices include inserting a "leader strip" during a long shutdown or "jogging" the line during a short line stop to prevent strip burn-off. (*Id.*) For example, operators use the same material for the leader strip as is used for the pot equipment on galvanizing or aluminum-zinc lines. (*Id.*)

113. Although BIEC provides its licensees with information relating to various line stop procedures including jogging (2/13/92 Tr. at 151, Wechsler Direct; Pl.'s Ex. 91 at 174, 444, 520), welding (2/13/92 Tr. at 152–53, Wechsler Direct; Pl.'s Ex. 91 at 488, 520), and nitrogen purging procedures (2/13/92 Tr. at 154, Wechsler Direct), the evidence fails to establish that this information is not in the public information or that there exists a discrete set of recommendations relating to these procedures.

114. Like galvanizing lines, air wipers are used on 55% aluminum-zinc processing lines to achieve a uniform and specified coating weight. The two commercially distributed coating weights are openly set forth in an American Standard for Testing and Materials ("ASTM") standard. (Defs.' Ex. 150.) Monitoring of coating weights is done automatically by controls attached to the air wiping system. (2/19/92 Tr. at 183–86, Borzillo Direct; 2/24/92 Tr. at 39–42, Caldwell Direct.) With a closed loop system, these adjustments are done automatically without any operator assistance. (*Id.*) The use of air wipers on aluminum-zinc processing is similar to that in galvanizing. (2/19/92 Tr. at 183–86, Borzillo Direct; 2/24/92 Tr. at 39–42, Caldwell Direct; Defs. Ex. 119 at 43, 45; Defs.' Ex. 130 at 35.)

115. The evidence established that the only operating changes that interact regarding coating weight are between line speed and the air wipers. This occurs because a change in line speed affects the

amount of coating metal carried out of the bath onto the strip, which requires adjustments to the air wipers to obtain the desired uniform coating weight. (2/24/92 Tr. at 78–79, Caldwell Direct.) While adjustments to the air wipers occur automatically through use of a closed loop system, adjustments are often controlled by an operator making adjustments to the specific nozzle configuration and operating parameters in combination with a standard coating weight gauge. (2/18/92 Tr. at 46, Marder Direct.) BIEC provides its licensees with the configuration, nozzle opening, distance from the sheet steel, angle to the sheet steel, cooling medium, air pressure and air flow and spacing of the jet wiper above the bath, and in the form of tables for the operating parameters that change with line speed and strip thickness, width and grade on specific aluminum-zinc lines operated by BIEC and its licensees. (2/13/92 Tr. at 88, 138–39, Wechsler Direct; 2/18/92 Tr. at 61–63, Marder Direct; Pl.'s Ex. 91 at 327, 341–360, 494–95, 497; Pl.'s Ex. 96, Vickers, at 18.) These configurations and operating parameters are not intrinsically known to an operator, rather they become apparent through trial and error.

116. A related problem to jet wipers is the use of edge siphons and beaver tails to avoid heavy edges on the 55% aluminum-zinc coated sheet steel. (2/13/92 Tr. at 76, Wechsler Direct; Pl.'s Ex. 97, National Steel Notes, Session 10; Pl.'s Ex. 97, LTV Notes, Session 10; Pl.'s Ex. 97, Daido Notes, at 4; Pl.'s Ex. 97, Operating Committee Notes, Frikeverda; Pl.'s Ex. 98, Dofasco Start-up, at 8; Pl.'s Ex. 98, USX Notes, Session 4; Pl.'s Ex. 98, LTV Notes, Section 5, at 3; Pl.'s Ex. 99, Daido Start-up, at 5.) The use of beaver tails or "false edges" and edge siphons to help reduce heavy edges in hot-dip coating are generally disclosed by U.S. Patent Nos. 3,742,905 (Defs.' Ex. 271), 3,480,469 (Defs.' Ex. 270), and 3,525,116 (Pl.'s Ex. 91 at 337–340.) (2/24/92 Tr. at 53–57, Caldwell Direct.)

117. BIEC provides its licensees with actual engineering drawings of the size of the beaver tail, its design, and how air is supplied for 55% aluminum-zinc coating, which are not in the public information.

(2/13/92 Tr. at 141, Wechsler Direct; 2/18/92 Tr. at 47, 62, Marder Direct; Pl.'s Ex. 91 at 494–95.) Similarly, BIEC provides its licensees with the particular parameters in terms of design cross-sectional area, spacing relative to the sheet edge, air pressure, air flow, length, angle of impingement and their utilization in combination with beaver tails. (2/13/92 Tr. at 139–41, Wechsler Direct; 2/18/92 Tr. at 47, 62, Marder Direct; Pl.'s Ex. 91 at 335–36, 494–95.) These specifications are not intrinsically known to an operator; rather they become apparent through trial and error.

118. The creation of bottom dross is a naturally occurring concern in any hot-dip coating bath and is the result of dissolution and build-up of iron in the coating bath. (2/20/92 Tr. at 35, Borzillo Direct.) The dross forms because the pot materials and strip are made of iron which are attacked by the coating bath. This interaction releases iron into the bath. When the bath becomes saturated with iron, the excess iron precipitates as iron compound particles which accumulate and settle toward the bottom of the pot. (2/20/92 Tr. at 36, Borzillo Direct.)

119. The practices associated with the prevention and removal of bottom dross are not unique to aluminum-zinc processing. (2/20/92 Tr. at 36, Borzillo Direct; Defs.' Ex. 130 at 40.) Moreover, the necessity of removing bottom dross in aluminum-zinc processing is well documented in the public literature. (2/20/92 Tr. at 37–38, Borzillo Direct.) Indeed, Junker, a pot manufacturer, recommends use of its pots in aluminum-zinc processing because its pots have features that enable an operator to easily monitor the accumulation of bottom dross. (*Id.;* Defs.' Ex. 158 at IV. 9.) Further, because of the need for high quality galvanized products in the automobile industry, extensive research is being done to manufacture pots that minimize the creation of bottom dross on galvanizing lines. (2/20/92 Tr. at 38–42, Borzillo Direct; Defs.' Ex. 232 at 117, Fig. 7.)

120. While BIEC instructs its licensees on the prevention of bottom dross, there is insufficient evidence to find that this infor-

mation is not in the public domain or that BIEC maintains discrete recommendations relating to these methods. (2/13/92 Tr. at 127, Wechsler Direct; 2/18/92 Tr. at 54, Marder Direct; Pl.'s Ex. 91 at 65, 185–88.)

121. BIEC provides its licensees with specific information concerning the relationship of the 55% aluminum-zinc alloy layer thickness to the operating parameters. (2/18/92 Tr. at 55; Marder Direct.) More specifically, BIEC information relates 55% aluminum-zinc alloy layer thickness to the steel grade, silicon content of the molten bath, temperature of the molten bath, incoming strip temperature to the bath, retention time of the strip in the bath, line speed and cooling rate in the upleg cooling tower. (Pl.'s Ex. 92, § I, at 1, 6–10, Figures 4, 8, 9; Pl.'s Ex. 99, Mercer and Willis; Pl.'s Ex. 98, Bethlehem Notes; Pl.'s Ex. 98, US Steel Notes, Session 12, at 1; Pl.'s Ex. 97, US Steel Notes.) These parameters are not intrinsically known to an operator; rather they become apparent after trial and error. While the effect of these parameters can be predicted from standard scientific diffusion theory and have been observed in galvanized and aluminized coatings (Defs.' Ex. 230 at 327, Fig. 4, 328, 336, Fig. 2, 338, Figs. 4(a), 4(b), and 5), BIEC has reduced Bethlehem Steel's laboratory studies into a readily useable reference form for its licensees. BIEC also provides information on procedures for determination of the alloy layer thickness by measuring iron content in the coating and a certain acid solution for stripping the overlayer to permit examination of the alloy layer. (Pl.'s Ex. 91 at 443–47; Pl.'s Ex. 92, § VI, at 64–66.)

122. BIEC has publicly revealed the specific post-treatments used on 55% aluminum-zinc sheet steel. The public literature revealed the specific oils, chromate passivation treatments and acrylic passivation treatments, as well as the amounts required. (2/20/92 Tr. at 45–53, Borzillo Direct; Defs.' Exs. 120 at 14; Defs.' Ex. 121 at 4, 5; Defs.' Ex. 124 at 7; Defs. Ex. at 161–164; Defs.' Ex. at 166–167; Defs.' Ex. 168 at 27, 30, Table 17; Defs.' Ex. 232 at 201; Defs.' Ex. 236 at "Rolling Forming"; Defs.' Ex. 264; Defs.' Ex. 272.)

123. BIEC provides its licensees with a comparison of the effectiveness of various acrylic passivation and chromate passivation treatments. (Pl.'s Ex. 95, Day 5 Passivation Treatments, Schuler.) While anyone can use the publicly known treatments to obtain the comparisons described above (2/20/92 Tr. at 137–38, Borzillo Direct), BIEC has already performed the necessary tests and compiled the results in a readily, useable reference form for its licensees.

124. The 55% aluminum-zinc product may be used either in a bare (i.e., coated) condition or painted on a separated continuous painting line. (2/13/92 Tr. at 165, Wechsler Direct.) The painting of 55% aluminum-zinc is in general similar to painting of galvanized products, but pretreatment used for painting of 55% aluminum-zinc and galvanized coating are different and incompatible. (Pl.'s Ex. 91 at 607, Table 8; Defs.' Ex. 235, Bates No. 80313.) The chemicals and paint systems used on 55% aluminum-zinc are provided by commercial vendors and hence their availability and claimed properties are available from the vendors' sales literature. (Defs.' Ex. 168.) Moreover, there is extensive documentation detailing the performance of 55% aluminum-zinc coated sheet steel painted with numerous pretreatment and paint systems in a wide range of atmospheres. (Defs.' Exs. 111; 112; 128; 132 at 367–373 and 389–396.)

125. BIEC has compiled its own test results, in a readily useable reference form for its licensees, which related to the relative performance in actual operation and long-term outdoor exposure tests of the vendors' competitive products. (Pl.'s Ex. 91 at 640–83; 2/13/92 Tr. at 165–66; Wechsler Direct.)

126. The evidence establishes that fluxing cannot be used on an aluminum-zinc processing line, and that this information was publicly revealed by BIEC. (2/29/92 Tr. at 136, Marder Cross; 2/20/92 Tr. at 60, Borzillo Direct; Defs.' Ex. 122.)

127. Having spent twenty-five (25) hours reviewing BIEC's Operating Manual (Pl.'s Ex. 91), Research and Technology

Manual (Pl.'s Ex. 92), and the six (6) Inter-ZAC Manuals (Pl.'s Exs. 95–100), and having spent an additional twenty-five (25) hours reviewing the public literature, BIEC's expert, Dr. Marder, testified that he found "an extraordinary number of pieces of information" which he believed to be proprietary to BIEC, that is, information which Dr. Marder did not find in the public literature and did not believe would be evident to those working in the field. Dr. Marder tabbed those pages of BIEC's manuals and minutes which he believed to contain proprietary information. Dr. Marder never gave actual details or specific examples of the alleged tabbed proprietary information, and we cannot conduct a review because BIEC never introduced the tabbed manuals into evidence. (2/28/92 Tr. at 18–36, Marder Direct.)

128. Dr. Marder is a metallurgical engineer and Professor of Material Science and Engineering at Lehigh University, Bethlehem, Pennsylvania with a strong research background in the area of hot-dip coatings. Dr. Marder has worked on several applied problems in the production of commercial product including galvanized, galvannealed, and galfan products. Dr. Marder also did some work comparing a new coating to the 55% aluminum-zinc coating. (2/18/92 Tr. at 2–12.) Dr. Marder has never consulted on nor operated a galvanizing, aluminum, or aluminum-zinc line. (2/18/92 Tr. at 91–93.)

129. At trial, BIEC did not attempt to specifically identify those portions of the manuals and conference minutes which it now contends, in Plaintiff's Post–Trial Proposed Findings of Fact 79–114, contain confidential information. Rather, BIEC offered only general testimony and evidence, through Dr. Marder and Richard Wechsler, describing the various parts of the manufacturing process for 55% aluminum-zinc coated sheet steel, claiming that BIEC's manuals contained, without identifying them, confidential information related to those general principles.

130. Without pointing to any specific provisions in the manuals and minutes, Dr. Marder testified that specific settings and parameters contained in the manuals and minutes including—substrate temperatures, surface roughness parameters, line speeds, thermal cycles, atmosphere control practices, and jet wiper settings—would be proprietary to BIEC. (2/18/92 Tr. at 35–50.) Taken together then, we find that the manuals and minutes contain at least some information which is confidential. More specifically, we believe that those provisions of the manuals enumerated in Findings 89, 95, 108, 111, 115, 117, 121, provide examples of information of the kind likely be confidential to BIEC.[6] The parameters contained in these provisions are not intrinsically evident to an operator; rather they only become evident to an operator after a period of trial and error. In each of these cases, BIEC has compiled the results of its experimentation and trial and error over the years into a readily useable reference form for its licensees.

131. We are convinced that an experienced galvanizer could recreate the confidential information contained in Findings 89, 95, 108, 111, 115, 117, 121 through his own trial and error. The evidence fails to establish, however, how long it would take an experienced galvanizer to recreate these parameters.

132. Having listened to the testimony of Forand, Borzillo, Shin, Caldwell, and Wechsler, we recognize that the individual Defendants, Forand, Borzillo, Shin, and Connolly, have committed an extraordinary and impressive amount of information related to 55% aluminum-zinc technology to memory. We are convinced that much of this includes the specific confidential parameters we discussed in Findings 89, 95, 108, 111, 115, 117, 121. It would be impossible for these individuals to attempt to recreate the parameters they have not committed to memory or to operate a 55% aluminum-zinc line without relying on the specific confi-

---

**6.** Accordingly, Findings 89, 95, 108, 111, 115, 117, 121 are not intended to be exhaustive, but rather are merely intended to provide examples of the kind of information for which we believe

that BIEC has established a likelihood that it will succeed on the merits at a final trial in proving that at least some of the information we have identified in these findings is confidential.

dential parameters they have committed to memory over the course of professional lives. Engineers are trained to build on what they know, not to reinvent the wheel before moving on. (2/18/92 Tr. at 77, 89–90, Marder Direct.)

133. We have already stated that absent expert testimony, subject to cross-examination, identifying those portions of the manuals and conference minutes which allegedly contain confidential information, the evidence at this point fails to establish which of the information enumerated in BIEC's Proposed Findings of Fact 79–114 is confidential and not publicly available. (Findings 80, 82, 84, 86, 92, 96, 101, 104, 106, 113, 120, 123, and 125.)

134. As enumerated in Findings 80, 82, 84, 86, 92, 96, 101, 104, 106, 113, 120, 123, and 125, BIEC has compiled an enormous amount of information relating to the manufacture of 55% aluminum-zinc coated sheet steel. While there is presently insufficient evidence to find that this information is more than a "textbook" of information in the public domain, this information has been compiled into a convenient, readily useable, efficient reference form for BIEC licensees, which can save time and money.

135. One of BIEC's current licensees, LTV (then J & L), a long-time galvanizer, came very close to producing commercial quality 55% aluminum-zinc coated sheet steel without using BIEC's technology and only using information in the public domain. (2/20/92 Tr. at 110, Borzillo Redirect; 2/24/92 Tr. at 84–87, Caldwell Direct.) LTV's primary mistake was its failure to adhere to the correct composition of the coating bath, a composition which was a matter of established public record. (*Id.*) Ultimately, LTV became a BIEC licensee, and within a short time was producing prime product.

136. Very recently, Wheeling–Nisshin (which has since become a BIEC licensee) told BIEC's officials that they did not believe they needed BIEC's assistance to make commercial quality 55% aluminum-zinc coated sheet steel. (2/19/92 Tr. at 130–31, Borzillo Cross.) In response, BIEC admitted in an internal memorandum that:

> Given enough time and money, we [BIEC] agree that Nisshin technical people will very likely be able to establish practices that will make it possible to produce good quality Galvalume. However, there will be a cost to this effort and this cost could conceivably exceed that of our fee....
>
> BIEC has an established reputation and successful track record in assisting its ... licensees with smooth, fast and low cost start-ups....
>
> BIEC would consider licensing the Galvalume trademark and the atmosphere control patent, if, in fact, W–N [Wheeling–Nisshin] decides not to license under our technology.

(Pl.'s Ex. 33.) Ultimately, Wheeling–Nisshin agreed to pay BIEC to purchase the technology.[7] (Pl.'s Ex. 173.)

137. Much of the information contained in BIEC's manuals and minutes and much of the technical information needed to produce high quality 55% aluminum-zinc coated sheet steel is in the public domain. (Findings 77–78, 81, 85, 91, 93, 98–100, 103, 105, 109, 114, 116, 119, 122, 124). Moreover, there are at least eleven, extant or almost extant, patents which relate to the manufacture of 55% aluminum-zinc coatings. (Findings 94, 107, 109, 116).

138. Given the quantity of information in the public domain, the reported experiences of LTV and Wheeling–Nisshin, BIEC's own admission (Pl.'s Ex. 33), and the testimony of five of the most knowledgeable individuals concerning 55% aluminum-zinc coated products, namely,—Forand, Borzillo, Shin, Caldwell, and Wechsler—we are convinced that an experienced galvanizer would be capable of establishing practices based solely on information in the public domain that would make it possible to produce commercial quality 55% aluminum-zinc sheet steel, albeit at what

---

**7.** Contrary to Defendants allegations, there is insufficient evidence to conclude on the basis of one internal BIEC memorandum that Wheeling–Nisshin sought to become a licensee solely because they wanted to use the GALVALUME trademark and one BIEC patent.

would probably be great cost and substantial start-up time.

139. BIEC's manuals and minutes provide licensees with a comprehensive body of technical knowledge which allows the licensor to enter the 55% aluminum-zinc coating market and make a competitive quality product relatively quickly.

140. BIEC has an established reputation and successful track record in assisting its twenty-three (23) licensees with smooth, fast and low-cost start-ups. We are convinced that the real value of BIEC's services and information rests in its ability to assist a licensee in producing a high quality product in a timely cost-effective manner.

## VI. OTHER BIEC BUSINESS TRADE SECRETS AND CONFIDENTIAL INFORMATION.

141. A detailed history of the product introduction of the first two manufacturers of 55% aluminum-zinc sheet during the 1980's is provided to licensees. These histories cover such items as development of a marketing plan, a project team approach, pricing strategies, target markets, competitive products, promotional activities, seeding the market with purchased coils prior to production start, development of new geographical markets, and introduction of needed ancillary and complimentary products such as compatible sealants (in place of solder), roll forming lubricants, compatible flashing materials (*e.g.*, not lead or copper) and compatible fasteners. (Pl.'s Ex. 93 at 89–125; Marketing Manual, pp. 89–125.) Much of this marketing information is in the public information. (Defs.' Exs. 110–15, 120–24, 126, 135–40, 156, 159, 161–67, 170, 172–84, 188–89, 192–204, 208, 210, 212–221, 236–239, 243, 242.)

142. BIEC maintains computerized mailing lists of its customers, critical contacts and prospective licensees. BIEC's mailing lists were compiled over more than ten years by BIEC employees, including the individual Defendants. As new contacts were made for example, at conferences, trade shows, or during sales trips, the lists were regularly updated. Employees, including the individual Defendants, had the discretion to add and delete names on these lists as they deemed necessary. The lists contain valuable information necessary for communication with BIEC's actual and prospective customers. At trial, Borzillo acknowledged that he treated the master lists as confidential within BIEC. Never-the-less, many of the names on the lists would be well-known to those familiar with the industry (for example, names of steel companies with galvanizing lines). (2/13/92 Tr. at 29–34, Wechsler Direct; 2/20/92 Tr. at 95–99, Borzillo Cross; 2/27/92 Tr. at 36–37, Forand Cross; Pl.'s Ex. 105.)

143. Like BIEC, the customers and business contacts of Global Steel Services represent large scale steel-makers and steel processors around the world who would have the capability of producing 55% aluminum-zinc coated sheet steel through the use of a continuous processing line. (Pl.'s Ex. 72.)

144. Throughout the discovery and trial of this case, the Defendants asserted that information relating to Global Steel Services' customers, prospective customers, proposals, contacts and consultants constituted sensitive business information of Global Steel Services. (2/27/92 Tr. at 11–12, Forand Cross; 2/14/92 Tr. at 97, 99, 147–48, Borzillo Direct.)

145. Within BIEC, each of the senior managers and officers was listed on a routing slip and thereby provided access to correspondence and other documentation received or prepared within BIEC. (Joint Stipulation—Pl.'s Proposed Finding number 118.)

146. Each of the individual Defendants was intimately involved day-to-day in one or more aspects of BIEC's business, including the terms and details of its existing licenses, the details and status of prospective licensees, marketing strategies, business plans, and financial reports and projections. These plans and projections are updated on an annual basis. (2/27/92 Tr. at 35, Forand Cross.) These aspects of BIEC's business involved information not in the public domain. (2/26/92 Tr. at 89–

92, Forand Cross; 2/25/92 Tr. at 144–49, Shin Cross; Pl.'s Exs. 163 at 36–37, 164 at 327–32, 165 at 283–87, 175 at 350.) Moreover, we believe that it would be impossible for the individual Defendants, having assisted in the start-up of twenty-two (22) of the twenty-three (23) existing 55% aluminum-zinc lines, and having been responsible for negotiating most of the existing BIEC license agreements, to now compete in the area of 55% aluminum-zinc coatings without relying on BIEC's confidential business information enumerated above.

## VII. BIEC HAS TAKEN REASONABLE STEPS TO SECURE AND PROTECT ITS TRADE SECRETS AND CONFIDENTIAL INFORMATION

147. BIEC is located in a small, 3,000–4,000 square foot office at 3400 Bath Pike, Bethlehem, Pennsylvania. (2/12/92 Tr. at 83, Wechsler Direct.) There are two standard size entrances to the BIEC office and each door has a standard lock and a separate dead-bolt lock. Normally only the front entrance is used. (2/12/92 Tr. at 83, Wechsler Direct.)

148. BIEC has a relatively small staff consisting of nine (9) persons, including three (3) secretaries. All employees have access to the confidential information and files since that is needed in order to perform their duties. (2/12/92 Tr. at 83, Wechsler Direct.)

149. Accordingly, the technical, marketing, and operating manuals and the various ZAC proceedings are contained in an unlocked room at BIEC. (2/14/92 Tr. at 16–17, Wechsler Cross.)

150. As officers and senior managers of BIEC, Wechsler and the individual Defendants signed written agreements in August, 1986 when they continued their employment relating to the maintenance and protection of BIEC's confidential information as follows:

4. *Confidential Information*

(a) Employee recognizes that Employer's business and continued success depend upon the use and protection of a large body of confidential and proprietary information. All of such confidential and proprietary information now existing or to be developed in the future will be referred to in this Agreement as "Employer Secrets." Employee intends that the meaning of "Employer Secrets" in this Agreement will be read as broadly as possible to include all information of any sort (whether merely remembered or embodied in a tangible medium) which (i) is related to Employer's business or any of Employer's potential future business and (ii) is not generally and publicly known.

(b) Employee promises and agrees to protect and preserve as confidential during the employment relationship and at all times after the termination of the employment relationship all of the Employer Secrets at any time known to Employee or at any time in Employee's possession or control.

(c) Employee will neither use nor allow any other person or entity (including, without limitation, entities partially or wholly owned by Employee) to use in any way, except for the benefit of Employer and as directed by Employer, any of the Employer Secrets.

(d) Employee will, prior to or upon leaving employment with Employer, deliver to Employer any and all records, items and media of any type (including, without limitation, all partial or complete copies of duplicates) containing or otherwise relating to any of the Employer Secrets, whether prepared or acquired by, or provided to, Employee. Employee acknowledges that all such records, items and media are and at all times will be and remain the property of Employer.

(e) Employee will enter into and comply fully with any agreement reasonably required by any of Employer's affiliates, suppliers or contractors with respect to the protection of the confidential and proprietary information of such entities.

(Pl.'s Exs. 50, 58, 61, 62.)

151. Those BIEC employees without written confidentiality agreements are counseled and made aware of the fact that BIEC's business involves the licensing of technology and confidential information.

(2/12/92 Tr. at 84, Wechsler Direct.) BIEC also has written secrecy agreements with its technical consultants and other consultants who are under contract to assist BIEC. (2/13/92 Tr. at 10–11, Wechsler Direct.)

152. Prior to 1986 when Broken Hill Proprietary acquired BIEC, Bethlehem Steel issued a written code of conduct on a yearly basis to certain employees. Although the code of conduct did not contain any explicit confidentiality provision until the December 1986 version, the pre–1986 versions did provide that "every employee must avoid any interest that conflicts with the interests of [Bethlehem Steel]...." (Pl.'s Exs. 14A—14I; Pl.'s Ex. 168 at 57–59, 73–74.)

153. BIEC also specifically protected the confidentiality of BIEC's technical information by transferring technology to a licensee only after each license agreement was signed. A typical BIEC license agreement provides as follows:

> For a period of ten (10) years from the date of disclosure to Licensee of Technical Information [8] and information related to each Licensor Improvement, Licensee shall use reasonable efforts to maintain such information secret and confidential. Furthermore, Licensee shall not, except as provided under this Agreement, disclose such information to a third party or use such information for Licensee's own benefit except for the production of Licensed Products or research work related thereto.

(Pl.'s Ex. 173, Tab E, § 10.01.) Disclosure by licensees to equipment makers and other suppliers was permitted only after the supplier signed a secrecy agreement with BIEC or the licensee. (2/12/92 Tr. at 80, Wechsler Direct; 2/14/92 Tr. at 172–74, Borzillo Redirect.)

154. There is insufficient evidence to find that the parties to the license agreements, namely BIEC and its licensees, have any dispute as to the meaning of the ten (10) year confidentiality provision quoted above in Finding 153. While there is evidence that BIEC attempted to enter into contract extensions with those licensees who entered into agreements prior to 1982, there is insufficient evidence to conclude that the purpose of those negotiations was to prevent licensees from disclosing services related to 55% aluminum-zinc coatings to third parties when the contracts expired at the end of the ten (10) year period. Rather, all the evidence suggests that BIEC merely sought to extend its very lucrative royalties. (2/27/92 Tr. at 54–55, Wechsler Redirect; 2/19/92 Tr. at 90–93, Borzillo Direct.)

155. When negotiating with prospective licensees, BIEC had its prospects sign an interim confidentiality agreement which provided as follows:

> In consideration of BIEC, or any of BIEC's Licensees, disclosing to [Prospective Licensee] certain proprietary information related to technology, equipment and/or facilities for the production of aluminum-zinc alloy coated products, [Prospective Licensee], for a period of ten (10) years from the date of such disclosure, hereby agrees: (a) to treat all such information as confidential, (b) not to disclose any such information to third parties without BIEC's written permission, and (c) not to use such information except for purposes of determining whether [Prospective Licensee] wishes to obtain a license from BIEC with respect to proprietary information applicable to such products.

These interim agreements were thereafter superseded by the confidentiality provision

---

**8.** "Technical Information" is defined as follows: Bethlehem's existing proprietary data, know-how and technical information which relates to the subject of Sheet and/or Strip coated with an aluminum-zinc alloy having aluminum in the range of twenty-five percent (25%) to seventy percent (70%) by weight and JLA's [John Lysaght Australia's] existing proprietary data, know-how and technical information which relates to the JLA invention described in JLA's Australian provisional patent application No. PE5122, and all data, know-how and technical information applicable to such JLA invention as of the Effective Date and developed by JLA prior to April 14, 1986. Such information by way of example being shown in outline form in Appendix A. (Pl.'s Ex. 173, Tab E, § 1.03.)

of the license agreements when negotiations were successful. (2/26/92 Tr. at 105–11, Forand Cross; Pl.'s Exs. 173, Tab X, § 15.01, 173.)

156. BIEC's technology manuals were treated as confidential and proprietary within BIEC, including by the individual Defendants. BIEC's technology manuals are labelled confidential and numbered, and maintained as confidential and proprietary information. The manuals, as updated, are only provided to licensees, and then only after the license agreement and accompanying confidentiality agreement has been signed. (2/12/92 Tr. at 64–66, Wechsler Direct; Pl.'s Exs. 91, 92, 93, 94, 171, 172, 174.)

157. The cover of each technology manual carries a notation confirming the confidential nature of the binder: "The information herein is considered proprietary to BIEC International, Inc. and John Lysaght (Australia), Ltd. (now known as BHP [Broken Hill Proprietary] Steel International Group—Coated Products Division) and shall be maintained confidential." (Pl.'s Exs. 91, 92, 93, 94, 171, 172, 174.)

158. BIEC, including the individual Defendants, treated BIEC's non-technical business information as confidential to BIEC, including the mailing lists, business plans, license terms, customer and target customer negotiations, marketing strategies and financial records. (2/13/92 Tr. at 28–43, Wechsler Direct; 2/20/92 Tr. at 92–103, Borzillo Cross.)

159. The InterZAC manuals were also treated as confidential and proprietary within BIEC, including by the individual Defendants. The manuals are labelled as confidential, numbered, and provided to licensees with a letter noting the confidential and proprietary nature of the information. They are provided to new licensees only after a license agreement is signed. (2/12/92 Tr. at 67–69, Wechsler Direct; 2/26/92 Tr. at 92, Forand Cross; 2/20/92 Tr. at 111, 125–33, Borzillo Cross.)

160. The cover page of each InterZAC binder carries a notation confirming the confidential nature of the information: "Information contained in the proceedings of InterZAC [year] is to be maintained confidential and used only in the manner permitted by the provisions of one or more agreements between BIEC International, Inc. and its licensees directed to aluminum zinc alloy coated ferrous-based products." (Pl.'s Exs. 17, 20, 23, 26, 29, 31.)

161. Moreover, in his cover letter distributing the 1986, 1987 and 1989 InterZAC binders, Borzillo wrote: *"Please note that the proceedings are a confidential document and are considered to be part of BIEC's GALVALUME technology. Each copy is numbered and a record is kept of the persons to whom each copy is sent."* (emphasis in original) (Pl.'s Exs. 19, 22, 25.) In his cover letters distributing the 1984, 1983 and 1981 InterZAC manuals, Borzillo similarly highlighted BIEC's view that the information was confidential and proprietary and not in the public information. (2/14/92 Tr. at 133–37, Borzillo Direct; Pl.'s Exs. 28, 30, 32.)

162. The minutes and other documents from the NamZAC, PacZAC, EuroZAC and OpZAC proceedings were also treated as confidential within BIEC, including by the individual Defendants. The information was only shared with licensees. (2/12/92 Tr. at 69–75, Wechsler Direct; 2/25/92 Tr. at 148–49, Shin Cross; 2/21/92 Tr. at 62–64, Borzillo Cross.)

163. Albeit somewhat informally, BIEC has monitored and continues to monitor the quality of all GALVALUME products sold by its licensees. As part of BIEC's technology transfer, BIEC experts are present at all line start-ups and provide on-going on-site problem-solving and consulting skills as required under the terms of its licenses, thereby keeping BIEC abreast of the quality of all GALVALUME products. BIEC experts also make at least one visit to licensees per year. While many of these visits are in the nature of a courtesy call, such visits never-the-less provide BIEC with an opportunity to monitor the quality of its licensees' GALVALUME products. (2/12/92 Tr. at 82, Wechsler Direct.) In April 1991, Forand, as BIEC's President, implemented a "more formal" program of monitoring the use of BIEC's GALVA-

LUME trademark and the quality of the product sold by licensees using the GALVALUME trademark. (Pl.'s Ex. 211.) Moreover, BIEC license agreements specifically require that licensees assure the high quality product associated with the GALVALUME trademark. (Pl.'s Ex. 173, Tabs D, E, F, G, N, R, S, U, X.)

164. The term GALVALUME is used without attribution to BIEC in several metals trade journals. (2/26/92 Tr. at 74–76, Forand Direct; Defs.' Exs. 286, 287, 288.)

165. In *American Metal Market*, the daily publication about the metals industry, the section of the magazine that quotes steel base prices has recently [9] used the term GALVALUME without attribution to BIEC or indication of the registered trademark for the price quotation of sheet steel coated with 55% aluminum-zinc. (2/26/92 Tr. at 74–75, Forand Direct; Defs.' Ex. 286.)

166. The term GALVALUME has been used similarly over the last year [10] in the monthly trade journal, *Metal Construction News*, and the monthly trade magazine, *Metal Architecture*. (2/26/92 Tr. at 76, Forand Direct; Defs.' Exs. 287, 288.)

## VIII. THE INDIVIDUAL DEFENDANTS' DEPARTURE FROM BIEC.

167. By 1989, the Pacific Rim or Pacific Basin region (countries in close proximity to the Pacific Ocean—*e.g.*, Korea, Taiwan, Japan, Western United States, Australia and New Zealand) was an area of importance to BIEC's licensing efforts. (2/26/92 Tr. at 47, Forand Direct.) The Pacific Basin represented BIEC's highest level of prospective business. (2/26/92 Tr. at 47, Forand Direct.)

168. Borzillo and Forand had been negotiating with Company X (Confidential Appendix ¶ 6) since the early 1980's to consummate a 55% aluminum-zinc licensing agreement when at the May 1988 BIEC board meeting, Doyle told Forand to stop negotiations with Company X because of Broken Hill Proprietary's concern over competition by Company X in the Australian market. (2/26/92 Tr. at 50, Forand Direct; Defs.' Ex. 282 at 12.)

169. BIEC adhered to Doyle's request and Forand and Borzillo stopped all licensing negotiations with Company X. (2/26/92 Tr. at 50, Forand Direct.)

170. In November 1989, BIEC, acting through Shin, made a contract proposal to license 55% aluminum-zinc services to Company Y. (Confidential Appendix ¶ 7.) (2/25/92 Tr. at 77, Shin Direct.)

171. In March 1990, Doyle [11] informed Forand to withdraw the pending Company Y contract proposal and submit a new contract proposal which contained a 12½% tariff import royalty on all 55% aluminum-zinc coated sheet steel which Company Y would produce and ship to Australia. (2/26/92 Tr. at 51, 52, Forand Direct; 2/25/92 Tr. at 80, Shin Direct.) Forand and Shin complained to Doyle contending the withdrawal of these contract proposals was not an appropriate way to do business. (2/26/92 Tr. at 52, Forand Direct.)

172. Doyle informed Forand that the reason for the imposition of the 12½% tariff import provision into the proposed licensing contracts was that it was necessary to protect Broken Hill Proprietary from competition in the Australian marketplace. (2/26/92 Tr. at 53–54, Forand Direct.) The 12½% Australian tariff import royalty eliminated the profit margin in imported 55% aluminum-zinc coated sheet steel and made it economically unfeasible for any producer to ship such a product

---

**9.** Defs.' Ex. 286 was published on January 10, 1992.

**10.** Defs.' Exs. 287 and 288 were published in October, 1991 and September, 1991 respectively.

**11.** As the Director of BIEC and as the individual responsible for supervising BIEC's actions for Broken Hill Proprietary, Doyle was authorized to speak on behalf of BIEC, although he was an employee of Broken Hill Proprietary. Therefore, Doyle's oral and written statements (see Defs.' Exs. 20, 23, 25, 27, 31, 35, 36–38, 40, 44, 46, 49–50, 57, 61–63, 69 and Findings 172–182) are admissible as an admission of a party-opponent. *See Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1306 (9th Cir.1983).

into Australia. (2/26/92 Tr. at 53–54, Forand Direct.)

173. Broken Hill Proprietary became involved in the redrafting of the Company Y contract proposal and two proposed agreements were set forth—the essential change in the agreements from the prior contract proposal being the imposition of the 12½% Australian tariff import royalty. (2/26/92 Tr. at 52, Forand Direct.)

174. Company Y refused to enter into a licensing agreement with BIEC after the submission of the new proposal containing the 12½% Australian tariff import royalty despite the efforts of Forand, Shin and Doyle who all traveled together to visit Company Y. (2/25/92 Tr. at 80, Shin Direct; 2/26/92 Tr. at 53, Forand Direct.)

175. In the spring of 1990, BIEC, through Shin, made a contract proposal to Company Z (Confidential Appendix ¶ 8) in which BIEC sought to establish a licensing arrangement relating to 55% aluminum-zinc services. (2/25/92 Tr. at 82, Shin Direct; Defs.' Ex. 30.)

176. In May 1990, Doyle informed Forand and Shin that the Company Z proposal must be withdrawn and an amended proposal containing a 12½% Australian tariff import royalty must be submitted. (2/25/92 Tr. at 91, Shin Direct; Defs.' Ex. 31.)

177. At Doyle's request, Shin withdrew the original proposal sent to Company Z and subsequently submitted a revised proposal to Company Z containing the 12½% Australian tariff import royalty. (2/25/92 Tr. at 92–93, Shin Direct.)

178. Company Z rejected the new contract proposal containing the 12½% Australian tariff import royalty. (2/25/92 Tr. at 93, Shin Direct.)

179. In May 1990, Shin and Forand were also notified that all future 55% aluminum-zinc licensing agreements in the Asian/Pacific region must contain the 12½% Australian tariff import royalty.

(2/25/92 Tr. at 91, Shin Direct; 2/26/92 Tr. at 56, Forand Direct; Defs.' Ex. 31.)

180. In late 1990, Doyle instructed Forand to find a way to stop licensing in the United States despite the fact that negotiations were underway with two American steel-makers. (Confidential Appendix ¶ 9.) (2/26/92 Tr. at 56–57, Forand Direct.)

181. On July 30, 1990, Doyle instructed Forand that *all* future 55% aluminum-zinc licensing agreements with companies not having a Broken Hill Proprietary equity must contain the 12½% Australian tariff import royalty. (2/26/92 Tr. at 56, Forand Direct; Defs.' Ex. 38.)

182. Wechsler, Shin and Forand traveled to Broken Hill Proprietary in Australia in March 1990. Besides discussions concerning the tariff import royalty language in the proposed licensing agreements, Broken Hill Proprietary turned down BIEC's latest investment project—the Market Mill project—concerning a warehouse distribution system in the United States.[12] (2/26/92 Tr. at 58–59, Forand Direct.) The warehouse distribution system investment project was one of approximately a dozen investment studies that were undertaken by BIEC but refused implementation by Broken Hill Proprietary. (2/26/92 Tr. at 58–59, Forand Direct). After the March 1990 meeting in Australia, BIEC had only one proposed investment project outstanding and that called for a scaled down version of the original Market Mill project and was called the East Coast Market Mill project. (2/26/92 Tr. at 58–59, Forand Direct.)

183. In the spring of 1990, Wechsler, Forand, Borzillo, Shin and Connolly met to discuss the future of BIEC because of the Broken Hill Proprietary imposed restrictions on BIEC's licensing program, rejection of BIEC investment projects and also because BIEC's revenue stream was expected to fall precipitously. (2/25/92 Tr. at

---

12. Over a period of a year and a half, BIEC developed a number of Market Mill studies involving a detailed analysis of a fully integrated facility for the production of sheet steel coated with 55% aluminum-zinc. (2/12/92 Tr. at 92–

93, Wechsler Direct.) BIEC's market mill documents were developed by BIEC at a cost of approximately $1.5 million. The idea centered around constructing a steel mill closer to the places where the steel is used.

99–100, Shin Direct; 2/26/92 Tr. at 58–60, Forand Direct.)

184. The individual Defendants and Wechsler realized that the recent imposition by Broken Hill Proprietary of the 12½% Australian tariff import royalty on future licensing contracts made it virtually impossible to enter into new 55% aluminum-zinc agreements, and that the result would be the further shrinking of BIEC revenues.

185. In June 1990, after a BIEC Board Meeting, Forand told the key management employees of BIEC—Forand, Borzillo, Shin, Connolly and Wechsler—that Broken Hill Proprietary had advised him to design and implement a plan to "harvest" (i.e., downsize or liquidate) BIEC. (2/25/92 Tr. at 156, Shin Cross; 2/26/92 Tr. at 118, Forand Cross; 2/12/92 Tr. at 101, Wechsler Direct; Pl.'s Exs. 36, 164 at 254–56.)

186. Beginning in 1990, the individual Defendants and Wechsler met and discussed their options for leaving BIEC. Planning meetings occurred in the spring and fall of 1990. (2/25/92 Tr. at 156–58, Shin Cross; 2/26/92 Tr. at 118–20, Forand Cross; 2/12/92 Tr. at 100–01, Wechsler Direct.) Forand consulted with attorney Ed Fedok in the spring of 1990 on such issues as the Defendants' right to get into the 55% aluminum-zinc business without Broken Hill Proprietary's agreement, and the impact on those rights if Broken Hill Proprietary elected to "harvest" BIEC (i.e., liquidate or downsize BIEC). (2/26/92 Tr. at 118–20, Forand Cross.)

187. In February 1991, Broken Hill Proprietary rejected the East Coast Market Mill project, which was the last pending investment alternative for BIEC. (2/26/92 Tr. at 61, Forand Direct.)

188. In March 1991, after Broken Hill Proprietary rejected the East Coast Market Mill project, Forand, in conjunction with the other individual Defendants and Wechsler, drafted a document listing several desirable outcomes for the group ("desirable outcomes memo"). (2/26/92 Tr. at 60–61, Forand Direct; Defs.' Ex. 285.) The desirable outcomes memo represented a consensus of discussions between the individual

Defendants and Wechsler. (2/26/92 Tr. at 63, Forand Direct.)

189. The first option was negotiating with BIEC to receive severance payments calculated through a multiplier factor. The group justified asking for severance pay compensation in excess of the contracted amount because Broken Hill Proprietary had inhibited BIEC's ability to generate revenue and profits through the imposition of the tariff import royalty in the prospective licensing contracts. (2/25/92 Tr. at 104, Shin Direct.)

190. The second option was to form a company owned by the group, which would run BIEC's licensing business pursuant to an agreement with Broken Hill Proprietary. (2/25/92 Tr. at 104, Shin Direct.)

191. The third option was for the group to continue working at BIEC with modified employment contracts. (2/25/92 Tr. at 104–05, Shin Direct.)

192. The fourth option was to accept BIEC's termination, with the group receiving one year severance pay and gaining the immediate freedom to compete with BIEC. (2/25/92 Tr. at 104–05, Shin Direct.)

193. By the spring of 1991, the individual Defendants began to regularly consult with outside counsel, Ed Fedok and G. Thompson Bell of Stevens & Lee, the law firm which Ed Fedok had joined. Meetings were held with Stevens & Lee in March, May and June 1991. (2/25/92 Tr. at 165, Shin Cross; 2/26/92 Tr. at 120–21, Forand Cross; 2/21/92 Tr. at 71–73, Borzillo Cross.)

194. On March 25, 1991, Wechsler, Forand, Borzillo, Shin and Connolly entered into a "Gentlemen's Agreement" in which they promised to act as a group in all negotiations with BIEC and Broken Hill Proprietary. (2/12/92 Tr. at 99, Wechsler Direct; 2/26/92 Tr. at 114–15, Forand Cross; Pl.'s Exs. 39, 175 at 438–39.)

195. In early June 1991, everyone at BIEC had the expectation that their employment at BIEC would be terminated at the end of the month. (2/12/92 Tr. at 105, Wechsler Direct.)

196. By memoranda dated May 8, 1991 and June 20, 1991, Wechsler voiced his opposition to what he perceived to be plans to extract a large and unwarranted payment from BIEC and to compete with BIEC in violation of the Defendants' employment contracts. By his own choice, Wechsler was no longer involved in the Defendants' discussions after June 20, 1991. (2/12/92 Tr. at 103–08, 110–11, 113–14, Wechsler Direct; 2/14/92 Tr. at 68–71, Wechsler Redirect; 2/26/92 Tr. at 121–24, Forand Cross; 2/25/92 Tr. at 160–65, 167–68, Shin Cross.)

197. Surprised and upset by Wechsler's memos, Borzillo, Shin and Forand responded in writing to Wechsler, expressing their outrage and shock at Wechsler's implication that the group would in any way attempt to defraud or "rip off" BIEC or Broken Hill Proprietary. (2/19/92 Tr. at 105, Borzillo Direct; 2/25/92 Tr. at 106–07, Shin Direct; Defs.' Exs. 95, 96.)

198. Having listened to and evaluated the credibility of Wechsler's, Forand's, Borzillo's, and Shin's testimony, we find no evidence of bad faith or bad dealing on the part of any of these individuals. In light of the obvious credibility problems here—Forand, Borzillo and Shin were in the midst of ending what had been long-term employment relationships with BIEC and Wechsler was being considered for a promotion to President of BIEC—we refuse to give any weight to the unreliable fingerpointing by each of these individuals in their memoranda and at trial. Rather, we find that from May 1991 through June 28, 1991, each of these individuals feared imminent termination from BIEC and each took steps to protect what he perceived to be legitimate employment options. (2/12/92 Tr. at 103–08, 110–11, 113–14, Wechsler Direct; 2/25/92 Tr. at 160–65, 167–68, Shin Cross; 2/26/92 Tr. at 121–24, Forand Cross; 2/19/92 Tr. at 106–07, Borzillo Direct; Pl.'s Exs. 6, 7; Defs.' Exs. 95, 96.)

199. The June 28, 1991 BIEC Board Meeting was attended by Doyle, Tune and Wechsler and for parts of the meeting by the individual Defendants. (2/25/92 Tr. at 109, 126, Shin Direct.)

200. At the June Board Meeting, Forand, Borzillo, Shin and Connolly were presented with letters of termination, terminating their employment contracts "without cause" as of July 28, 1991, (2/14/92 Tr. at 54, Wechsler Cross; 2/26/92 Tr. at 65, Forand Direct; Defs.' Exs. 83, 84, 85, 86) and Wechsler was named the new President of BIEC. (2/26/92 Tr. at 65, Forand Direct.)

201. New contracts were tendered to Borzillo, Shin and Connolly. These contracts provided for increased base salaries, eliminated the previous bonus provisions (effectively reducing their compensation by one-third), added a benefits and pension package (for which the Defendants had long been lobbying), and required each Defendant to release BIEC and Broken Hill Propriety from any liability with respect to their employment relationship. (2/25/92 Tr. at 110, 171–72, Shin Direct and Cross; 2/21/92 Tr. at 75–76, Borzillo Cross.) Borzillo, Shin and Connolly rejected BIEC's offer. (2/25/92 Tr. at 110, Shin Direct.)

202. As reflected in the minutes of the June 28, 1991 Board Meeting, Doyle advised BIEC's employees that BIEC provided the opportunity for growth, not harvesting, and that BIEC and its employees were considered vital and important assets to Broken Hill Proprietary. (Pl.'s Ex. 188.)

203. Immediately following the BIEC Board Meeting, on the same day, the individual Defendants assembled at the Stevens & Lee law firm for a meeting with their counsel. (Joint Stipulation—Pl.'s Proposed Finding number 142.)

204. Forand, Borzillo, Shin and Connolly allege that BIEC breached the severance pay provision for each of the individual Defendants by paying them only three (3) months' severance pay when the severance pay provision in the employment contract mandates a twelve (12) month severance pay payment. (2/26/92 Tr. at 66, Forand Direct; 2/25/92 Tr. at 116, Shin Direct.) The relevant portions of the employment contract for each individual Defendant provides:

If employer terminates the employment relationship without cause after Decem-

ber 31, 1987, employee shall be entitled to receive three (3) months' salary from the date of notice of termination as severance pay. If employer terminates the employment relationship *without cause and for corporate or holding company reasons unrelated to the performance of the business of employer or the performance of employee, employee shall be entitled to receive twelve (12) months' salary from the date of notice of termination as severance pay.* (Emphasis added).

(Pl.'s Exs. 50, 58, 61, 62.)

205. Wechsler testified that the employment relationships with Forand, Borzillo, Shin and Connolly were terminated for corporate or holding company reasons on grounds that the contracts operated "to the detriment of the overall Company [Broken Hill Proprietary's] good." (Defs.' Ex. 289 at 354.) On the basis of this testimony, there is insufficient evidence to conclude that the Defendants were terminated for "holding company reasons unrelated to the performance of the business of" BIEC, and therefore, entitled to severance payments pursuant to the termination clause cited above in Finding 204.

## IX. FORMATION OF GLOBAL STEEL SERVICES.

206. After receiving their termination letters, Forand and Borzillo discussed forming a new company. They included Shin (who had been recuperating from surgery) in the discussions in mid-July 1991. (2/25/92 Tr. at 121, Shin Direct.) Although Connolly is retired and has never performed any services for Global Steel Services, Connolly has been identified as a possible consultant for Global Steel Services and has been referred to as part of the Global Steel Services team in at least one Global Steel Services proposal. (Pl.'s Exs. 2, 111.)

207. Forand, Borzillo and Shin's prior employment contract with BIEC contained both a covenant not-to-compete and a confi-

dentiality and non-disclosure provision. (Pl.'s Exs. 50, 58, 61, 62.)

208. The covenant not-to-compete clause provided:

(d) Notwithstanding any other provision in this section 7 to the contrary, the covenants of employee not to compete with employer for a period of twelve (12) months after the termination of the employment relationship shall not be binding upon employee if employer terminates the employment relationship *without cause.* (Emphasis added).

(2/26/92 Tr. at 68, Forand Direct; 2/25/92 Tr. at 125, Shin Direct; Pl.'s Exs. 50, 58, 61, 62.)

209. The letters of termination that Forand, Borzillo, Shin and Connolly received from BIEC each stated that the individuals were terminated "without cause." (Defs.' Exs. 83, 84, 85, 86.)

210. The primary business of BIEC at the time Forand, Borzillo, Shin and Connolly were terminated was the licensing of 55% aluminum-zinc services and the GALVALUME trademark. (2/25/92 Tr. at 126, Shin Direct; 2/26/92 Tr. at 68, Forand Direct; 2/12/92 Tr. at 45–46, Wechsler Direct.)

211. The confidentiality provision in Forand, Borzillo, Shin and Connolly's employment contracts specifically excludes from the sphere of confidential information that which is "generally and publicly known." [13] (Pl.'s Exs. 50, 58, 61, 62.)

212. In light of their freedom to compete, their belief that the information associated with 55% aluminum-zinc coatings was "generally and publicly known", and their belief that the confidentiality provisions of early Bethlehem Steel and Bethlehem International licensees were either expired or about to expire,[14] thus giving these companies the freedom to provide services related to 55% aluminum-zinc coatings to third parties, Forand, Borzillo and Shin decided, by at least July 10, 1991, to form Global Steel Services to similarly provide services associated with 55% aluminum-zinc

---

**13.** For the full text of the confidentiality provision see Finding 150.

**14.** For the full text of the confidentiality provision in the license agreements see Finding 153.

coatings to world steel-makers. (2/26/92 Tr. at 68, 126, Forand Direct and Cross; 2/25/92 Tr. at 115, 121, Shin Direct; 2/21/92 Tr. at 81–82, Borzillo Cross; 2/14/92 Tr. at 82, Borzillo Direct; Pl.'s Ex. 175 at 13.)

213. Forand and Borzillo stayed at BIEC through July 28, 1991. During that time, they made no effort to shield themselves from BIEC's confidential information and made no announcement of their plans to form a competing business and to transfer 55% aluminum-zinc technology. (2/21/92 Tr. at 91, Borzillo Cross; 2/26/92 Tr. at 125–26, Forand Cross; Pl.'s Ex. 175 at 15–16, 19–21.)

214. By July 15–17, 1991, Global Steel Services' stationery, business cards and logo were prepared and finalized. (Joint Stipulation—Pl.'s Proposed Finding number 145.)

215. The Global Steel Services logo is strikingly similar to the logo formerly used by BIEC. The BIEC logo includes a segmented globe surrounded by an angle. The Global Steel Services logo is identical to the BIEC logo except that the open side of the Global Steel Services angle has been closed so that the segmented globe is surrounded by an equilateral triangle. (Pl.'s Ex. 71.)

216. The Global Steel Services logo was conceived by Forand while he was President of BIEC and was specifically derived from the BIEC logo. At a meeting in October 1987, Forand asked Mike Sayre of Saraceno & Sayre, BIEC's outside graphics firm, to develop, on a confidential basis, a logo for Bethlehem International Group, a separate company Forand and others, were contemplating starting. Forand suggested that Bethlehem International Group's logo should be derived from the BIEC logo, and he sketched a logo for Sayre which is the same as the logo now used by Global Steel Services. Pursuant to Forand's instruction, Sayre then graphically developed the logo for Forand by deriving it from the existing BIEC logo. (2/27/92 Tr. at 33–35, Forand Cross; 2/27/92 Tr. at 48–51, Sayre Direct; Pl.'s Exs. 206, 207.)

217. Although the BIEC logo from which the Global Steel Services logo was derived has not been printed on any BIEC documents since 1988, the logo is still in use. Among other things, it appears on early copies of the technology manuals, the InterZAC manuals for the years 1981, 1983, 1984, 1986 and 1987, the announcements sent by BIEC after the Broken Hill Proprietary acquisition, and the BIEC clips and other correspondence circulated by BIEC. The publications are still in use by BIEC licensees today. (2/13/92 Tr. at 8–10, Wechsler Direct; 2/27/92 Tr. at 32–33, Forand Cross; Pl.'s Exs. 77, 96, 97, 98, 99, 100, 171, 172, 174.)

218. By July 16–18, 1991, Global Steel Service's press release, dated August 2, 1991, was prepared and five hundred copies were printed. (2/26/92 Tr. at 126–27, Forand Cross; 2/27/92 Tr. at 27–29, Forand Cross; Pl.'s Exs. 2, 107.) The press release stated in relevant part:

Former BIEC Executives Start New Steel Consulting Company

Bethlehem, PA, August 2, 1991—Three former BIEC International, Inc. (BIEC) executives have formed a new consulting firm, Global Steel Services Ltd. (GSS). The executives, with their former positions at BIEC indicated, are:

 —James L. Forand, President and Chief Executive Officer
 —Angelo R. Borzillo, Vice President, Coated Steel Technology
 —Paik W. Shin, Vice President, Far East

BIEC is currently a subsidiary of BHP [Broken Hill Proprietary] Steel (Australia). BIEC had its origins as a subsidiary of Bethlehem Steel Corp. when it was called Bethlehem International Engineering Corporation. BHP [Broken Hill Proprietary] acquired certain BIEC assets from Bethlehem in 1986. All three executives were long term employees of Bethlehem prior to the sale of these assets. They have a combined experience of nearly 100 years in the steel industry. GSS will offer a full range of technical, marketing, procurement, operating and engineering services to worldwide pro-

ducers, suppliers, and users of hot dip coated steel products. Typical products are steels coated with zinc, zinc-aluminum, aluminum-zinc and aluminum coatings. These products are used in the construction, automotive and appliance industries.

While at BIEC, the new firm's team was instrumental in selling GALVALUME* sheet steel licenses to 23 major steel companies around the world. The Galvalume steel licensing program is recognized as one of the most successful ever in the steel industry.

GSS executives are not only expert in licensing steel technology, but also have a wide and varied experience in the steel industry. Collectively, they have backgrounds in sales, marketing, engineering, research and licensing. Each is recognized for his individual professional reputation:

—J.L. Forand for his general management, marketing, licensing, negotiating and research skills.

—A.R. Borzillo for his reputation as the co-inventor of Galvalume sheet and hot dip coatings and corrosion research accomplishments.

—P.W. Shin for his expertise in sheet steel and hot dip coating technology, and vast business experience in the Far East.

Collectively, the new company management team was responsible for research work that led to numerous U.S. and foreign patents on coated sheet steels. These patented developments all came about during their tenure with Bethlehem's research department.

GSS will also be assembling a staff of consulting associates expert in the field of coated steel products. These associates will assist the management team on specific projects in which their skills, knowledge and backgrounds can be used. The first such consulting associates are also former long term employees with Bethlehem Steel.

—J.J. Connolly, Operating Associate. Mr. Connolly is the former Vice President of Operations of BIEC and has over 35 years experience in managing galvanizing and Galvalume lines. His extensive experience in problem-solving would be an aid to any producer of hot dip coated sheet steel.

—L.B. Caldwell, Technical Associate. Mr. Caldwell is a former Technical Consultant for BIEC and has over 35 years research and operating experience with galvanized, aluminum-zinc and aluminum coated products.

The firm will be headquartered in Bethlehem, PA and is ready to discuss business arrangements with interested parties now.

---

* GALVALUME is a trademark of BIEC International, Inc.

(Pl.'s Ex. 2.)

219. The August 2, 1991 "press release" describes the various lines of business in which the Defendants are involved. In addition to the 55% aluminum-zinc technology, the "press release" indicates that the Defendants are involved in other competing hot-dip coatings, including zinc, zinc-aluminum, aluminum-zinc and aluminum. (Pl.'s Ex. 2 at 2.) Specifically, in addition to 55% aluminum-zinc, Global Steel Services' sphere of business includes the following hot-dip coatings: galvanizing (100% zinc), Crack Free (1% aluminum), Galfan (5% aluminum), Superzinc (5% aluminum), aluminum-zinc in the range of 75% to 90% aluminum, and aluminizing (100% aluminum). The Defendants believe that they have the competence and the experience to operate and provide technology, marketing, procurement and engineering services in all of these competing hot-dipped coatings. (Joint Stipulation—Pl.'s Proposed Finding number 199.)

220. The "press release" was sent by Global Steel Services to approximately five hundred prospective customers and industry contacts developed by the individual Defendants throughout their professional careers. While some of the names may correspond with those listed on documents taken by the individual Defendants from BIEC, no names were taken off of BIEC's computerized mailing list (Pl.'s Ex. 105) or list of key customer contacts (Pl.'s Ex. 59).

Rather, all names were either personal contacts of the individual Defendants or taken off of the Defendants' personal rolodex which may or may not have been computerized or business cards. (2/14/92 Tr. at 94, Borzillo Direct; 2/20/92 Tr. at 79–82, Borzillo Cross; 2/27/92 Tr. at 27–28, Forand Cross; 2/25/92 Tr. at 192, Shin Cross; Pl.'s Ex. 164 at 77–78.) There is insufficient evidence to conclude that names were taken off of BIEC's correspondence files,[15] which were among the files taken by the Defendants from BIEC. (2/20/92 Tr. at 79–82, Borzillo Cross.)

221. By July 22, 1991, the incorporation papers for Global Steel Services were filed by the Stevens & Lee law firm. (Joint Stipulation—Pl.'s Proposed Finding number 147.)

222. Sometime between mid-July and July 25, 1991, Borzillo advised BIEC, through Noel Doyle, that he was not going to accept BIEC's offer for continued employment. (2/21/92 Tr. at 87–89, Borzillo Cross; Pl.'s Ex. 175 at 20–21.)

223. Wishing to retain their personal work product from their time at BIEC and feeling they had an absolute right to do so, Forand, Borzillo, Shin and Connolly retained copies of documents which included the Research and Technology Manual, the Operating Technology Manual, the Marketing Manual, the Equipment Manufacturer's Manual, the InterZAC proceedings and other documents which they believe encompassed their work product. (2/26/92 Tr. at 66–67, Forand Direct.) They also retained copies of documents which they felt would be needed to document certain affairs of Broken Hill Proprietary and BIEC in the event of litigation. (2/25/92 Tr. at 118, Shin Direct.)

224. Neither Borzillo, Forand, Shin or Connolly retained or took copies of any documents which were not contained within the individual offices at BIEC. (2/26/92 Tr. at 66, Forand Direct; 2/25/92 Tr. at 118, Shin Direct.)

225. As detailed below, the more than 30,000 pages of BIEC documents taken by the individual Defendants from BIEC include the following:

Technology manuals;
Operating manuals;
Marketing manuals;
Equipment supplier manuals;
InterZAC binders and materials;
NamZAC, PacZAC and OpZAC materials;
License agreements and details;
Prospective licensee information;
Business correspondence files;
Mailing lists;
Marketing strategies;
Business plans;
Financial records and projections;
Confidential studies and analyses;
including the "market mill" project.

(2/14/92 Tr. at 82–91, Borzillo Cross; 2/25/92 Tr. at 178–81, Shin Cross; 2/26/92 Tr. at 127–31, Forand Cross; Pl.'s Exs. 112–162, 163 at 49–64, 171, 172, 174, 178.)

226. Borzillo took from BIEC his date files containing BIEC business correspondence from October 1, 1983 through July 1991. (Joint Stipulation—Pl.'s Proposed Finding number 151.)

227. Forand took from BIEC the "J.L. Forand Date File" containing BIEC business correspondence from January 1985 through December 1988. (Joint Stipulation—Pl.'s Proposed Finding number 152.)

228. Shin took from BIEC files containing business correspondence to and from Broken Hill Proprietary–Coated Products Division for the period covering August 1986 through June 1991. (Joint Stipulation—Pl.'s Proposed Finding number 153.)

229. Borzillo took from BIEC two sets of the InterZAC 81 manuals, two sets of the InterZAC 84 manuals, and copies of the InterZAC 83, InterZAC 87, and InterZAC 89 manuals. (2/14/92 Tr. at 88–89, Borzillo Cross; Pl.'s Exs. 138, 139, 140 A–B, 141, 142.)

230. Defendants took from BIEC three sets of the technology manuals relating to the production of 55% aluminum-zinc coated sheet steel. (Pl.'s Ex. 117.)

---

15. BIEC maintains correspondence files by employee which include all correspondence sent or received by that particular BIEC employee. (See e.g. Pl.'s Exs. 112, 113, and 114.)

231. Defendants took or retained from BIEC documents related to research conducted and collected by BIEC, Broken Hill Proprietary, and Bethlehem International concerning various aspects of 55% aluminum-zinc technology, including business correspondence, memoranda, handwritten notes and status reports of ongoing BIEC projects. (Pl.'s Exs. 120, 121, 122, 156 A–E, 136 A–B.)

232. Defendants took or retained from BIEC copies of the InterZAC 83 manual, the InterZAC 86 manual, the InterZAC 87 manual, and the InterZAC 89 manual. (Pl.'s Exs. 123, 125 A–B, 126 A–B, 127, 135.)

233. Defendants took or retained from BIEC copies of the OpZAC 89 proceedings, the OpZAC 90 proceedings, and the OpZAC 91 proceedings. (Pl.'s Exs. 128 A–B, 129, 130.)

234. Defendants took or retained from BIEC files concerning BIEC's 1991 restructuring and correspondence relating to BIEC's business and the termination of Forand. (Pl.'s Ex. 143.)

235. Defendants took or retained from BIEC a copy of Defendants' and Wechsler's 1986 Leverage Buyout Proposal. (Pl.'s Ex. 152.)

236. Defendants took or retained from BIEC the USA Market Mill Proposal File, the East Coast Market Mill project file, and the Eastern USA Regional Market Mill project. (Pl.'s Exs. 118, 153 A–B, 154.)

237. Defendants took or retained from BIEC internal business files concerning: license agreement terms; royalty rate structures; patent information; key customer contacts; financial reports including revenues and cash-flow summary projections; memoranda; minutes of meetings with potential licensees; business plans for 1990–1997; and budget and capital expenditure information. (Pl.'s Ex. 159.)

238. Defendants took or retained from BIEC the BIEC Technology Manual (February 1986), the BIEC Operating Manual (January 1986), and the BIEC Equipment Licensee Manual (February 1986). (Pl.'s Exs. 171, 172, 174.)

239. Defendants took or retained the following business records from BIEC: minutes from Board of Directors meetings; revenue projections; business correspondence to and from licensees and prospective licensees; documents relating to BIEC customers; project summaries; status reports; documents related to PacZAC, InterZAC, and NamZAC; and employment files. (Pl.'s Exs. 115–16, 119, 124, 131 A–B, 132, 133 A–B, 134, 144–51, 155, 157–58, 160–61, 162 A–C, 178.)

240. In October 1991, nearly three months after they formed Global Steel Services, the Defendants returned to BIEC certain copies of BIEC's technology manuals—including the research and technology manual, the operators' manual, the marketing manual and the equipment supplier manual, together with a copy of the InterZAC 89 manual. (2/14/92 Tr. at 92, Borzillo Direct; 2/27/92 Tr. at 16–17, Forand Cross; Pl.'s Ex. 164 at 114–17.) Several additional copies of the technology manuals and InterZAC manuals that had been taken or retained by Defendants from BIEC were not returned at that time. These additional manuals were held by Defendants and produced only as a result of this lawsuit. (2/14/92 Tr. at 92, Borzillo Direct; 2/27/92 Tr. at 18–20, Forand Cross; Pl.'s Exs. 123, 125, 126, 127, 135, 138, 139, 140, 141, 142, 171, 172, 174.)

241. In October 1991, the Defendants also returned to BIEC property of BIEC given to them by Larry Caldwell in August, including Caldwell's reduced-size operating manual and two computer disks.[16] Although Caldwell testified at his deposition that the disks contained reports of visits to BIEC licensees, BIEC has been unable to

---

**16.** Caldwell testified that he gave four computer disks to Forand for return to BIEC. Forand testified that all disks given to him by Mr. Caldwell were returned to BIEC. We find no wrongdoing on the part of Forand. Either Caldwell is mistaken that he returned four disks or Forand

inadvertently lost two of the four disks. (2/27/92 Tr. at 16–18, Forand Cross; 2/24/92 Tr. at 153–55, 160–64, Caldwell Cross; 2/25/92 Tr. at 2–6 Caldwell Cross; Pl.'s Ex. 164 at 117–18.)

review the two disks returned to BIEC because Caldwell placed a double lock on the disks, and Caldwell has refused to provide the passwords to BIEC. Prior to returning the reduced-sized operating manual to BIEC, Caldwell blacked out notes made by him in the manual while he was working as a consultant for BIEC. (2/24/92 Tr. at 153–55, 160–64, Caldwell Cross; 2/25/92 Tr. at 2–6, Caldwell Cross; 2/27/92 Tr. at 16–18, Forand Cross; Pl.'s Exs. 192, 193, 194.)

242. O'Keefe was familiar with and involved in BIEC's technology protection program from its beginning. He was formerly in-house patent counsel for Bethlehem Steel and BIEC, and he was closely and continually involved in the development of the 55% aluminum-zinc licensing business that Broken Hill Proprietary bought from Bethlehem Steel, except for a brief period during the mid–1980's (when Mr. Iverson was counsel). Upon retirement from Bethlehem Steel in 1982, O'Keefe formed his own patent law firm and resumed his position as intellectual property counsel of BIEC upon acquisition by Broken Hill Proprietary in 1986. (Pl.'s Ex. 167 at 57–62.)

243. O'Keefe, through his law firm, served as intellectual property counsel for BIEC from 1986 until he resigned as counsel by letter dated August 26, 1991. (Pl.'s Exs. 85, 167 at 62–65.) During that period of time, total billings by his law firm to BIEC were approximately $300,000, and he was involved in all phases of BIEC's technology protection, including patents, trademarks, and licensing (as well as other matters). (2/14/92 Tr. at 8–9, Wechsler Direct; 2/26/92 Tr. at 131–32, Forand Cross; 2/14/92 Tr. at 141–42, Borzillo Direct; Pl.'s Ex. 86.)

244. As officers and senior managers of BIEC, the individual Defendants were aware that O'Keefe provided legal services to BIEC. (2/26/92 Tr. at 131–32, Forand Cross; 2/14/92 Tr. at 141–42, Borzillo Direct; Pl.'s Exs. 164 at 67–69, 175 at 70–71.)

245. The individual Defendants (without Connolly) consulted O'Keefe for legal advice in August 1991 concerning their right to work with and transfer to others the 55% aluminum-zinc technology owned by BIEC. (2/26/92 Tr. at 132–33, Forand Cross; 2/14/92 Tr. at 145–46, Borzillo Direct; Pl.'s Exs. 107, 164 at 57–60, 167 at 32–45.)

246. O'Keefe's office was used by Global Steel Services for telephone, facsimile and written communications until its permanent offices were secured in September 1991. O'Keefe's telephone and facsimile numbers appeared on the original Global Steel Services letterhead, and his facsimile number is still listed on Global Steel Services' stationary as the backup fax number for Global Steel Services. (2/26/92 Tr. at 132, Forand Cross; 2/27/92 Tr. at 27, Forand Cross; 2/14/92 Tr. at 142–44, Borzillo Direct; Pl.'s Exs. 2, 107, 111, 175 at 15, 66–67.)

247. O'Keefe's records indicate that he opened a file for his representation of Global Steel Services by August 13, 1991, prior to submitting his letter of resignation to BIEC on August 26, 1991. (2/26/92 Tr. at 132, Forand Cross; 2/14/92 Tr. at 144, Borzillo Direct; Pl.'s Exs. 107, 164 at 57–60, 167 at 32–45.) Without informing BIEC of his representation of Global Steel Services or seeking a waiver, O'Keefe provided legal advice to the Defendants both before he resigned as BIEC's counsel on August 26, 1991 and for at least several months thereafter. (2/14/92 Tr. at 10–11, Wechsler Direct; 2/26/92 Tr. at 132–34, Forand Cross; 2/14/92 Tr. at 144–51, Borzillo Direct; Pl.'s Exs. 107, 164 at 57–60, 167 at 73–75.)

248. The documents and the testimony confirm that O'Keefe provided legal advice to the Defendants on the following matters:

a. O'Keefe reviewed and assisted in the preparation of a form letter which Forand sent to dozens of prospective customers of Global Steel Services (Confidential Appendix ¶ 10) stressing Global Steel Services' right to consult in the field of 55% aluminum-zinc coatings.

b. O'Keefe prepared a written legal

opinion [17] concerning Global Steel Services' alleged right to use BIEC's 55% aluminum-zinc technology, which Global Steel Services then used in its written proposals to prospective customers, including current licensees of BIEC. (Confidential Appendix ¶ 11.)

c. O'Keefe reviewed letters and proposals sent to prospective Global Steel Services customers relating to 55% aluminum-zinc technology, some of whom were licensees of BIEC.

d. O'Keefe spoke by telephone with at least one prospective customer of Global Steel Services about the Global Steel Services–BIEC legal issues and his view of the same.

e. O'Keefe traveled with Borzillo and Forand and met with a current BIEC licensee in an attempt to persuade it to do business with Global Steel Services, rather than BIEC.

(2/14/92 Tr. at 145–51, Borzillo Direct; 2/26/92 Tr. at 132–34, Forand Cross; Pl.'s Exs. 107, 108, 111, 164 at 224–32, 167 at 32–45, 175 at 64–66, 89–90.)

249. There is no evidence that Defendant Connolly ever consulted with or used O'Keefe. To date, Connolly has had no association with Global Steel Services. (2/19/92 Tr. at 114, Borzillo Direct; 2/25/92 Tr. at 121, Shin Direct; Pl.'s Ex. 163 at 70–71.)

250. In an August 15, 1991 proposal letter, Forand wrote: "You will recall that Joe O'Keefe was the patent counsel for Bethlehem Steel responsible for drafting all of the early GALVALUME licenses between Bethlehem Steel as well as BIEC and its licensees...." (Pl.'s Ex. 108.)

251. By letter to O'Keefe dated December 20, 1991, the Defendants expressed their appreciation for O'Keefe's efforts on their behalf:

Dear Joe:

There is no way that words could express how deeply we feel about all of the many kind words of encouragement and

sound advice you have offered during the first few months of our new business venture. You have contributed greatly towards keeping our spirits high during a most difficult time....

(Pl.'s Ex. 56.)

252. Forand was vaguely familiar with the concept of an attorney's conflict of interest. In September 1991, O'Keefe himself advised Forand of a possible conflict arising out of O'Keefe's representation of Global Steel Services and a company with whom Global Steel Services was attempting to do business. (2/27/92 Tr. at 7–8, Forand Cross.)

253. Global Steel Services followed its initial "press release" with letters to dozens of prospective customers. (Pl.'s Exs. 108, 109, 110, 111.) A majority of the Defendants' contacts related in some way to the manufacture of 55% aluminum-zinc coatings. (Confidential Appendix ¶ 12.)

254. Global Steel Services solicited business relationships with seven of BIEC's current licensees. In particular, Global Steel Services proposed agreements to five current BIEC licensees to jointly license technical information and services related to 55% aluminum-zinc coatings to third parties. None of Global Steel Services' proposals to jointly license 55% aluminum-zinc technical information and services has been accepted by any of BIEC's licensees. (2/14/92 Tr. at 100–02, Borzillo Direct; Pl.'s Ex. 108, Tabs 1, 3, 5, 6, 7; Pl.'s Ex. 175 at 88.)

255. By letter dated October 14, 1991, Forand proposed to provide atmosphere control information to a BIEC licensee which would allow the licensee to produce 55% aluminum-zinc coatings without the need to license Broken Hill Proprietary's Australian patent No. 543013. Global Steel Services' proposal was rejected by the licensee by letter dated October 15, 1991. (Pl.'s Ex. 108.) (Confidential Appendix ¶ 13.)

**17.** The content of the Stevens & Lee opinion letter and any alleged misstatements of fact are superseded by the Injunction Order accompanying this Decision. Accordingly, we make no findings concerning these alleged misstatements.

256. Global Steel Services also solicited prospective BIEC licensees. The individual Defendants were aware of the status, history and details of BIEC's negotiations with these prospects by reason of their BIEC employment. (2/25/92 Tr. at 186–87, Shin Cross; Pl.'s Exs. 72, 73, 111.)

257. Global Steel Services has also targeted customers in territories where BIEC has granted exclusive licenses, including such territories as Argentina, Mexico, Taiwan and Sweden. (Pl.'s Exs. 72, 73.)

258. While many of their proposals to transfer technical information and services related to 55% aluminum-zinc coatings did not contain price terms, Global Steel Services did firmly propose to transfer 55% aluminum-zinc technology to prospective producers for amounts in excess of $1 million. (Confidential Appendix ¶ 14.) (2/14/92 Tr. at 107–09, 111–14, Borzillo Direct; 2/25/92 Tr. at 186–91, Shin Cross; Pl.'s Ex. 111.)

259. Two of Global Steel Services' firm proposals to transfer 55% aluminum-zinc technology included the proposal that these companies would keep the information transferred confidential for ten years. Borzillo acknowledged that the confidentiality provisions would prevent Global Steel Services' customers from competing in the field of start-up assistance to manufacturers of 55% aluminum-zinc coated sheet steel. (2/14/91 Tr. at 107–09, 111–14, Borzillo Direct; 2/25/92 Tr. at 186–91, Shin Cross; Pl.'s Ex. 111.)

260. Global Steel Services' firm proposals included a promise by Global Steel Services to provide written documentation of the technology being transferred. Defendants have yet to create such documentation. (Joint Stipulation—Pl.'s Proposed Finding number 222.)

261. The Defendants justify the multimillion dollar prices quoted by Global Steel Services to transfer technical information and services related to 55% aluminum-zinc coatings on the ground that Global Steel Services can provide the necessary know-how, information and expertise to bring all of the public information together into a workable form. As stated at trial by defendant Shin:

I think, Mr. Jordan, you sort of mischaracterize what it is we're trying to do. Your Honor, what we are selling is not only the information that are already out in the public domain, but even if one man has all the public, the information that is available in the public domain, he cannot start up a 55 percent aluminum zinc product production in his plant without knowing how to put—how to get the, in the first place, how to get the information together, where the information is. And once you get the information together and analyze what it is one has to do to make that product on the operational side, that is the kind of skill mixes that we want to bring to the table.

QUESTION: So you're selling them the skill and knowledge that brings it all together?

ANSWER: That is correct.

(2/25/92 Tr. at 188–189, Shin Cross.)

262. Global Steel Services also firmly proposed to transfer technical information and services related to 55% aluminum-zinc coatings to prospective equipment suppliers. (Confidential Appendix ¶ 15.) (2/14/92 Tr. at 114–16, Borzillo Direct; Pl.'s Ex. 111.)

263. In their solicitations and proposals to transfer technical information and services related to 55% aluminum-zinc coatings, Global Steel Services used the word GALVALUME. Illustrative of such letters are the following:

a. August 22, 1991 letter from Borzillo: "Your father asked that we provide information about our company, as well as about the equipment requirements to produce Galvalume sheet. Accordingly, I am enclosing a copy of a recent news release announcing the formation of our company. Please understand that we have only been in business for three weeks and therefore have not yet prepared company brochures. However, as indicated in our news release, my partners and I, as well as our associates, have extensive backgrounds and experience in the field of hot dip coated sheet steel."

b. August 29, 1991 letter from Shin: The letter contains a section entitled "Galvalume for Company Y." [18]

c. October 8, 1991 letter from Forand: "Our management team is best known worldwide for inventing 'Galvalume', doing the market development for product in the USA and finally licensing the technology all over the world. Enclosed is a copy of our first press release."

d. October 24, 1991 letter from Forand: "Originally the client-buyer wanted a dual purpose line capable of producing both conventional galvanized sheet as well as 'Galvalume' sheet. However, the three process line builders provided such outrageous terms for the 'Galvalume package' that the prospective buyer dropped 55% Al–Zn coated sheet requirement from the specs. When we have our meeting we can discuss this project in more detail. Transmitted herewith is the latest communique encouraging us to provide a 'Galvalume bid package'."

e. December 6, 1991 letter from Forand: "I would imagine the next step will be GALVALUME at your second flat rolling facility in Arkansas." ... "Ken, we'd really like to join forces with your ... team now on your first venture into hot dip coatings. And of course when you get ready to launch into the 'GALVALUME' business we are the logical choice to provide [you] with knowhow and services to assure your smooth entry into the 55% Al–Zn alloy coated sheet steel business. We've got the two co-inventors and four seasoned operating experts who have run lines that have literally produced millions of tons of 'GALVALUME'."

f. December 9, 1991 letter from Shin: "We are ... particularly pleased to learn of [your] renewed interest in 55% aluminum-zinc coated sheet steel (i.e., 'Galvalume'). As you know, I have discussed 'Galvalume' with [you] over the past ten years now."

g. December 11, 1991 letter from Forand: "We also have five (5) operating associates on our staff—who have over 150 years of combined experience in operating galvanizing and 'GALVALUME' production facilities."

h. December 12, 1991 letter from Forand: "We have a strong focus on metallic and organic sheet steel—and our staff includes the most experienced and qualified people in the world in the field of hot-dip coatings—particularly when it comes to 55% Al–Zn alloy coated sheet steel. Mr. Angelo R. Borzillo, my partner is the co-inventor of 'GALVALUME'. Dr. James B. Horton, the other co-inventor of GALVALUME, is one of our Technical Advisors."

i. January 7, 1992 letter from Forand: "Perhaps [you] would be interested in getting into the 'GALVALUME' sheet steel business."

There is no dispute that the statements quoted above are factually accurate. (Pl.'s Ex. 111.)

264. Global Steel Services has also proposed to provide certain marketing services to the North American producers of 55% aluminum-zinc coated sheet steel. These services would be similar to those previously provided by BIEC through its NamZAC Organizations, no longer in existence. (2/14/92 Tr. at 104–06, Borzillo Direct; Pl.'s Ex. 110.)

265. By letter dated November 27, 1991, Global Steel Services also offered to develop a Market Mill project. Although the individual Defendants and Wechsler had discussed marketing BIEC's Market Mill project on their own in February 1991 in the event that Broken Hill Propriety "shelved" the project, there is no evidence that Global Steel Services has offered BIEC's Market Mill study for sale. (2/12/92 Tr. at 91–97, Wechsler Direct; 2/27/92 Tr. at 14–15, Forand Cross;

---

**18.** For Company Y's identity see Confidential Appendix ¶ 7.

2/26/92 Tr. at 65, Forand Direct; Pl.'s Ex. 111 at Bay Stamp 07571.)

### X. PROSPECTIVE HARM TO BIEC UNLESS THE INJUNCTION IS GRANTED.

266. Global Steel Services' entry into the marketplace has caused some confusion regarding the ownership of the technical information and services related to the 55% aluminum-zinc coatings and the GALVALUME trademark. Illustrative of this confusion is Global Steel Services' own correspondence. A recipient of Global Steel Services' August 2, 1991 "press release," who is also a prospective licensee to BIEC, wrote to Global Steel Services on August 14, 1991, as follows:

We have received your letter with thanks and would like to take this opportunity to congratulate you and your colleagues in your new business endeavor.

[We are] interested in establishing a mutually beneficial business relationship with G.S.S. So that we may have a better understanding of your company, please inform us of the following:

1. What is the present relationship between GSS and BIEC?

2. If we consider a Galvalume project for one of our clients, is GSS in a position to supply this technology or must we deal with BIEC directly?

(2/25/92 Tr. at 194–96, Shin Cross; Pl.'s Ex. 111.)

267. By letter dated August 22, 1991, Shin and Global Steel Services replied:

... In response to your two questions, I offer you the following response, in the hope that we may develop the relationship.

First, GSS has no relationship with BIEC. GSS is an independent consulting firm.

Secondly, GSS is in a position to offer consulting services related to Galvalume to your clients in China, so that your clients can start the production quickly and economically. GSS is at present made of the executives who have developed Galvalume license agreements with 23 companies around the world while employed by Bethlehem Steel Corporation and then later by BIEC. In other words, the original licensing team, now with GSS, can offer you the same services on a more flexible basis.

(2/25/92 Tr. at 196–97, Shin Cross; Pl.'s Ex. 111.)

268. By letter dated September 4, 1991, the recipient of the Global Steel Services' "press release" replied as follows:

We have been in contact with a customer who is in the preliminary stages of purchasing a Galvalume steel line. In regards to this project, we have contacted equipment manufacturers.... We are very interested in using your services to supply the Galvalume technology.

We would appreciate your comments on how to present to our client our source for this technology. In particular we are concerned about possible infringements on the Galvalume patents and license. Please provide us with details of the Galvalume license so that we may determine the best way to proceed on this project.

(2/25/92 at 197–98, Shin Cross; Pl.'s Ex. 111.)

269. Finally, by letter dated October 24, 1991, Shin and Global Steel Services stated that:

Whether [you] plan to produce only galvanized steel, or both galvanized steel and Galvalume, GSS' expertise and experience in hot-dip coating in general and Galvalume in particular will be a great asset to the fourth bidder consortium.

(2/25/92 Tr. at 198–200, Shin Cross; Pl.'s Ex. 111.)

270. The above colloquy (Findings 266–69) provides the only example of actual confusion in the marketplace.

271. Defendants' presence in the marketplace has challenged BIEC's current status as the sole owner and provider of services related to 55% aluminum-zinc coatings. If the Defendants compete with BIEC in the area of 55% aluminum-zinc coatings, the market and price level for BIEC's 55% aluminum-zinc services is likely to be affected. (2/14/92 Tr. at 6–7, Wechsler Direct.)

272. If the Defendants are permitted to compete with BIEC in the area of 55% aluminum-zinc coatings, BIEC's relationships and business opportunities with its target licensees will be irreparably harmed. (Confidential Appendix ¶ 16.) (2/14/92 Tr. at 7–8, Wechsler Direct; Pl.'s Ex. 72, 73, 111.)

273. If the Defendants are permitted to compete with BIEC in the area of 55% aluminum-zinc coatings, BIEC's relationships with its existing licensees who have exclusive rights to BIEC's 55% aluminum-zinc technology in their territories will be irreparably harmed. (Confidential Appendix ¶ 17.) (2/13/92 Tr. at 13–14, 24–28, Wechsler Direct; Pl.'s Exs. 11, 72, 169 at 7–13, 17–19, 170 at 11–12, 13–14, 14–17, 182, 183; Defs.' Ex. 99.)

274. If the Defendants are permitted to compete with BIEC in the area of 55% aluminum-zinc coatings, BIEC's goodwill and business relationships with its North American licensees will be irreparably harmed. For example, BIEC is attempting to extend its NamZAC organization, and its proposal is in competition with Global Steel Services' proposal, which is pending. (2/14/92 Tr. at 104–06, Borzillo Direct; Pl.'s Ex. 109.)

275. Defendants' attempts to provide technical information and services related to 55% aluminum-zinc coatings outside of BIEC and its licensee group jeopardizes BIEC's rights under the license agreements, including BIEC's rights to fees and royalty payments. (Pl.'s Ex. 173, Tab X.)

276. Defendants' attempts to provide technical information and services related to 55% aluminum-zinc coating outside of BIEC and its licensee group jeopardizes the millions of dollars in fees, royalties, capital expenditures and equipment and marketing costs invested by BIEC's licensees throughout the world. If defendants are not enjoined from competing in the area of 55% aluminum-zinc coatings, BIEC's select group of licensees will lose their competitive advantage which they have acquired at a high cost. (Pl.'s Ex. 69.)

277. At considerable time and expense, BIEC has had to visit its licensees around the world as a result of Defendants' presence in the marketplace, thereby disrupting BIEC's attempts to focus on and further develop its business. (2/14/92 Tr. at 5, Wechsler Direct.)

278. In addition to its other numerous business discussions, Global Steel Services' five (5) firm proposals to transfer BIEC's 55% aluminum-zinc technology (Finding 254) are still pending. Absent an injunction, Global Steel Services' conduct will continue, the pending proposals may be accepted, and the irreparable harm to BIEC and its licensees will continue. (2/14/92 Tr. at 109, 113–14, Borzillo Direct; Pl.'s Exs. 101, 128, 175 at 95, 179.)

## XI. PROSPECTIVE HARM TO GLOBAL STEEL SERVICES IF THE INJUNCTION IS GRANTED.

279. If Global Steel Services is denied the right to consult and provide services associated with 55% aluminum-zinc, then the business of Global Steel Services will almost certainly end. (2/26/92 Tr. at 80, Forand Direct; 2/25/92 Tr. at 129–30, Shin Direct.)

280. Services associated with 55% aluminum-zinc is the only commercially viable business available to Global Steel Services and to Forand, Borzillo and Shin. (2/20/92 Tr. at 73–74, Borzillo Direct; 2/26/92 Tr. at 80, Forand Direct.)

281. The evidence demonstrates that since its inception in July 1991 Global Steel Services has entered into two steel service contracts amounting to $6,000 in revenues. (2/25/92 Tr. at 127, Shin Direct.) Neither of these contracts involve 55% aluminum-zinc coatings. (*Id.*)

282. Neither Forand, Borzillo, or Shin has currently drawn any salary from Global Steel Services. (2/19/92 Tr. at 3, Borzillo Direct; 2/25/92 Tr. at 56–57, Shin Direct; 2/26/92 Tr. at 33, Forand Direct.)

283. From 1962 to the present, Borzillo has spent nearly his entire professional career in the 55% aluminum-zinc field. (2/20/92 Tr. at 73–74, Borzillo Direct.)

284. From the early 1970's until 1985, Forand has spent 35% and 75% of his pro-

fessional career in the 55% aluminum-zinc field. (2/26/92 Tr. at 43, Forand Direct.) From 1985 to the present, Forand has spent his entire professional career in the 55% aluminum-zinc field.

285. Shin has been involved in the 55% aluminum-zinc field since the early 1970's. (2/25/92 Tr. at 60, Shin Direct.) From 1978 to 1985, Shin spent over 50% of his professional career in the 55% aluminum-zinc field. (2/25/92 Tr. at 64–65, Shin Direct.) Since 1985, Shin's professional career has been entirely in the 55% aluminum-zinc field. (2/25/92 Tr. at 69–70, Shin Direct.)

## DISCUSSION

■ In considering BIEC's motion for a preliminary injunction, we must carefully weigh four well-known factors: (1) whether BIEC has shown a reasonable probability of success on the merits; (2) whether BIEC will be irreparably injured by a denial of injunctive relief; (3) whether granting preliminary relief will result in even greater harm to Global Steel Services; and (4) whether granting preliminary relief will be in the public interest. *See SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1254–55 (3d Cir.1985) (citing *Klitzman, Klitzman and Gallagher v. Krut,* 744 F.2d 955, 958–59 (3d Cir.1984) and *Continental Group v. Amoco Chemicals Corp.,* 614 F.2d 351, 356–57 (3d Cir.1980)). Only if BIEC produces evidence sufficient to convince this Court that all four factors favor preliminary relief should the injunction issue.

BIEC has asserted five grounds in support of its motion for a preliminary injunction: (1) Global Steel Services and the individual Defendants have engaged and continue to engage in unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) Global Steel Services and the individual Defendants have misappropriated BIEC's trade secrets; (3) Global Steel Services and the individual Defendants have intentionally interfered with BIEC's contractual relationships; (4) Global Steel Services and the individual Defendants have diverted corporate opportunities

belonging to BIEC; and (5) Global Steel Services and the individual Defendants have unlawfully conspired to compete with BIEC. We address each claim in turn.

## I. UNFAIR COMPETITION.

Section 43(a) was enacted to protect the consuming public from any false or misleading representation concerning the origin or quality of a product. *A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 304 (3d Cir.1986) (quoting *Scott Paper v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1228 (3d Cir.1978)) ("The trademark laws exist ... 'to protect the consuming public from confusion, concomitantly protecting the trademark owner's right to a non-confused public' "); *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.,* 214 F.2d 649, 651 (3d Cir.1954). More specifically, § 43(a) provides as follows:

(a) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol or device, or any combination thereof, or any false designation of origin, *false or misleading description* of fact, or *false or misleading representation* of fact, which—

(1) *is likely to cause confusion,* or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or *as to the origin, sponsorship, or approval of his or her goods,* services, or commercial activities by another person, or

(2) in commercial advertising or promotion, *misrepresents the nature, characteristics, qualities, or geographic origin* of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (emphasis added).

■ Section 43(a) has been broadly construed to proscribe conduct which is contrary to honest industrial and commercial practice. *PPX Enterprises, Inc. v. Audiofidelity, Inc.,* 746 F.2d 120, 124 (2d Cir. 1984); *Kirkland v. National Broadcasting Co., Inc.,* 425 F.Supp. 1111, 1115

(E.D.Pa.1976), *aff'd*, 565 F.2d 152 (3d Cir. 1977). Examples of such uncompetitive practices include: the unauthorized use of a competitor's trademark, the unprivileged imitation of a competitor's trademark, service mark, logo, or trade dress, and the publication of false or misleading advertisements. *See e.g. Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir.1990) (trademark infringement); *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 296–97 (3d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991) (trade dress infringement); *SK & F, Co. v. Premo Pharmaceutical Laboratories, Inc.*, 625 F.2d 1055, 1065–66 (3d Cir.1980) (trade dress infringement); *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 921–22 (3d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990) (false advertising). In short, § 43(a) prohibits attempts to pass one's goods or services off as those of a competitor and attempts to misrepresent the nature and quality of goods or services brought to the market.

■■■ The record evidence established that BIEC owns the trademark GALVALUME for sheet steel coated with 55% aluminum-zinc and that this trademark is a valuable asset highly regarded in the steel industry (Findings 33, 51–56). BIEC, its predecessors and licensees have been using the trademark GALVALUME since 55% aluminum-zinc coatings were first brought to market by Bethlehem Steel during the 1970's (Findings 1, 31, 34–44, 48, 50–55). Moreover, BIEC's GALVALUME trademark is registered by BIEC and its licensees in twenty-one (21) countries, including the United States (Finding 33). The fact that the GALVALUME trademark was not registered until 1990 is irrelevant. Trademark protection does not depend upon registration, but rather upon the usage of the mark which, in the case of GALVALUME, has been well documented continually and widely for over a decade. *Honickman*, 808 F.2d at 296.

■■■ Global Steel Services contends that BIEC's rights in the GALVALUME trademark have been abandoned due to BIEC's failure to exercise sufficient control over the use of the trademark. In particular, Global Steel Services points to the absence of a formal policy at BIEC to monitor the quality of its licensees' GALVALUME products and publications in the world metal market that use the term GALVALUME on a regular basis without any attribution to BIEC. To establish a defense of abandonment, Global Steel Services must establish non-use and an intent to abandon. *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 138 (3d Cir.1981). In reaching this conclusion, however, we bear in mind that "abandonment, being in the nature of a forfeiture, must be strictly proved." *Id.* at 139 (citations omitted).

There is no question that BIEC and its licensees "use" the GALVALUME trademark and have exhibited no intent to abandon the mark. Albeit somewhat informally, BIEC exerts a high degree of control over the quality of all GALVALUME products sold by its licensees. As part of BIEC's technology transfer, BIEC experts are present at all line start-ups and provide on-going on-site problem-solving and consulting skills as required under the terms of its licenses, thereby keeping BIEC abreast of the quality of all GALVALUME products (Finding 163). BIEC experts also make at least one visit to licensees per year (Finding 163). While many of these visits are in the nature of a courtesy call, such visits nevertheless provide BIEC with an opportunity to monitor the quality of its licensees' GALVALUME products (Finding 163). In April 1990, Forand, as BIEC's president, implemented a "more formal" program of monitoring the use of BIEC's GALVALUME trademark and the quality of the product sold by licensees (Finding 163). Moreover, BIEC license agreements specifically require that licensees assure the high quality product associated with the GALVALUME trademark (Finding 163). These proactive steps in attending to the quality of the product is more than sufficient to protect the validity of trademark. *Jaycees*, 639 F.2d at 140; *General Motors Corp. v. Gibson Chemical & Oil Corp.*, 786 F.2d 105, 110 (2d Cir.1986);

*Turner v. HMH Publishing Co., Inc.*, 380 F.2d 224, 229 (5th Cir.), *cert. denied*, 389 U.S. 1006, 88 S.Ct. 566, 19 L.Ed.2d 601 (1967) (use of operating manuals, periodic visits, licensee supervision/inspection, and product specifications are all positive indicia of quality control).

The fact that three trade journals have routinely used the term GALVALUME without attribution to BIEC within the last year and one-half (Findings 164–66), is insufficient, in and of itself, to constitute abandonment. Abandonment means much more than failure to prosecute trademark infringements promptly, *Jaycees*, 639 F.2d at 139, and since BIEC adequately monitors the quality of the product and since there is no evidence that the GALVALUME trademark has ceased to be associated in the public's mind with BIEC's goods or services, *see Defiance Button Machine Co. v. C. & C. Metal Products*, 759 F.2d 1053, 1059 (2d Cir.), *cert. denied*, 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985), we find insufficient evidence to support the Defendants' claim that BIEC has abandoned the GALVALUME trademark. Accordingly, we find that BIEC has put forth sufficient evidence to establish that the GALVALUME trademark is valid, legally protected, and owned by BIEC.

BIEC makes four claims pursuant to the Lanham Act: (1) Global Steel Services caused confusion in the marketplace when it distributed the August 2, 1991 Press Release announcing the formation of Global Steel Services; (2) Global Steel Services heightened the confusion by using a former BIEC logo; (3) Global Steel Services circulated letters and proposals in which Global Steel Services passed itself off as the owners and legitimate users of the GALVALUME trademark; and (4) Global Steel Services confused the marketplace by using Joseph O'Keefe, a former BIEC attorney, to prepare Global Steel Services' documents and to call Global Steel Services' prospects. We address each claim in turn.

a. *Global Steel Services' press release and proposals.*

■ The principles of analysis under Section 43(a) for advertising materials such as the Global Steel Services' press release and the Global Steel Services' letters and proposals are well settled. BIEC must prove that (1) Global Steel Services has made false or misleading statements about BIEC's or Global Steel Services' products or services; (2) Global Steel Services' statements actually deceived or have a tendency to deceive a substantial portion of the Defendants' contacts; (3) Global Steel Services' false or misleading statements are material (i.e. likely to influence purchasing decisions); (4) Global Steel Services' goods or services traveled in interstate commerce; and (5) there is a likelihood of injury to BIEC. *U.S. Healthcare v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 922 (3d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990).

■ BIEC claims that certain statements in Global Steel Services' press release and promotional literature constitute misuse of the GALVALUME trademark since the trademark is used in a manner that is likely to cause confusion in the marketplace. The allegedly misleading statements contained in the press release are as follows: [19]

Former BIEC Executives Start New Steel Consulting Company

Bethlehem, PA, August 2, 1991—Three former BIEC International, Inc. (BIEC) executives have formed a new consulting firm, Global Steel Services Ltd. (Global Steel Services). The executives, with their former positions at BIEC indicated, are:

—James L. Forand, President and Chief Executive Officer

—Angelo R. Borzillo, Vice President, Coated Steel Technology

—Paik W. Shin, Vice President, Far East

.　　.　　.　　.　　.

While at BIEC, the new firm's team was instrumental in selling GALVALUME* sheet steel licenses to 23 major steel

---

**19.** For the full text of the press release see Finding 218.

companies around the world. The Galvalume steel licensing program is recognized as one of the most successful ever in the steel industry.

* GALVALUME is a trademark of BIEC International, Inc.

(Pl.'s Ex. 2.) In addition, the press release describes the credentials of certain of its employees and consultants as follows:

—A.R. Borzillo for his reputation as the coinventor of Galvalume sheet and hot dip coatings and corrosion research accomplishments.

. . . . .

—J.J. Connolly ... is the former Vice President of Operations of BIEC and has over 35 years experience in managing galvanizing and Galvalume lines. His extensive experience in problem-solving would be an aid to any producer of hot dip coated sheet steel.

(Pl.'s Ex. 2). And finally, examples of the alleged misstatements contained in Global Steel Services' promotional letters read as follows:

a. October 8, 1991 letter from Forand: "Our management team is best known worldwide for inventing 'Galvalume', doing the market development for product in the USA and finally licensing the technology all over the world. Enclosed is a copy of our first press release."

b. December 9, 1991 letter from Shin: "We are ... particularly pleased to learn of [your] renewed interest in 55% aluminum-zinc coated sheet steel (i.e., 'Galvalume'). As you know, I have discussed 'Galvalume' with [you] over the past ten years now."

c. December 11, 1991 letter from Forand: "We also have five (5) operating associates on our staff—who have over 150 years of combined experience in operating galvanizing and 'GALVALUME' production facilities."

d. December 12, 1991 letter from Forand: "We have a strong focus on metallic and organic sheet steel—and our staff includes the most experienced and qualified people in the world in the field of hotdip coatings—particularly when it comes to 55% aluminum-zinc alloy coated sheet steel. Mr. Angelo R. Borzillo, my partner is the co-inventor of 'GALVALUME'. Dr. James B. Horton, the other co-inventor of GALVALUME, is one of our Technical Advisors."

e. December 6, 1991 letter from Forand: "We've got the two co-inventors and four seasoned operating experts who have run lines that have literally produced millions of tons of 'GALVALUME'."

(Pl.'s Ex. 111.)

It is undisputed that the statements quoted above from the press release and promotional letters are factually accurate (Finding 263). Moreover, the experience of Global Steel Services' principals is information that Global Steel Services and the individual Defendants may lawfully present to the public. It has long been settled that the trademark laws do not prohibit the use of a company name or trademark where the name or trademark is used as a means of identifying either an individual working for a company or as a means of describing the nature of the goods or services being offered by that company. *See, e.g., G.D. Searle & Co. v. Hudson Pharmaceutical Corp.,* 715 F.2d 837, 842–43 (3d Cir.1983) (citing *Prestonettes, Inc. v. Coty,* 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924); *In Business Trends Analysts v. Freedonia Group,* 650 F.Supp. 1452, 1461 (S.D.N.Y.1987) ("*Freedonia I*"); *In Business Trends Analysts v. Freedonia Group,* 700 F.Supp. 1213, 1233–34 (S.D.N.Y.), *aff'd in part, rev'd in part on other grounds,* 887 F.2d 399 (2d Cir.1989) ("*Freedonia II*").

Stating that Messrs. Forand, Borzillo, Shin, and Connolly have previously been employed by BIEC and are familiar with the technical and marketing aspects of GALVALUME does not invite the inference that Global Steel Services is in any way affiliated with BIEC. Rather, the references to GALVALUME in the press re-

lease and those promotional letters quoted above merely describe the skill and expertise of Global Steel Services' employees and the nature of the products being offered. As the Third Circuit has stated,

> [W]hether one is entitled to refer to a competitor's trademark depends not on where the reference appears but on whether the reference is truthful. The governing principle, announced by Justice Holmes almost six decades ago, is clear:
>
> > ... [T]he trademark ... does not confer a right to prohibit the use of the word or words. It is not a copyright.... A trademark only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his.... When the mark is used in a way that does not deceive the public, we see no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo.

*Searle & Co.*, 715 F.2d at 843 (quoting *Coty*, 264 U.S. at 368, 44 S.Ct. at 351). Finding no evidence of false or misleading statements in Global Steel Services' press release or the above quoted letters, and finding no evidence of injury to BIEC, other than "healthy" competition, we find no violation of the Lanham Act.

Notwithstanding these findings, BIEC argues, on the basis of one letter which indicates that a recipient of the press release was inquiring about the current relationship between BIEC and Global Steel Services (Pl.'s Ex. 111), that however accurate, Global Steel Services' press release is misleading and has caused confusion in the marketplace. We disagree. Although evidence of actual confusion usually implies a likelihood of confusion, *Country Floors, Inc. v. Gepner*, 930 F.2d 1056, 1064 (3d Cir.1991), it is well established that likelihood of confusion "should be determined ... from the perspective of an ordinary consumer...." *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 293 (3d Cir.), *cert. denied,* — U.S. —,

112 S.Ct. 373, 116 L.Ed.2d 324 (1991). The degree of caution used by "ordinary consumers" or "reasonably prudent buyers" depends on the relevant buying class. Some buying classes, for example professional buyers will be held to a higher standard than others. *Id.* BIEC's and Global Steel Services' customers are sophisticated manufacturers of aluminum-coated zinc. (Findings 38, 50–51, 54–55, 58–59, 253; Confidential Appendix ¶¶ 1, 3, 12.) The record evidence establishes that it costs between $18 million and $75 million to build a 55% aluminum-zinc line and that licensing negotiations often span a period of two to three years (Findings 58–59). Accordingly, we find no evidence that a sophisticated steel manufacturer could be misled by the plain language used in the press release. Rather, a close reading of the colloquy between Global Steel Services and this one isolated steel manufacturer, indicates that the manufacturer's real confusion stems from his concurrent negotiations with BIEC and his concern that BIEC might institute legal action if the manufacturer contracted the services of Global Steel Services rather than BIEC (Findings 266–69). Accordingly, we find no Lanham Act violation in Global Steel Services' press release.

▬ On the other hand, we find that some of Global Steel Services' letters and proposals do use the GALVALUME trademark in a misleading manner.[20] The misleading statements are as follows:

a. August 22, 1991 letter from Borzillo: "Your father asked that we provide information about our company, as well as about *the equipment requirements to produce Galvalume sheet.* Accordingly, I am enclosing a copy of a recent news release announcing the formation of our company. Please understand that we have only been in business for three weeks and therefore have not yet prepared company brochures. However, as indicated in our news release, my partners and I, as well as our associates, have extensive back-

---

**20.** This list is not meant to be exhaustive but merely meant to serve as a basis for our finding

that BIEC has established a likelihood of success of the merits of this claim.

grounds and experience in the field of hot dip coated sheet steel."

b. August 29, 1991 letter from Shin: The letter contains a section entitled *"Galvalume for Company Y.*[21]*"*

c. October 24, 1991 letter from Forand: "Originally the client-buyer wanted a dual purpose line capable of producing both conventional galvanized sheet as well as 'Galvalume' sheet. However, the three process line builders provided such outrageous terms for the 'Galvalume package' that the prospective buyer dropped 55% aluminum-zinc coated sheet requirement from the specs. When we have our meeting we can discuss this project in more detail. *Transmitted herewith is the latest communique encouraging us to provide a 'Galvalume bid package'.*"

d. December 6, 1991 letter from Forand: *"I would imagine the next step will be GALVALUME at your second flat rolling facility...."* "Ken, we'd really like to join forces with your ... team now on your first venture into hot dip coatings. *And of course when you get ready to launch into the 'GALVALUME' business* we are the logical choice to provide [you] with know-how and services to assure your smooth entry into the 55% aluminum-zinc alloy coated sheet steel business.

e. January 7, 1992 letter from Forand: *"Perhaps [you] would be interested in getting into the 'GALVALUME' sheet steel business."*

(Pl.'s Ex. 111—emphasis added.)

While Global Steel Services may advertize its ability to assist in the manufacture of commercial quality 55% aluminum-zinc coated sheet steel and may refer to the GALVALUME mark to help describe the nature of the product being offered, Global Steel Services may not suggest that it can help its clients manufacture genuine GALVALUME, that is, 55% aluminum-zinc coated sheet steel produced under a license agreement with BIEC. The best Global Steel Services can offer is to help its clients manufacture 55% aluminum-zinc coated sheet steel which is "very similar to" or "equivalent" to GALVALUME. *See e.g. G.D. Searle & Co. v. Hudson Pharmaceutical Corp.*, 715 F.2d 837, 842–43 (3d Cir. 1983) (citing *Prestonettes, Inc. v. Coty,* 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924) (defendant's use of the term METAMUCIL in connection with the sale of defendant's generic laxative REGACILIUM—"Equivalent to METAMUCIL"—held to be fair use of plaintiff's registered trademark). Statements which suggest that Global Steel Services has put together a "Galvalume bid package" for the production of GALVALUME or statements like "Galvalume for Company Y," "your father asked that we provide information ... about the equipment requirements to produce Galvalume sheet," "when you get ready to launch into the 'GALVALUME' business we are the logical choice to provide [you] with know-how ...," or "perhaps [you] would be interested in getting into the 'GALVALUME' sheet steel business," come dangerously close to suggesting that Global Steel Services can help its clients produce genuine GALVALUME.

BIEC and its licensees have devoted over ten (10) years and over $1.6 million to produce and market commercial quality 55% aluminum-zinc coated sheet steel under the GALVALUME trademark (Finding 56). As a result, the GALVALUME trademark is widely known and respected throughout the steel industry, and the production of GALVALUME sheet steel has become a highly competitive and profitable business (Findings 31, 34–40, 43, 48, 50–55). Similarly, there can be no question that the ability to market 55% aluminum-zinc coated sheet steel under the GALVALUME trademark would be material to a prospective manufacturer of 55% aluminum-zinc coatings. While nothing in the trademark laws prevent a competitor from developing and marketing its own 55% aluminum-zinc coated sheet steel, § 43(a) of the Lanham act explicitly prohibits Global Steel Services from suggesting that its clients can pass

---

**21.** See Confidential Appendix ¶ 7 for the identity of Company Y.

their products off as what has become known in the industry as GALVALUME. *See e.g. Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 605 (3d Cir.1978); *Parkway Baking Co., Inc. v. Freihofer Baking Co.*, 255 F.2d 641, 648 (3d Cir.1958); *Blumenfeld Dev. Corp. v. Carnival Cruise Lines, Inc.*, 669 F.Supp. 1297, 1321 (E.D.Pa.1987); *VISA Int'l Service Ass'n v. VISA Hotel Group, Inc.*, 561 F.Supp. 984, 995–96 (D.Nev.1983); and *Hallmark Cards, Inc. v. Hallmark Dodge, Inc.*, 634 F.Supp. 990, 999 (W.D.Mo.1986).

Taken together then, we find these statements to be misleading, likely to cause confusion in the marketplace, and material to purchasing decisions. *U.S. Healthcare v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 922 (3d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990). Where there is a likelihood of confusion, irreparable injury to the owner of a trademark is presumed. *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 196 (3d Cir.1990). Accordingly, we find that BIEC has established a likelihood of success on the merits of its claim that certain statements in Global Steel Services' promotional literature constitute misuse of the GALVALUME trademark. *U.S. Healthcare*, 898 F.2d at 922.

b. *Former BIEC logo.*

 It is well established that Global Steel Services is liable to BIEC under § 43(a) of the Lanham Act if it uses a logo which is confusingly similar to BIEC's logo. *Country Floors, Inc. v. Gepner*, 930 F.2d 1056, 1063–64 (3d Cir.1991). The likelihood of confusion analysis requires the balancing of a number of factors, including: (1) the degree of similarity between BIEC's logo and the Global Steel Services logo; (2) the strength of BIEC's logo; (3) the price of GALVALUME and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time Global Steel Services has used the logo without evidence of actual confusion arising; (5) intent

of Global Steel Services in adopting the mark; (6) the evidence of actual confusion; (7) whether BIEC's and Global Steel Services' products are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect BIEC to manufacture a product in Global Steel Services' market. *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 293 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991) (quoting *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir.1978). An evaluation of these factors makes clear that Global Steel Services' logo infringes on the former BIEC logo. The logos are virtually identical. Global Steel Services' logo is of a globe surrounded by an equilateral triangle. BIEC's logo is identical except that the left side of the equilateral triangle is missing (Findings 215–16). BIEC enjoys significant strength in its own logo which was used on many of its technology, operating, and marketing manuals, InterZAC manuals and proceedings, literature, and letterhead prior to 1988. Although BIEC stopped printing the logo in question in 1988, BIEC has not stopped using the logo. Licensees are still using and will continue to use into the unforseen future, manuals with this former logo (Finding 217). Until BIEC updates or replaces those manuals, the BIEC logo has not been abandoned.[22] BIEC and Global Steel Services are competing in the same market and offer the same services (Findings 1, 212, 218). Accordingly, BIEC has shown a likelihood of success on the merits of this claim.

c. *Cooperation of Joseph O'Keefe.*

 BIEC argues that Global Steel Services' collaboration with Joseph O'Keefe, an attorney who previously performed legal services for BIEC, violates § 43(a) of

---

**22.** For a discussion of the abandonment doctrine and Global Steel Services' strict burden, see our prior discussion at 533.

the Lanham Act. We find no support for this proposition under the plain meaning of the statute or the case law. The language of § 43(a) prohibits false or misleading representations concerning the source or quality of a product. Neither O'Keefe's signature on a letter nor his telephone calls nor his visits to prospective Global Steel Services clients (Findings 242–252), can be construed as a false or misleading use of a "word, term, name, symbol, or device ... in connection with any goods or services." 15 U.S.C. § 1125(a). Accordingly, the use of O'Keefe is not actionable, however, we do find violations of the Lanham Act as discussed above.

## II. MISAPPROPRIATION OF TRADE SECRETS.

BIEC seeks trade secret protection with respect to the 55% aluminum-zinc technology, BIEC's manuals, BIEC's mailing lists, the terms of BIEC's license agreements, and BIEC's marketing information including its business plans, marketing strategies, and financial projections.

There is no dispute that in exercising pendent jurisdiction over BIEC's trade secrets claims, we must apply the trade secrets law of Pennsylvania, the forum state. *See SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1255 (3d Cir.1985) (citing *Rohm and Haas Co. v. Adco Chemical Co.*, 689 F.2d 424, 428–29 (3d Cir.1982) and *Sims v. Mack Truck Corp.*, 608 F.2d 87, 95 (3d Cir.1979), *cert. denied*, 445 U.S. 930, 100 S.Ct. 1319, 63 L.Ed.2d 764 (1980)).

The Pennsylvania courts have adopted the definition of trade secret given in the Restatement of Torts § 757 comment b (1930) as follows:

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

*See SI Handling*, 753 F.2d at 1255; *Healthcare Affiliated Services, Inc. v. Lippany*, 701 F.Supp. 1142, 1154 (W.D.Pa. 1988); *Felmlee v. Lockett*, 466 Pa. 1, 9, 351 A.2d 273, 277 (1976); *Van Products Co. v. General Welding and Fabricating Co.*, 419 Pa. 248, 258–59, 213 A.2d 769, 775 (1965); *Air Products and Chemicals, Inc. v. Johnson*, 296 Pa.Super. 405, 418, 442 A.2d 1114, 1121 (1982). "The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." *Anaconda Co. v. Metric Tool & Die Co.*, 485 F.Supp. 410, 421–22 (E.D.Pa.1980) (quoting Restatement of Torts § 757, Comment b. at 5–6 (1939)). " 'Novelty is only required of a trade secret to the extent necessary to show that the alleged secret is not a matter of public knowledge.... A trade secret may be no more than a slight mechanical advance over common knowledge and practice in the art.' " *SI Handling*, 753 F.2d at 1255 (quoting *Anaconda*, 485 F.Supp. at 422. Moreover, the concept of a trade secret does not include "[a] man's aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment.... The right to use and expand these powers remains his property...." *SI Handling*, 753 F.2d at 1255–56 (quoting *Pittsburgh Cut Wire Co. v. Sufrin*, 350 Pa. 31, 35, 38 A.2d 33, 34 (1944)); *Van Products*, 419 Pa. at 260, 213 A.2d at 775.

Some factors to be considered in determining whether information is a trade secret are: (1) the extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *SI Handling*, 753 F.2d at 1256.

With these general principles before use, we will consider the factual and legal basis for each of BIEC's alleged trade secrets:

A. *The 55% aluminum-zinc technology and the BIEC manuals.*

BIEC claims that as a technology licensing company, it "owns and possesses an 'extraordinary' and 'massive' body of technical trade secrets and confidential information related to its 55% aluminum-zinc technology.... BIEC's trade secrets extend throughout the process of making 55% aluminum-zinc coated sheet steel, from a selection of the steel for the substrate through heat treatment, coating, cooling, and post-coating treatment." BIEC's Post–Trial Mem. at 77–78. BIEC claims that while "[m]uch of the confidential information related the 55% aluminum-zinc coated sheet steel is contained in BIEC's technology manuals, ... [t]he trade secrets in various aspects of the process are also interrelated and impossible to separate." *Id.* Global Steel Services contends that the process used by BIEC to produce commercial quality 55% aluminum-zinc technology is not a trade secret because it incorporates principles which are matters of public knowledge and because BIEC has failed to take adequate precautions to protect the secrecy of its technology.

The process of manufacturing 55% aluminum-zinc coated sheet steel is very similar to hot-dip galvanizing (Findings 77–79, 81, 83, 85, 87, 88, 90, 91, 93, 94, 97–100, 102–103, 105, 112, 114, 118–119, 124, 126). The various parts of the processing and the equipment used in the manufacture of 55% aluminum-zinc coated sheet steel, namely, the sheet steel or substrate used for coating, the furnace and its protective atmospheres, the snout section of the furnace, the coating bath composition, the pre-melt pot, main pot and launder, bottom dross, the pot machinery, the line speed, the upleg cooling tower, the jet wipers, line stops, post-annealing, passivation and painting practices, are well documented in the public literature. (*Id.*) Furthermore, the process of manufacturing 55% aluminum-zinc coated sheet steel depends on at least eleven extant or nearly extant patents (Finding 137).

On the other hand, the specific relationships between the various parts of the processing, the equipment, and the specific operating parameters which are necessary to produce a commercial product are not generally known and are only readily discoverable through trial and error (Findings 89, 95, 108, 111, 115, 117, 121). The specific processing and operating parameters on a given 55% aluminum-zinc line will vary based on a number of factors including: line speed, the coating and alloy layer properties of the coated sheet steel, the fluidity of the molten 55% aluminum-zinc, the thickness of the steel grade of the substrate, the specific mixture of gases in the atmosphere of the furnace, the level of impurities in the composition of the bath, cooling rates, and the configuration of the air wipers. (*Id.*) Furthermore, the equipment is very expensive, massive, and custom built on site. Accordingly, there is no step-by-step, off-the-shelf formula for manufacturing 55% aluminum-zinc coated sheet steel. Rather, it is only after years of trial and error that BIEC has been able to determine and document many of the relationships between these factors and the specific processing and operating parameters necessary to produce a commercial product. While these relationships have been recorded in BIEC' manuals in the form of tables and charts and are not generally known in the industry, we are convinced that, given sufficient time, they could be recreated by any experienced galvanizer (Finding 131).

BIEC has spent years creating and developing its operating, technology, and marketing manuals. As their core, the manuals use the manufacturing process and the specific operating parameters and procedures used at two identical 55% aluminum-zinc lines, Broken Hill Proprietary's John Lysaght line and Bethlehem Steel's Sparrow's Point line (Finding 60–61). In addition, the manuals contain more general information designed to help the licensee draw on and apply the John Lysaght and Sparrow's Point experiences to their own lines (Finding 134). The manuals are regularly updated, based on the on-going expe-

riences of BIEC licensees, to reflect new information regarding better and improved ways to make, use or sell 55% aluminum-zinc coated steel products (Findings 62, 70–74).

The BIEC technology is transferred to its licensees through a multi-step process. After a license agreement is signed, the manuals are sent by BIEC to the new licensee. After an exhaustive review of the manuals, the licensee submits a list of questions to BIEC, and BIEC then schedules a formal technology transfer session, lasting several days, during which BIEC's technical experts teach the technology to the licensee's operators. A tour of one of BIEC's licensees existing 55% aluminum-zinc facilities and a research facility also occurs. After BIEC reviews the licensee's engineering drawings for technical adequacy, the licensees are then sent home to build or equip their facilities under confidentiality agreements with their equipment suppliers and BIEC's equipment suppliers. Thereafter, BIEC personnel personally visit and assist the new licensee in starting up its line and making the commercial product. These production assistance visits typically last a few weeks to a month. Finally, the technology transfer involves on-going trouble-shooting and problem-solving as the new licensee makes the 55% aluminum-zinc coated product. (Findings 63–67.)

Taken together, BIEC's multi-step approach to transferring the technology can be broken down into two primary components: (1) BIEC's manuals which pull together the general principles of manufacturing 55% aluminum-zinc coated sheet steel, well-known in the industry, into a readily useable, textbook form and which document the relationships between specific operating parameters, the various component parts of the coating process, and the equipment resulting from over ten (10) years of trial and error; and (2) BIEC's on-site engineering, consulting, and problem-solving skills which enable it to adapt and modify these relationships to the specific operating parameters of a given licensee line. To BIEC's credit, this approach to transferring the technology has been highly successful. BIEC has an established reputation and successful track record in assisting its twenty-three (23) licensees with smooth, fast and low cost start-ups (Findings 139–140). And to date, BIEC's licensees are the only manufacturers of 55% aluminum-zinc coated sheet steel (Finding 55).

Based on the foregoing facts, BIEC has failed to prove, and indeed would be hard pressed to prove a single step-by-step, off-the-shelf secret process for manufacturing 55% aluminum-zinc coatings, and as such, can claim no global trade secret protection in what it calls "the 55% aluminum-zinc technology." Rather, the process of manufacturing 55% aluminum-zinc coated sheet steel has become a mature technology since its discovery by Borzillo and others at Bethlehem Steel in the early 1960's. Through published articles, patent publications and the natural evolution of hot-dip coating expertise, the various parts of the processing and the equipment used in the manufacture of 55% aluminum-zinc coated sheet steel have entered the public domain.

While it is quite possible that BIEC may have an " 'extraordinary' and 'massive' body of technical trade secrets and confidential information ... [which allegedly] extend throughout the process of making [55% aluminum-zinc] coated steel sheet," (BIEC's Post–Trial Mem. at 77–78), the law requires that BIEC separate those "interrelated" processes before it has satisfied its heavy burden of proving specific trade secrets. *See SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1256 (3d Cir.1985); *Felmlee v. Lockett,* 466 Pa. 1, 351 A.2d 273 (1976); *Van Products Co. v. General Welding and Fabricating Co.,* 419 Pa. 248, 259, 213 A.2d 769 (1965). Although BIEC has attempted to specifically identify for the first time, in Plaintiff's Post–Trial Proposed Findings of Fact 79–114, those portions of the manuals and conference minutes which it contends contain confidential information, we believe BIEC failed to put forth sufficient evidence *at trial* to support these conclusions. Rather, BIEC offered only general testimony and evidence, through its expert Dr. Marder and its president, Richard Wechsler, describing the var-

ious parts of the manufacturing process for 55% aluminum-zinc coated sheet steel, claiming that BIEC's manuals contained, without identifying them, confidential information related to those general principles (Finding 129). And although, Dr. Marder placed tabs in the operating, research and technology, and InterZAC manuals to identify information which he believed was not evident to those working in the field and thus entitled to trade secret protection, Dr. Marder never walked the Court through these specific examples of alleged trade secrets, and BIEC never introduced the tabbed manuals into evidence (Finding 127). Accordingly, at this time, this Court can make no specific findings with respect to the allegedly confidential information contained on those pages of the manuals which were tabbed.

■ On the other hand, Dr. Marder did testify, albeit in general terms and without pointing to specific provisions in the manuals, that the specific settings and parameters contained in the manuals and minutes including—substrate temperatures, surface roughness parameters, line speeds, thermal cycles, atmosphere control practices, and jet wiper settings—would be examples of the kind of information he believed would be proprietary to BIEC. Having reviewed the manuals in evidence and those specific provisions identified by BIEC in Plaintiff's Post–Trial Proposed Findings of Fact 79–114, we agree and find that the manuals unquestionably contain at least some information which is confidential to BIEC. More specifically, we believe that those provisions of the manuals enumerated in Findings 89, 95, 108, 111, 115, 117, 121, provide examples of the kind of information which is most likely to be confidential to BIEC. The parameters contained in these provisions would not be intrinsically evident to an operator; rather they would only become evident to an operator after a period of trial and error. In each of these cases, BIEC has compiled the results of its experimentation and trial and error over the years into a readily, useable, reference form for its licensees (Finding 130).

It is quite frankly beyond the time this Court can make available in the context of a preliminary injunction and stretches the abilities of this Judge, notwithstanding his strong technical background, to make specific findings at this point as to which specific information contained in the manuals and identified by BIEC in Plaintiff's Post–Trial Proposed Findings of Fact 79–114, constitute confidential information without the aid of expert testimony which has been thoroughly cross examined. Final resolution of what specific portions of the manuals and minutes constitute trade secrets must await a final hearing, at which time this matter can be referred to a special master pursuant to Fed.F.Civ.P. 53. Given the highly voluminous nature of this case, and time limitations for discovery and a preliminary hearing, it would be unfair if we did not allow Defendants to respond once BIEC has fully identified the information it contends is secret. Accordingly, Findings 89, 95, 108, 111, 115, 117, 121 are not intended to be exhaustive, but rather are merely intended to provide examples of the kind of information for which we believe that BIEC has established a likelihood that it will succeed on the merits at a final trial in proving that at least some the information we have identified in these findings is confidential.

Although we have difficulty at this point making a final ruling on specific information in the manuals and minutes, we have no such difficulty with the manuals and minutes taken as a whole. Taken together, we have no trouble holding that the BIEC manuals—the technology, operating, marketing, and equipment manuals as well as the InterZAC, PacZAC, and OpZAC materials—qualify as legally protected trade secrets. It is well settled that technical processes, methods of manufacturing, operating parameters, procedures, or compilations of the foregoing represent trade secrets. *See e.g. SI Handling, Inc. v. Heisley,* 753 F.2d 1244, 1256–1257, 1258 (3d Cir.1985); *Reinforced Molding Corp. v. General Electric Co.,* 592 F.Supp. 1083, 1085 (W.D.Pa.1984); *Anaconda Co. v. Metric Tool & Die Co.,* 485 F.Supp. 410, 422 (E.D.Pa.1980); *Air Products and Chemi-*

*cals, Inc. v. Johnson,* 296 Pa.Super. 405, 418, 442 A.2d 1114, 1121 (1982). Although many of BIEC's parameters and procedures are in the public domain or subject to recreation through independent trial and error, BIEC's precise configuration, juxtaposition, and assemblage of this information is sufficient to constitute trade secrets. *SI Handling,* 753 F.2d at 1255, 1261–62 ("A trade secret may be no more than a slight mechanical advance over common knowledge and practice in the art."); *see also Anaconda,* 485 F.Supp. at 422. To paraphrase *SI Handling,* it is not the " 'ability' or 'experience' " of BIEC's employees, and more specifically the individual Defendants in this case who were responsible for developing and writing these manuals, "that we recognize as qualifying for trade secret protection, but rather the compiled products of that ability and experience that [have] been *recorded for repetitive use"* and which represent over thirty-years of BIEC investment dollars. *SI Handling,* 753 F.2d at 1262 (emphasis added).

We are mindful that BIEC's and the individual Defendants' ability to solve novel problems arising in the manufacture of 55% aluminum-zinc and experience to avoid past mistakes and failures (so called "negative know-how") is not protected as a trade secret but rather is precisely what the courts have deemed "[a] man's aptitude, skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment." *SI Handling,* 753 F.2d at 1255, 1262 (citations omitted). Defendants' "right to use and expand these powers remains [their] property." *Id.* Accordingly, that portion of BIEC's technology transfer which includes review of a licensee's engineering drawings and on-site trouble-shooting during start-up would not be protectable as trade secrets, except to the extent that BIEC's engineers refer to and rely on BIEC's manuals in solving these problems. The success of these problem-solving skills is wholly dependant on the knowledge and skill of BIEC's employees, and an employee can never be a trade secret.

We are convinced that the precautions which BIEC took to maintain the confidentiality of its manuals were sufficient to afford trade secret status. Trade secrets are not restricted to corporations which are run like maximum security prisons. BIEC's small facility is properly secured and the staff of nine is well aware of the importance and confidential nature of BIEC's information. (Findings 147–152). The individual Defendants and other senior employees of BIEC have contracts specifically requiring the maintenance of confidentiality, as do BIEC's technical consultants. Therefore, given the size of BIEC's office and the nature of its employees responsibilities which requires constant access to the manuals, BIEC need not, as Global Steel Services suggest, keep its manuals under twenty-four hour, lock and key, in order to maintain their trade secret status. In addition, BIEC marks each manual as "CONFIDENTIAL" and numbers and catalogues each copy. Thus, BIEC is at all times aware of the location of each confidential manual (Findings 156–62). And finally, all licensees and equipment suppliers sign and, to date, have abided by the terms of their written confidentiality agreements (Findings 153–55). It is well established that licensing one's technology to a third party does not place that technology in the public domain. *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974); *A.L. Laboratories, Inc. v. Philips Roxane,* 803 F.2d 378 (8th Cir.1986), *cert. denied,* 481 U.S. 1007, 107 S.Ct. 1632, 95 L.Ed.2d 206 (1987); *Ecolaire, Inc. v. Crissman,* 542 F.Supp. 196, 205–06 (E.D.Pa.1982). Taken together, we find that although the secrecy maintained is by no means absolute, BIEC's security is such that except by the use of improper means, one would have difficulty in acquiring the manuals. *See Ecolaire,* 542 F.Supp. at 206; *Anaconda Co. v. Metric Tool & Die Co.,* 485 F.Supp. 410, 422 (E.D.Pa.1980).

We are aware that Global Steel Services argues that since BIEC's confidentiality agreements are limited to a period of ten years, BIEC can claim no trade secret protection of information disclosed to pre-

1982 licensees. We disagree. Where as here, an agreement is expressed in writing and there is no ambiguity,[23] the language of the writing controls and the interpretation thereof is a question of law for this Court. *Dept. of Trans. v. Manor Mines*, 523 Pa. 112, 565 A.2d 428 (1989); *Brokers Title Co. v. St. Paul Fire & Marine Ins. Co.*, 610 F.2d 1174, 1178–79 (3d Cir.1979). The confidentiality agreements provide:

> For a period of 10 years from the date of disclosure to Licensee of Technical Information and information related to each Licensor Improvement, Licensee shall use reasonable efforts to maintain such information secret and confidential. Furthermore, Licensee shall not, except as provided under this Agreement, disclose such information to a third party or use such information for Licensee's own benefit except for the production of Licensed Products or research work related thereto.

(Pl.'s Ex. 173, Tab E, § 10.01.) As a matter of law, we find the confidentiality provision to have two separate components. First, for a ten year period, the licensee has an affirmative obligation to use reasonable efforts to maintain the information as confidential. Second, or "furthermore," [24] the licensee shall never intentionally disclose such information to third parties. The first requirement holds the licensee to a negligence like standard for ten years while the second forbids indefinitely all intentional disclosures. Contrary to Global Steel Services' assertions, nothing in the plain meaning of the language permits pre–1982 licensees to willfully or intentionally disclose confidential information, thereby stripping the BIEC manuals of their trade secret status. Having found that the manuals constitute a trade secret, Global Steel Services cannot argue that all information sought to be protected is publicly available and therefore not protected by the confidentiality clause of the contracts.

Based on the foregoing facts and conclusions of law, we find all BIEC manuals—the technology, operating, marketing, and equipment manuals as well as the Inter-ZAC, PacZAC, and OpZAC materials—qualify as legally protected trade secrets.

*B. BIEC's mailing lists and marketing information.*

■■■■ BIEC also seeks trade secret protection with respect to its customer lists, which include mailing lists (Pl.'s Ex. 105), lists of key customer contacts (Pl.'s Ex. 159) and correspondence files (Pl.'s Exs. 112–114) as well as its confidential marketing and business information, which include the terms of its license agreements (Pl.'s Exs. 67–69, 90, 159, 173), and its business plans, marketing strategies, and financial projections (Pl.'s Exs. 118, 119, 159).

Under Pennsylvania law, confidential customer lists have long been held to be trade secrets. *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1258 (3d Cir. 1985) (citing *American Ice Co. v. Royal Petroleum Corp.*, 261 F.2d 365 (3d Cir. 1958) and *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 136 A.2d 838 (1957)). As the Pennsylvania Supreme Court stated in *Morgan's Home:*

> In many businesses, permanent and exclusive relationships are established between customers and salesmen. The customer lists and customer information which have been compiled by such firms represent a material investment of employers' time and money. This information is highly confidential and constitutes a valuable asset. Such data has been held to be property in the nature of a 'trade secret' for which an employer is entitled to protection, independent of a nondisclosure contract, either under the law of agency, or under the law of unfair trade practices.

. . . . .

**23.** There is no evidence that the parties to the license agreements, BIEC and its licensees, have any dispute as to the meaning of the ten (10) year confidentiality provision (Finding 154). Although Global Steel Services has attempted to create such a dispute, Defendants' evidence was

insufficient to support such a finding and based on hearsay. (*Id.*)

**24.** Webster's defines "furthermore" to mean: "in addition to what precedes." *Webster's Third New International Dictionary*, (1981).

Whether this information was embodied in written lists or committed to memory is, we believe, of no significance; in either case the data are entitled to protection.

*Morgan's Home*, 390 Pa. at 623–24, 136 A.2d at 842–43. Similar protection has been extended to certain business and marketing information including the costing and pricing information of an employer's product or services, an employer's business plans, marketing strategies, and financial projections, and the terms of specific customer accounts including contract expiration dates and revenues generated. *See e.g. SI Handling*, 753 F.2d at 1260 (cost and pricing information); *Union Carbide Corp. v. UGI Corp.*, 731 F.2d 1186, 1191 (5th Cir.1984) (applying Pennsylvania law) (marketing information and strategies); *Air Products and Chemicals, Inc. v. Johnson*, 296 Pa.Super. 405, 418–20, 442 A.2d 1114, 1121 (1982) (business plans and financial projections); *Alexander & Alexander, Inc. v. Drayton*, 378 F.Supp. 824, 833 (E.D.Pa.), *aff'd*, 505 F.2d 729 (3d Cir.1974) (the terms of specific customer accounts). Customer lists and confidential business information cannot be trade secrets if they are easily or readily obtained, without great difficulty, through some independent source other than the trade secret holder. *General Business Services, Inc. v. Rouse*, 495 F.Supp. 526, 530 (E.D.Pa.1980) (citing *Van Products Co. v. General Welding & Fabricating Co.*, 419 Pa. 248, 213 A.2d 769, 777 (1965) and *Denawetz v. Milch*, 407 Pa. 115, 178 A.2d 701, 704–705 (1962)); *see SI Handling*, 753 F.2d 1244, 1258–59 (3d Cir. 1985). Accordingly, courts have denied protection to customer lists which are easily generated from trade journals, ordinary telephone listings, or an employee's general knowledge of who, in an established industry, is a potential customer for a given product. *S.I. Handling*, 753 F.2d at 1258; *Van Products Co. v. General Welding and Fabrication Company*, 419 Pa. 248, 263, 213 A.2d 769, 777 (1965); *Spring Steels, Inc. v. Molloy*, 400 Pa. 354, 358, 162 A.2d 370 (1960).

BIEC's exhaustive mailing list comprises names and addresses of BIEC customers and critical industry contacts which have been developed over the years (Finding 142). While many of the names and much of the information on these lists and in these files is readily ascertainable to one working in the steel industry or easily discoverable by reference to standard trade journals (Finding 142), the exhaustive compilation represents a significant investment of time and money on the part of BIEC and its predecessors and assures BIEC ready communication with the steel industry, a competitive value not to be underestimated. *Accord General Business*, 495 F.Supp. at 530 (granting trade secret protection where only some but not all of the names on a list were readily ascertainable to one familiar with the industry). Moreover, as part of his job description, each Defendant was paid to obtain licensees and to establish contacts in the steel industry (Findings 4–7, 36, 49, 75, 142, 145). Accordingly, Global Steel Services cannot argue that BIEC's mailing lists are not trade secrets merely because the Defendants are largely responsible for their compilation. *Accord Robinson Electronic Supervisory Co. v. Johnson*, 397 Pa. 268, 270, 154 A.2d 494, 495 (1959) (affording trade secret protection to customer lists prepared by the defendant on grounds that the defendant was specifically hired to prepare such lists); *compare Fidelity Fund, Inc. v. Di Santo*, 347 Pa.Super. 112, 122, 500 A.2d 431, 437 (1985) (denying trade secret protection to customer lists compiled by defendant prior to his employment with plaintiff). Similarly, we believe that BIEC's lists of key contacts (Pl.'s Ex. 159) and BIEC's correspondence files (Pl.'s Ex. 112–114) should be afforded protection, irrespective of the format in which they are maintained. *See Morgan's Home*, 390 Pa. at 623–24, 136 A.2d at 842–43. Taken together they ensure BIEC's ready communication with the steel industry. Accordingly, the Defendants must return BIEC's mailing list, key contact lists, and correspondence files. We note, however, that since none of these lists were used by the Defendants in compiling their own customer/mailing list, BIEC has suffered no injury (Finding 142).

On the other hand, the Defendants' individual rolodex files, whether maintained in a computer file prepared by BIEC secretaries or maintained in a manual file, are not trade secrets of BIEC. The fact that many of these names appear on BIEC's mailing list or in BIEC's correspondence files is irrelevant. Both BIEC and Global Steel Services target large steel-makers around the world with production facilities and/or equipment manufacture facilities sufficient to produce 55% aluminum-zinc coated sheet steel (Findings 35, 142–43). Anyone working in the steel world knows who these manufacturers are. Moreover, the Third Circuit has expressly held that an employee's personal business contacts, although made while in plaintiff's employ, are not plaintiff's trade secrets. *SI Handling*, 753 F.2d at 1258. Quoting the Pennsylvania Supreme Court, the Third Circuit noted:

> It is not a phenomenal thing in American business life to see an employee, after a long period of service, leave his employment and start a business of his own or in association with others. And it is inevitable in such a situation, where the former employee has dealt with customers on a personal basis that some of those customers will want to continue to deal with him in his new association. This is so natural, logical and part of human fellowship, that an employer who fears this kind of future competition must protect himself by a preventive contract with his employee. . . .

*Id.* (quoting *Spring Steels v. Molloy*, 400 Pa. 354, 363, 162 A.2d 370, 375 (1960)). Accordingly, we find no reason to enjoin the Defendants from using their personal rolodex files, although largely developed while in BIEC's employ.

We find many of the details of BIEC's license agreements, business plans, financial projections, and marketing strategies, including BIEC's Market Mill project, to enjoy trade secret protection. *See e.g. SI Handling*, 753 F.2d at 1260 (affording trade secret protection to costing and pricing information relating to plaintiff's materials, labor, overhead, and profit margin); *Union Carbide*, 731 F.2d at 1191 (applying Pennsylvania law) (affording trade secret protection to marketing information and strategies); *Air Products*, 296 Pa.Super. at 418–20, 442 A.2d at 1121 (affording trade secret protection to business plans and financial projections); *Alexander & Alexander*, 378 F.Supp. at 833 (affording trade secret protection to the terms of specific customer accounts).

This is not information which is readily obtained through independent sources and is treated as highly confidential by BIEC. BIEC has devoted substantial time and money to negotiate its twenty-three (23) licensees over the last twenty (20) years. Some of these agreements took up to three (3) years to close. The expiration date of these license agreements, the amount of income generated, or the terms of the exclusive licenses is clearly peculiar and important to BIEC's business and a competitor like Global Steel Services who is already armed with such premium data. While some of this information might be easily obtainable by merely asking BIEC's licensees, all of whom are well-known in the industry as the sole producers of GAL-VALUME, a licensee whose contract is about to expire is not likely to share price information with a prospective licensor in order to protect the licensee's own competitive advantage during negotiations with any such prospective licensor. *Compare Fidelity Fund*, 347 Pa.Super. at 122, 500 A.2d at 437 (denying trade secret protection to policy expiration dates on grounds that such information is readily obtainable by contacting policyholders directly).

Similarly, the Defendants knowledge, as former BIEC executives, of BIEC's licensing procedures, BIEC's projected spending, the details of research and development projects, like the Market Mill study, and BIEC's target markets, could enable Global Steel Services to thwart BIEC's plans and to compete without the burden of testing and market analysis born by BIEC. Accordingly, we find the Defendants' collective knowledge of BIEC's market related information to encompass several BIEC business opportunities, and as such, to comprise confidential information protectable

under the trade secret laws. *See e.g. Air Products*, 296 Pa.Super. at 418–20, 442 A.2d at 1121; *Alexander & Alexander*, 378 F.Supp. at 833.

### C. *Global Steel Services' misappropriation of BIEC trade secrets.*

 Having found that BIEC's manuals and certain marketing information including BIEC's mailing lists, license agreements, business plans, financial projections, and marketing strategies are legally protected trade secrets, we turn now to the question of whether Global Steel Services has misappropriated these secrets. To be entitled to an injunction against use or disclosure of information under Pennsylvania law, in addition to establishing that the information constitutes a trade secret, a plaintiff must show: (1) that it was of value to the employer and important in the conduct of his business; (2) that by reason of discovery or ownership the employer had the right to the use and enjoyment of the secret; and (3) that the secret was communicated to the defendant while employed in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer. *See SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1255 (3d Cir.1985) (citing *Felmlee v. Lockett*, 466 Pa. 1, 8, 351 A.2d 273, 277 (1976) and *MacBeth–Evans Glass Co. v. Schnelbach*, 239 Pa. 76, 87, 86 A. 688, 691 (1913)); *Healthcare Affiliated Services, Inc. v. Lippany*, 701 F.Supp. 1142, 1153 (E.D.Pa.1988); *West Mountain Poultry v. Gress*, 309 Pa.Super. 361, 365, 455 A.2d 651, 652–53 (1982); *Air Products and Chemicals, Inc. v. Johnson*, 296 Pa.Super. 405, 418, 442 A.2d 1114, 1120 (1982).

There is no question on the record before us that BIEC's manuals and marketing information are valuable to BIEC and owned by BIEC. As we have found, BIEC's business involves the licensing of confidential information relating to 55% aluminum-zinc coatings, a business in which BIEC has been highly successful. For the period 1980 to 1991, BIEC has collected more than $61 million in fees and royalties. BIEC's 55% aluminum-zinc technology continues to be unique and highly valuable intellectual property. There are approximately two dozen producers of 55% aluminum-zinc coated sheet steel in the world, and all of them are licensees of BIEC. (Findings 33–59). Accordingly, we focus on the third element of BIEC's misappropriation claim—whether the secrets were communicated to the Defendants while employed in a position of trust and confidence under such circumstances as to make it inequitable and unjust for them to disclose the secrets to others.

There is no dispute that each of the Defendants gained their knowledge and expertise in the area of 55% aluminum-zinc coated sheet steel after thirty years of researching, developing,. and licensing the product for their employer, BIEC and. its corporate predecessors (Findings 4–7, 17, 34, 36, 49, 73, 75, 145–46). Nor can there be any dispute that the Defendants were employed in a position of trust and confidence. Each of the Defendants testified that they were aware of and understood the confidential and proprietary nature of their work at BIEC (Findings 45, 150, 156, 159, 162). Moreover, in August 1986, each of the Defendants signed an employment contract with BIEC expressly recognizing and agreeing:

> Employer's business and continued success depend upon the use and protection of a large body of confidential and proprietary information. All of such confidential and proprietary information now existing or to be developed in the future will be referred to in this Agreement as "Employer Secrets." Employee intends that the meaning of "Employer Secrets" in this Agreement will be read as broadly as possible to include all information of any sort (whether merely remembered or embodied in a tangible medium) which (i) is related to Employer's business or any of Employer's potential future business and (ii) is not generally and publicly known.

(Pl.'s Exs. 50, 58, 61, 62). As discussed above, BIEC's manuals, mailing lists, license agreements, business plans, financial projections, and marketing strategies, "re-

**548**

lat[e] to [BIEC's] business or any of [BIEC's] potential future business and . . . [are] not generally and publicly known." Therefore, under the express terms of the contract, Defendants have agreed not to disclose BIEC's trade secrets, whether "merely remembered or embodied in a tangible medium."

██ Under Pennsylvania law, the duty of an employee not to disclose the secrets of his employer may arise either from an express contract, or may be implied from the confidential relationship existing between the employer and employee. *Healthcare Affiliated Services, Inc. v. Lippany,* 701 F.Supp. 1142, 1152 (W.D.Pa. 1991); *Anaconda Co. v. Metric Tool & Die Co.,* 485 F.Supp. 410, 424 (E.D.Pa.1980); *Felmlee v. Lockett,* 466 Pa. 1, 8, 351 A.2d 273, 276 (1976); *Air Products and Chemicals, Inc. v. Johnson,* 296 Pa.Super. 405, 442 A.2d 1114 (1982). Accordingly, it appears, under these circumstances, the individual Defendants have both a contractual and an implied obligation not to disclose BIEC's trade secrets.

Global Steel Services argues that the confidentiality clause in the Defendants' employment contracts is unenforceable for three reasons: (1) BIEC has breached the severance pay provision of the contracts and therefore cannot claim protection under the confidentiality clause; (2) the information sought to be protected by BIEC is publicly available and thus unprotected under the specific contract language, and (3) the confidentiality clause directly conflicts with the contracts' non-compete clause, and as such, is ambiguous and should not be enforced. We disagree. Having just found that the individual Defendants have an obligation under the law not to disclose their employer's trade secrets under any circumstances, *Felmlee v. Lockett,* 466 Pa. 1, 8, 351 A.2d 273, 276 (1976), *Air Products and Chemicals, Inc. v. Johnson,* 296 Pa.Super. 405, 420–21, 442 A.2d 1114, 1122

(1982), the enforceability of the confidentiality clause is irrelevant. Moreover, the Defendants have failed to put forth sufficient evidence to prove that BIEC has breached the severance pay provision of the contracts,[25] and this Court has explicitly held that BIEC's trade secrets are not publicly known. Recognizing the extent to which the individual Defendants right to earn a living is at stake in this case, we consider Global Steel Services' argument with respect to the contracts' non-compete clause more carefully.

██ Under the terms of the non-compete clause, BIEC could only prevent the individual Defendants from competing with it if the Defendants were terminated for cause. It is undisputed on the facts of this case that the Defendants were not terminated "for cause" and, as such, are free to compete with BIEC to the extent possible without disclosing BIEC's trade secrets (Findings 200, 205). Pennsylvania law makes clear, however, that a court must enjoin an employee from competing with his ex-employer to the extent necessary to protect the ex-employer's trade secrets, even if the employee is free to compete, i.e. is not bound by a covenant not-to-compete. *See e.g. Lippany,* 701 F.Supp. at 1153; *Anaconda,* 485 F.Supp. at 424; *Air Products,* 296 Pa.Super. at 420–21, 442 A.2d at 1122. Accordingly, the fact that enforcement of the confidentiality clause may limit the Defendants' ability to compete in the area of 55% aluminum-zinc coated sheet steel makes the confidentiality clause no less enforceable but merely speaks to the scope of any injunction ordered by this Court. *See* Discussion *infra* at 551–552.

Taken together, we find that BIEC has established a likelihood of success on the merits of its claim that Global Steel Services and the individual Defendants are likely to misappropriate BIEC's trade secrets.

**25.** Defendants have failed to put forth sufficient evidence in the context of this preliminary hearing to conclude that the Defendants were terminated for "corporate or holding company reasons *unrelated to the performance of the business of employer* or the performance of employee." (emphasis added) *See* Findings 204, 205, and Pl.'s Exs. 50, 58, 61, 62. Accordingly, Defendants' claim for severance pay must await final resolution of the Defendants' pending state court action in the Northampton County Court of Common Pleas (Finding 11).

## III. BIEC'S REMAINING CLAIMS.

 BIEC argues that by approaching existing and prospective BIEC licensees in an effort to sell services related to 55% aluminum-zinc coatings, Global Steel Services and the individual Defendants have tortiously interfered with BIEC's contractual relations, diverted corporate opportunities belonging to BIEC, and have entered into an unlawful conspiracy. With the exception of Global Steel Services proposal to existing BIEC licensees, in which Global Steel Services attempted to induce BIEC licensees to breach their confidentiality agreements with BIEC (Finding 254), we disagree.

Pennsylvania has adopted Section 766 of the Restatement (Second) of Torts (1979) that provides for a cause of action in intentional interference with contract when an entity "intentionally and improperly interferes with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract." *See e.g. Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 482 Pa. 416, 431, 393 A.2d 1175, 1183 (1978), *cert. denied*, 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979); *Allied Security, Inc. v. Security Unlimited, Inc.*, 265 Pa.Super. 297, 401 A.2d 1219 (1979). Similarly, an employee who improperly and unfairly competes with his employer could be liable for diverting corporate opportunities. *See Lutherland, Inc. v. Dahlen*, 357 Pa. 143, 151, 53 A.2d 143, 147 (1947); *Food Fair Stores, Inc. v. Unemployment Comp. Bd.*, 11 Pa. Commw. 535, 538, 314 A.2d 528, 529 (1974); Restatement (Second of Agency § 393 (1958). And finally, under Pennsylvania law, "[a] civil conspiracy is a combination of two or more persons to do an unlawful or criminal act or to do a lawful act by unlawful means or for an unlawful purpose." *Landau v. Western Pennsylvania National Bank*, 445 Pa. 217, 224, 282 A.2d 335, 339 (1971) (citations omitted).

Taken together, nothing in the common law prohibits Global Steel Services from lawfully competing with BIEC. Lawful competition includes soliciting business from licensees whose contracts with BIEC are about to expire and includes soliciting contracts with prospective licensees even if BIEC's exclusive territories will be upset. BIEC's common law claims will not prohibit healthy competition. To the extent that Global Steel Services cannot compete without disclosing BIEC's trade secrets, BIEC's remedy lies in the trade secret law and not the common law.

On the other hand, we believe that Global Steel Services' proposed joint venture to existing BIEC licensees under which Global Steel Services attempted to induce licensees to breach their confidentiality clause with BIEC is precisely the kind of interference with existing contractual relations and diversion of corporate opportunity the common law was designed to protect. *See e.g. Adler, Barish, Daniels*, 482 Pa. at 431, 393 A.2d at 1183; *Lutherland, Inc.*, 357 Pa. at 151, 53 A.2d at 147; Accordingly, we find that BIEC has established a likelihood of success on the merits of its common law claims.

## IV. IRREPARABLE HARM, BALANCING THE HARMS, AND THE PUBLIC INTEREST.

 Based on the foregoing discussion and the evidence presented, we believe that BIEC has established a likelihood of success on the merits of its claims: (1) that Global Steel Services and the individual Defendants have engaged and continue to engage in unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) that Global Steel Services and the individual Defendants are in the process of and will continue to misappropriate BIEC's trade secrets; (3) that Global Steel Services and the individual Defendants have intentionally interfered with BIEC's contractual relationships; (4) that Global Steel Services and the individual Defendants have diverted corporate opportunities belonging to BIEC; and (5) that Global Steel Services and the individual Defendants have unlawfully conspired to compete with BIEC.

Absent injunctive relief, BIEC will suffer irreparable harm. BIEC has been able to

obtain its reputation and competitive advantage only through substantial investments associated with its trade secrets and confidential information in 55% aluminum-zinc technology and development of wide spread use and acceptance of its GALVALUME trademark. If Global Steel Services is permitted to compete with BIEC in the area of 55% aluminum-zinc coatings, BIEC and its licensees will be irreparably harmed. Defendants' presence in the market has upset BIEC's current status as the sole provider of services related to 55% aluminum-zinc coatings and the sole owner of the GALVALUME trademark. If the Defendants are permitted to compete with BIEC in the area of 55% aluminum-zinc coatings: the market and price level for BIEC's services and its licensees' products is likely to be damaged forever; BIEC's relationships and business opportunities with its target licensees will be irreparably harmed; millions of dollars in fees, royalties, capital expenditures and equipment and marketing costs invested by BIEC and its licensees throughout the world will be jeopardized; and exclusive licensees will contemplate terminating their licenses if Global Steel Services transfers the technology to their territorial competitors (Findings 266–78). Taken together, BIEC will suffer irreparable harm if this hard-earned competitive edge is not protected. Similarly, if Global Steel Services continues to confuse the marketplace with its use of the GALVALUME trademark in its promotional literature or with its strikingly similar logo, BIEC's goodwill and reputation will be irreparably injured.

On the other hand, if enjoined, Global Steel Services will also suffer substantial harm. Forand, Borzillo, and Shin have devoted almost their entire professional lives to the field of 55% aluminum-zinc coatings. Although they have the expertise to provide limited services in the area of other hot-dip coatings, services associated with 55% aluminum-zinc coatings are truly the only commercially viable business available to Global Steel Services and to Forand, Borzillo, and Shin. If Global Steel Services is denied the right to consult and provide services associated with 55% aluminum-

zinc, the business will almost certainly end (Findings 279–85).

The public interest also weighs in favor of both parties. "Public interest can be defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir.1990). Accordingly, the public interest clearly favors the protection of the GALVALUME trademark and the BIEC logo.

BIEC's trade secret claim is more problematic, however, particularly where, as here, any injunction will severely encroach on the Defendants' ability to pursue the livelihood of his choice. As so aptly stated by the Pennsylvania Superior Court:

[T]he right of a business person to be protected against unfair competition stemming from the usurpation of his or her trade secrets must be balanced against the right of an individual to the unhampered pursuit of the occupations and livelihoods for which he or she is best suited. A further consideration in support of protecting certain information is to encourage technological development by assuring the creator that he will be given the first chance to reap the benefits of his creation.

*Fidelity Fund, Inc. v. Di Santo*, 347 Pa.Super. 112, 121–22, 500 A.2d 431, 436 (1985). Given the magnitude of the resources BIEC and its predecessors have devoted to the technological development and licensing of services related to the manufacture of 55% aluminum-zinc coated sheet steel, we must enjoin the Defendants from using BIEC's trade secrets. The economic strength and growth of this country is due in large part to the vast amounts of time and money corporate America has devoted to large-scale research and development projects like this. As noted by *Milgram* § 5.02[2], trade secret "protection encourages the development and use, to the consuming public's advantage, of new and improved methods, techniques, ideas and concepts."

In light of the vast amounts of technical and business information the Defendants have committed to memory by virtue of a lifetime career in the area of 55% aluminum-zinc coatings, we believe it would be impossible for the Defendants to compete in this area without drawing on at least some BIEC's confidential material. These are the individuals who are responsible for much of the research and development that went into the technology, who are co-inventors on two of the patents, who assisted in the start-up of twenty-two (22) of the twenty-three (23) existing 55% aluminum-zinc lines, and who are responsible for negotiating most of the existing BIEC license agreements. There is no question that many of the charts, tables and parameters contained in the BIEC manuals have been committed to the Defendants' memory, as well as the details of the license agreements, and the specifics of BIEC's business plans and strategies. Thus, an order merely barring disclosure of certain items or types of information would be impossible to obey. Furthermore, to deny BIEC a remedy until after a disclosure has been made would be to deny a remedy altogether. Equity will enjoin action when there is substantial threat of injury, without waiting for the injury to be inflicted. Accordingly, we must enjoin Global Steel Services and the individual defendants from competing in the area of 55% aluminum-zinc technology, at least for some period. *Air Products*, 296 Pa.Super. at 420–22, 442 A.2d at 1122.

In tailoring our injunction, we cannot ignore the implicit problems when an employee is asked "to work in a trade secret area and thereby circumscribe his possible future liberty of action and the use of the knowledge and skills which are inextricably interwoven with his knowledge of the trade secrets." *E.I. Du Pont de Nemours & Co. v. American Potash & Chem. Corp.*, 41 Del.Ch. 533, 200 A.2d 428, 437 (1964). The ideal resolution to this problem would be to require that employers protect the competitive advantage derived from their trade secrets with reasonable covenants not-to-compete rather than leaving a delicate balancing of the equities to the court, as in this case.

On the facts before us where we are convinced that an experienced galvanizer would in time be able to recreate the trade secrets contained in BIEC's manuals, a "lead-time" injunction would be most appropriate, "whereby the trade secret injunction lasts only so long as is necessary to negate the advantage the misappropriator would otherwise obtain." *S.I. Handling*, 753 F.2d at 1266. Accordingly, and in light of the equities presented by this case and absent evidence at the final hearing that this time should be extended, our injunction will be limited to one year from the date of the filing of this action by BIEC, namely, January 8, 1992. We choose this time period for the following reasons.

First, the evidence shows that many of BIEC's non-technical trade secrets, like its financial projections and its business plans and strategies will be obsolete within one year and will no longer provide Global Steel Services with any competitive advantage. And while the terms of at least BIEC's most recent license agreements will be in effect for another ten years, this is information which we believe could be researched and collected over the period of one year.

Second, once BIEC's mailing lists are returned, there will be no danger of unfair competition, because no one can commit all of those names and addresses to memory. Moreover, the fact that the Defendants may remember names of the list is irrelevant because, while the Defendants may not appropriate the specific data on BIEC's lists (i.e. addresses and phone numbers), the Defendants are free to use their well-known industry contacts without violating the trade secret laws.

Third, the human memory, as amazing as it is, is unquestionably limited. Although the Defendants have committed vast amounts of technical information to memory, what has been committed to memory cannot compare with the 30,000 pages of material contained in the manuals. Without having the manuals for easy reference

and having been enjoined from all competition for one year, we are convinced that the Defendants will in fact have to recreate most of the relevant tables and charts. Absent evidence of specific trade secrets within the manuals and evidence of how long it would take an experienced galvanizer to recreate those secrets, we cannot enjoin the Defendants longer than necessary to protect BIEC's competitive advantage vis-a-vis those business trade secrets for which BIEC has met its burden of proof.

Had the parties covenant not-to-compete been enforceable, it would have been limited to the span of one year's time. Accordingly, we are merely enforcing a bar to competition which the parties believed to be reasonable and which protects BIEC from the unlawful use of those trade secrets it has proven. To restrain competition for more than one year would unduly restrain healthy competition in the market. The 55% aluminum-zinc technology has matured over the last two decades. Commercial product 55% aluminum-zinc sheet has been produced since 1972 and today millions of tons of 55% aluminum-zinc coated sheet steel is produced yearly. Unlike a revolutionary car-on-track materials handling system (the *SI Handling* case) or an entirely new method for distributing natural gas (the *Air Products* case), 55% aluminum-zinc is nearly thirty years old. Despite its maturity, technical services associated with 55% aluminum-zinc coatings are currently provided in the world market by only one company, BIEC. While Global Steel Services may not use BIEC's manuals to compete, Global Steel Services may and should be encouraged to create its own.[26]

Accordingly, we will enjoin the Defendants from competing in the area of 55% aluminum-zinc coatings (hot-dip coatings in the area of 25% to 70% aluminum)[27] for

one year from the filing of this lawsuit by BIEC, namely, from January 8, 1992. Although the Defendants have technically been competing with BIEC since their termination, pending the outcome of this lawsuit, no one in the 55% aluminum-zinc industry has been willing to deal with them. Moreover, in light of the time and expense devoted to defending this lawsuit, there has in fact been no appreciable competition since January 8, 1992.

## V. CONCLUSIONS OF LAW.

1. The GALVALUME trademark is valid, legally protected, and owned by BIEC.

2. BIEC exerts a sufficiently high degree of control over the quality of its licensees' product to protect the validity of the trademark.

3. The fact that three trade journals have routinely used the term GALVALUME without attribution to BIEC within the last year and one-half is insufficient, in and of itself, to constitute abandonment.

4. BIEC has failed to establish any false or misleading statements in Global Steel Services' August 2, 1992 press release or in those promotional letters quoted in Finding 163c, e (last sentence only), f, g, and h.

5. BIEC has established a likelihood of success in proving that those statements in the promotional literature quoted in Finding 263a, b, d, e, and l, which suggest that Global Steel Services can assist its customers in producing genuine GALVALUME constitute misuse of the GALVALUME trademark.

6. BIEC has established a likelihood of success in proving that the Global Steel Services logo is confusingly similar to the former BIEC logo.

---

**26.** In recognizing that the 55% aluminum-zinc market is ripe for competition, we are not unmindful of recent activities of BIEC and its parent corporation Broken Hill Proprietary. While we find insufficient evidence to make any specific findings of unclean hands, we believe that in the right forum, Broken Hill Proprietary and BIEC might be held liable for certain anticompetitive practices. (Findings 167–182.)

**27.** We are mindful of our duty to limit the breadth of our injunction and have limited our Order to those applications in the range of 25% to 70% aluminum in accordance with the coating bath compositions of the original patents (Findings 25–27).

7. BIEC has failed to establish that Global Steel Services' collaboration with Joseph O'Keefe, an attorney who previously performed legal services for BIEC, can be construed as a false or misleading use of a "word, term, name, symbol, or device ... in connection with any goods or services." 15 U.S.C. § 1125(a).

8. BIEC has established a likelihood of success in ultimately proving that at least some of the information contained in its manuals, as enumerated in Findings 89, 95, 108, 111, 115, 117, and 121 is confidential.

9. BIEC has established a likelihood of success in proving that its technology, operating, marketing, and equipment manuals as well as the InterZAC, PacZAC, and OpZAC materials qualify as legally protected trade secrets.

10. BIEC has failed to prove a single step-by-step secret process for manufacturing 55% aluminum-zinc coatings.

11. The individual Defendant's ability to solve novel problems arising in the manufacture of 55% aluminum-zinc coatings and experience to avoid past mistakes and failures (so called "negative know-how") is not protected as a trade secret but rather is precisely what the courts have deemed an employee's skill and experience.

12. BIEC's exhaustive mailing list (Pl.'s Ex. 105), correspondence files (Pl.'s Ex. 112–114), and lists of key contacts (Pl.'s Ex. 159) are protected trade secrets, although some but not all of the names are widely known in the industry or readily available in trade journals.

13. BIEC can claim no trade secret protection in the Defendants' personal rolodex files, whether maintained in a computer file prepared by BIEC secretaries or maintained in a file. An employee's personal business contacts, although made while in plaintiff's employ, are not plaintiff's trade secrets.

14. BIEC has established a likelihood of success in proving that the details of BIEC's license agreements, business plans, financial projections, and marketing strategies enjoy trade secret protection.

15. The individual Defendants have a contractual and implied duty not to disclose BIEC's trade secrets.

16. BIEC's security is sufficient to maintain the secrecy of its trade secrets.

17. BIEC has established a likelihood of success on the merits of its claim that Global Steel Services and the individual Defendants are likely to misappropriate BIEC's trade secrets. Accordingly, we must enjoin the Defendants from competing with BIEC to the extant necessary to protect BIEC's trade secrets, not-with-standing the fact that the Defendants are contractually free to compete.

18. BIEC has established a likelihood of success on its claims that the Defendants conspired unlawfully to interfere with BIEC's contractual relations and corporate opportunities.

19. BIEC is being immediately and irreparably harmed by the Defendant's use of a confusingly similar logo, certain uses of the GALVALUME trademark, use of BIEC's trade secrets, and the Defendants' unlawful conspiracy to interfere with BIEC's contractual relations and corporate opportunities.

20. The issuance of a preliminary injunction would not harm Global Steel Services and the individual Defendants more than a denial of the injunction would harm BIEC.

21. The issuance of a preliminary injunction furthers the public interest.

## VI. CONCLUSION.

Taken together, we find the equities in this case weigh in favor of a limited, one-year trade secret injunction against Global Steel Services and the individual Defendants. In addition, Global Steel Services and the individual Defendants must be enjoined from using the GALVALUME trademark in its promotional literature in a manner which suggests that Global Steel Services can assist its clients in manufacturing genuine GALVALUME, and Global Steel Services and the individual Defendants

must also be enjoined from using the BIEC logo.

An appropriate order follows.

## ORDER

AND NOW, this 5th day of May, 1992, upon consideration of Plaintiffs' Motion For Preliminary Injunction and the testimony presented in open court, and it appearing to the Court that BIEC International, Inc. is likely to succeed on the merits of its claims against Global Steel Services, Ltd., James L. Forand, Jr., Angelo R. Borzillo, James J. Connolly, and Paik W. Shin (the "Defendants"); that the irreparable harm to BIEC International, Inc. in the absence of a preliminary injunction outweighs any harm that may befall the Defendants upon the entry of a preliminary injunction; and that the public interest requires the entry of a preliminary injunction; and for other good cause shown, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that said MOTION be and hereby is GRANTED and that a PRELIMINARY INJUNCTION against the Defendants is hereby GRANTED consistent with the foregoing decision as follows:

1. enjoining and restraining Defendants, and any persons or entities acting under their direction, control or in concert therewith, from being engaged in, directly or indirectly, the business of selling, licensing, consulting on or servicing technology for hot-dip coatings of sheet steel in the range of 25% to 70% aluminum (hereafter "55% aluminum-zinc technology") for a period of one year from the date of the filing of this action by BIEC, namely, from January 8, 1992;

2. enjoining the Defendants, and any persons or entities acting under their direction, control or in concert therewith, from soliciting or contacting, directly or indirectly, licensees, potential licensees or competitors of licensees of BIEC with respect to 55% aluminum-zinc technology for a period of one year from the date of the filing of this action by BIEC, namely from January 8, 1992;

3. enjoining the Defendants, and any persons or entities acting under their direction, control or in concert therewith, from directly or indirectly, disclosing or requesting anyone to disclose any trade secrets of BIEC and from using in any way any trade secrets of BIEC;

4. enjoining the Defendants, and any persons or entities acting under their direction, control or in concert therewith, from soliciting or aiding anyone to improperly breach any contract with or legal obligation to BIEC;

5. enjoining the Defendants, and any persons or entities acting under their direction, control or in concert therewith, from directly or indirectly, requesting any current or former BIEC licensee to disclose any trade secrets or "Technical Information," as defined in the BIEC license agreements,[28] pertaining to the 55% aluminum-zinc technology transferred to the licensee by BIEC;

6. enjoining Defendants, and any persons or entities acting under their direction, control or in concert therewith, from using the present Global Steel Services' logo or any similar logo in any trade or business;

7. enjoining the Defendants, and any persons or entities acting under their direction, control or in concert therewith, from referring to or using the GALVALUME trademark in any manner which suggests that the Defendants can sell, license, consult on or provide services related to genuine GALVALUME;

8. ordering the Defendants to return to BIEC, within FIVE DAYS of the date of this Order, any and all documents, drawings, computer disks, technical information and other tangible records of BIEC or taken from BIEC, including all copies and adaptations of such documents, data, information, and records. BIEC shall provide receipts for all returned items.

**28.** See Finding of Fact 153 in our Decision of May 5, 1992 for the full definition of "Technical Information."

IT IS FURTHER ORDERED AND DE-CREED:

1. that Defendants' Motion to Dismiss Count I of Plaintiffs' Complaint is DISMISSED as moot;

2. that within FIVE DAYS of the date of this Order a bond be filed by BIEC International, Inc. in the sum of $15,000.00 conditioned for payment of such costs and damages as may be incurred or suffered by Global Steel Services, Ltd., James L. Forand, Jr., Angelo R. Borzillo, James J. Connolly, and Paik W. Shin;

3. that this Preliminary Injunction shall continue in full force and effect until further Order of this Court.

4. Within TWENTY-ONE DAYS of the date of this Order, Plaintiff and Defendants shall submit no more than ten (10) names of persons who are qualified and willing to act as a Special Master pursuant to Fed.R.Civ.P. 53(a).